# CONVERTINO v. UNITED STATES DEPARTMENT OF JUSTICE

## JONATHAN TUKEL

### April 24, 2009

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888   FAX: 248.644.1120

www.bienenstock.com

JONATHAN TUKEL
April 24, 2009

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


RICHARD CONVERTINO,

     Plaintiff,

vs.                    Case No. 07-CV-13842-DT

                          Hon. Robert H. Cleland

UNITED STATES DEPARTMENT OF

JUSTICE,

     Defendant.

_____


The Deposition of JONATHAN TUKEL,

Taken at 801 West Ann Arbor Trail, Suite 233,

Plymouth, Michigan,

Commencing at 9:05 a.m.,

Friday, April 24, 2009,

Before Viola Newman, CSR-4320, RPR.



JONATHAN TUKEL
April 24, 2009

Page 2

1   APPEARANCES:
2
3   STEPHEN M. KOHN
4   ERIK J. SNYDER
5   Kohn, Kohn & Colapinto
6   3233 P Street NW
7   Washington, D.C. 20007
8   202.342.6980
9      Appearing on behalf of the Plaintiff.
10
11  LENORE M. FERBER
12  Convertino & Associates
13  801 West Ann Arbor Trail, Suite 233
14  Plymouth, Michigan 48170
15  734.927.9900
16     Appearing on behalf of the Plaintiff.
17
18  JONATHAN E. ZIMMERMAN
19  JEFFREY M. SMITH
20  SCOTT A. RISNER
21  U.S. Department of Justice
22  20 Massachusetts Avenue NW
23  Washington, D.C. 20530
24  202.514.2395
25     Appearing on behalf of the Defendant.

Page 3

1   ALSO PRESENT:
2   Peter Fu
3   Richard Convertino
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                TABLE OF CONTENTS
2   WITNESS                        PAGE
3   JONATHAN TUKEL
4
5   EXAMINATION                      5
6   BY MR. KOHN:
7   EXAMINATION                    288
8   BY MR. SMITH:
9
10              EXHIBITS
11  EXHIBIT                        PAGE
12  (Exhibits attached to transcript.)
13
14  DEPOSITION EXHIBIT 1            61
15  DEPOSITION EXHIBIT 2            65
16  DEPOSITION EXHIBIT 3            93
17  DEPOSITION EXHIBIT 4           106
18  DEPOSITION EXHIBIT 5           164
19  DEPOSITION EXHIBIT 6           182
20  DEPOSITION EXHIBIT 7           189
21  DEPOSITION EXHIBIT 8           203
22  DEPOSITION EXHIBIT 9           225
23  DEPOSITION EXHIBIT 10          262
24
25

Page 5

1   Plymouth, Michigan
2   Friday, April 24, 2009
3   9:05 a.m.
4
5           JONATHAN TUKEL,
6     was thereupon called as a witness herein, and after
7     having first been duly sworn to testify to the truth,
8     the whole truth and nothing but the truth, was
9     examined and testified as follows:
10          MR. KOHN:  Steven M. Kohn, K-O-H-N,
11  attorney for Mr. Convertino.
12          MR. SMITH:  Jeffrey M. Smith for the
13  Department of Justice, representing the Defendant,
14  Department of Justice.
15          MR. ZIMMERMAN:  Jonathan E. Zimmerman for
16  the Department of Justice.
17          MR. RISNER:  Scott Risner for the
18  Department of Justice.
19          MR. FU:  Peter Fu, Department of Justice.
20          EXAMINATION
21  BY MR. KOHN:
22  Q.  Would you state your name and address for the record?
23  A.  Jonathan Tukel, 4948 Browning Drive, Orchard Lake,
24     Michigan 48323.
25  Q.  Where do you currently work?



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 6

1  A.  U.S. Department of Justice, United States Attorney's
2     Office, Eastern District of Michigan.
3  Q.  And how long have you worked there?
4  A.  I began June 4th, 1990.
5  Q.  And where did you go to law school?
6  A.  University of Michigan law school.
7  Q.  And what year did you graduate?
8  A.  1988.
9  Q.  And what was your first job?
10 A.  After law school?
11 Q.  Yes.
12 A.  I was an associate at the law firm of Honigman,
13     Miller, Schwartz & Cohn.
14 Q.  And how long did you stay there?
15 A.  Approximately two years.
16 Q.  And why did you leave?
17 A.  I was offered a job at the Department of Justice.
18 Q.  And then what was the next job you took?
19 A.  I was an assistant U.S. attorney for the Eastern
20     District of Michigan.
21 Q.  And how long did you hold that job for?
22 A.  Till the present.
23 Q.  Are you a licensed attorney?
24 A.  Yes.
25 Q.  In what states?

Page 7

1  A.  Michigan.
2  Q.  Have you ever conducted a civil deposition?
3  A.  Yes, I did.
4  Q.  Have you ever been deposed civilly?
5  A.  I don't think so.
6  Q.  Are you familiar with the rules governing depositions?
7  A.  Somewhat.
8  Q.  Briefly, if I ask you a question but you don't
9     understand it, you're free to ask me to rephrase it or
10     just tell me you didn't understand it and I can
11     rephrase it.
12 A.  All right.
13 Q.  There's no judge here, so objections may be raised on
14     the record, but you can still answer the question, so
15     if your attorney says objection, form, but if your
16     attorney instructs you not to answer a question, well,
17     then you may want to listen to your lawyer or listen
18     to me, but that's -- if he instructs you not to
19     answer, you don't have to answer, we'll take it up
20     with the court.
21        Do you understand you're under an
22     obligation to tell the complete truth?
23 A.  Yes.
24 Q.  Is there anything today that will interfere with your
25     ability to tell the truth?

Page 8

1  A.  No.
2  Q.  Are you on any type of medication or anything that
3     would make you not remember things?
4  A.  No.
5  Q.  Have you reviewed any documents in preparation for
6     today's deposition?
7  A.  Yes.
8  Q.  And what are they?
9  A.  I reviewed some handwritten notes that I had, I
10     reviewed some transcripts, I reviewed some
11     correspondence, I reviewed some e-mail messages.
12 Q.  Have you brought those documents with you today?
13 A.  I have not.
14        MR. KOHN:  Do you have the documents that
15 he used?
16        MR. SMITH:  I think they're all documents
17 that have been produced.
18        MR. KOHN:  Including, he referenced
19 handwritten notes?
20        MR. SMITH:  I'm pretty certain that the
21 handwritten notes have been produced.  Is that right?
22        MR. RISNER:  That's correct.  There was one
23 note that hadn't been previously produced but we
24 produced that to you earlier this week, one page.
25        MR. SMITH:  I thought it was several pages.

Page 9

1        MR. RISNER:  Several pages, sorry.
2  BY MR. KOHN:
3  Q.  And who was with you when you reviewed these
4     materials?
5  A.  The gentlemen you see here and one other Department of
6     Justice lawyer I believe.  I also reviewed some on my
7     own.
8  Q.  And what did you review on your own?
9  A.  Those same materials.
10 Q.  Do you have them in your own personal possession?
11 A.  I have them at my office.
12 Q.  So someone gave you copies of your transcripts with
13     the OIJ that you have personal possession of?
14 A.  Yes.
15 Q.  Who gave you those?
16 A.  The Department of Justice.
17 Q.  And when did they give you them?
18 A.  In the last several weeks at one time.
19 Q.  I understand you had hired a private attorney?
20 A.  Correct.
21 Q.  Does that attorney have anything in his or her control
22     or possession at their office?
23 A.  I don't know.
24 Q.  Have you asked them?
25 A.  No.



JONATHAN TUKEL
April 24, 2009

Page 10

1  Q.  Do you have anything at your home related to
2      Mr. Convertino or the leak?
3  A.  I have correspondence with the attorney.
4  Q.  When is the last time you looked at materials you have
5      at home and searched them?
6  A.  Not recently.  I couldn't tell you.
7  Q.  Did anyone inform you you were supposed to search your
8      personal possessions in preparation for today's
9      deposition?
10         MR. SMITH:  Objection, form.
11         You can answer.
12 A.  I don't think so, but what I have, other than my
13     attorney-client correspondence is identical to what I
14     reviewed at the office -- or it's a subset of what I
15     reviewed at the office.
16 BY MR. KOHN:
17 Q.  Might be identical but you have it at your home.  Is
18     that your own personal stuff or is it Department of
19     Justice documents you've taken home with you?
20 A.  It's copies of some of those same e-mails that we
21     talked about.
22 Q.  Okay.  But my question is, did you take United States
23     Department of Justice documents and bring them home
24     and convert them for your own use, or are they
25     documents that you have got and now they're your

Page 11

1      documents at home, which are they?
2  A.  I'm not sure I understand the question.
3         MR. KOHN:  Okay.  You have documents
4      related to this case at your home.
5         I'm now requesting that they all be
6      produced, every single one of them, and if there's a
7      privilege log, I'd like the log.  Do we have a problem
8      with that?
9         MR. SMITH:  We can discuss it later.
10        MR. KOHN:  Well --
11        MR. SMITH:  Right now this is a deposition,
12     not a --
13        MR. KOHN:  I was going to go off -- oh, no,
14     I'm going to say it actually on the record, because I
15     did a specific notice for this witness wanting to get
16     his personal materials.  I was informed earlier this
17     week that essentially they were produced.  I'm now
18     hearing from this witness he didn't even look at this
19     stuff or make a search of his home.
20        MR. SMITH:  He just said it's the same
21     stuff.
22        MR. KOHN:  How does he remember that?  And
23     I need a privileged log and I'd like them produced.
24        MR. SMITH:  You can ask him how he
25     remembers it.

Page 12

1  BY MR. KOHN:
2  Q.  When is the last time you've looked at every piece of
3      paper in your personal possession, at home or anywhere
4      else you may put personal things related directly or
5      indirectly to Mr. Convertino or anything about him?
6  A.  In the last several weeks.
7  Q.  And can you give me right now off the top of your head
8      an inventory of what those documents were?
9  A.  Not exactly.
10 Q.  And you said that some of them were correspondence
11     with your attorney?
12 A.  Yes.
13 Q.  And are you asserting a privilege on those documents?
14 A.  Yes.
15 Q.  Do you know if any of that correspondence is not
16     privileged because it was turned over to the justice
17     department?
18        MR. SMITH:  Objection, calls for legal
19     conclusion.
20        You can answer.
21 A.  Could you repeat that?
22 BY MR. KOHN:
23 Q.  Do you know if any of your correspondence with your
24     attorneys was turned over to the justice department?
25        MR. SMITH:  Same objection.

Page 13

1  A.  I turned no correspondence over to the justice
2      department, if that's what you mean.
3  BY MR. KOHN:
4  Q.  But do you know if your attorneys did?
5  A.  There were letters between my attorney and the justice
6      department, those were turned over, but that --
7  Q.  Now, how many lawyers --
8  A.  Those were sent to the justice department.
9  Q.  -- who represented you personally?
10 A.  James K. Robinson.
11 Q.  And what's his firm?
12 A.  Cadwalader Wickersham & Taft.
13 Q.  Who referred you to that firm?
14 A.  I knew Jim Robinson from before.
15 Q.  In what capacity?
16 A.  The firm where I worked, upon graduation from law
17     school he was a partner there at the time.
18 Q.  What was the name of that firm again?
19 A.  Honigman, Miller, Schwartz & Cohn.
20 Q.  Did you keep in touch with him?
21 A.  I would see him from time to time, I wouldn't say we
22     kept in touch.
23 Q.  Did the Honigman firm refer you over to him?
24 A.  No.
25 Q.  When's the last time you had any communications with



4 (Pages 10 to 13)

BENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

JONATHAN TUKEL
April 24, 2009

Page 14

1    anyone from the Honigman firm?
2  A.  I couldn't tell you, it's been a long time.
3  Q.  Do you know Mr. Herschel Fink?
4  A.  I knew him when I worked there.
5  Q.  How did you know him when you worked there?
6  A.  He was a partner in the law firm.
7  Q.  And what was your relationship with him then?
8  A.  I had known he was a partner in the law firm.
9  Q.  Have you ever spoken to Mr. Fink in your entire life,
10     yes or no?
11 A.  Yes.
12 Q.  And what was the nature of those communications?
13 A.  The last time I remember seeing Mr. Fink was
14     approximately 1990 and I saw him at the hardware
15     store.
16 Q.  So it's your testimony right now you've not seen
17     Mr. Fink since 1990?
18 A.  In person?
19 Q.  Yes.
20 A.  I think that's correct.
21 Q.  Are you aware that that's the law firm that's
22     representing Mr. Ashenfelter?
23 A.  I read that in the paper.
24 Q.  That's the only way you know that is from reading it
25     in the paper?

Page 15

1  A.  Well, I've seen -- I've seen things filed in court.
2  Q.  What have you seen filed in court?
3  A.  I've seen some of the legal briefs.
4  Q.  Which ones?
5  A.  I couldn't tell you.
6  Q.  Have you followed the legal briefs on whether
7     Mr. Ashenfelter might be required to disclose his
8     source?
9  A.  Yes.
10 Q.  Have you made copies of those briefs?
11 A.  What do you mean by make copies?
12 Q.  I mean, did you just look at them online or did you --
13     okay.  Do you have a copy of any of those briefs?
14 A.  I don't think so.
15 Q.  Did you ever have a physical copy of them?
16 A.  Well, I think, because it's difficult to read
17     documents online I probably printed them and after I
18     was finished reading, I threw them away.
19 Q.  I would like to search again for those documents,
20     anything that might still exist.
21         Did you, when you read those documents,
22     make any notes on them, underline anything, make any
23     type of notes?
24 A.  No.
25 Q.  Did you conduct any research on your own about the

Page 16

1    journalist privilege?
2  A.  No.
3  Q.  You didn't go up on Westlaw and look at a case or
4     LexisNexis?
5  A.  No.
6  Q.  And so we could -- is there a way to search in your
7     office -- where do you do computerized legal research?
8  A.  At work.
9  Q.  What computer do you use to do that?
10 A.  There's one in my office.
11 Q.  And you're testifying now under oath that you did not
12     do a Westlaw, Lexis or some type of Internet search
13     for the cases related to the journalistic privilege.
14     Is that your testimony, yes or no?
15 A.  Well, explain what you mean by do research.
16 Q.  In other words, look up a case, like see a case in the
17     brief talking about the journalist privilege and then
18     look it up.
19 A.  Oh, I may have done that.
20 Q.  Do you remember which cases you've looked up?
21 A.  No.
22 Q.  When you did that, did you take an official leave from
23     the United States Department of Justice and submit a
24     leave slip so you didn't bill the justice department
25     for the time or did you bill the taxpayer for the time

Page 17

1     you did looking at these briefs and doing that
2     research, yes or no, which is it?
3         MR. SMITH:  Objection to the form because
4     it was an either or question, not a yes or no
5     question.
6  BY MR. KOHN:
7  Q.  Okay.  I'd like to know, did you submit leave slips
8     when you at work reviewed the legal briefs related to
9     the Ashenfelter compel motion?
10 A.  I think there's an assumption in your question which
11     is not correct.  I said I printed them.  I typically
12     do legal reading at the gym when I'm exercising, and
13     so things that I print out I take and I put on a
14     bookrack and --
15 Q.  So you printed them at work?
16 A.  Yes.
17 Q.  So when you printed -- when you looked it up online,
18     printed it at work, did you take personal leave to do
19     that work?
20 A.  No.
21 Q.  Did you charge the taxpayer for the paper that you
22     printed those briefs on, yes or no?
23 A.  I know of no such requirement by the Department of
24     Justice.  We're permitted to use diminunus copies of
25     papers and computers and things.



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 18

1  Q.  And you're allowed to do personal legal research at
2      work?
3  A.  Yeah, it's part of my job to do legal research at
4      work.
5  Q.  Okay.  So looking up this -- you viewed this as part
6      of your job, looking up the Ashenfelter compel
7      motions?
8  A.  No, it was something I was interested in.  We're
9      allowed to do legal research to keep current.
10 Q.  And in terms of the legal research you did, what type
11     of service do you use, like is it Westlaw, Lexis or
12     what are the computerized legal research services
13     available to you?
14 A.  We have both.
15 Q.  Which one do you typically use?
16 A.  Lexis.
17        MR. KOHN:  I would -- I'm going to make a
18     request now, we can discuss it further but on the
19     record that I would like his Lexis and Westlaw
20     accounts downloaded and searched and a cross reference
21     done for all cases cited in any of the briefs filed in
22     the Ashenfelter compel and just to see when he may
23     have accessed and printed those.
24        MR. SMITH:  As you say, we can discuss it
25     later.

Page 19

1  BY MR. KOHN:
2  Q.  So it's your testimony that you have discarded every
3      piece of paper related to your research on the
4      Ashenfelter motion to compel?
5  A.  Correct.
6  Q.  And when did you discard all this paper?
7  A.  When I finished reading whatever I was reading.
8  Q.  When you -- in terms of the Ashenfelter motion to
9      compel, have you discussed that motion with any
10     person?
11 A.  Yes.
12 Q.  Who?
13 A.  I know I've discussed it with Bill Sauget.
14 Q.  Anybody else?
15 A.  I don't recall.
16 Q.  Tell me about your conversations with Mr. Sauget about
17     it.
18 A.  It's -- it's a topic of conversation from time to
19     time.  Someone would say did you see there was a
20     motion filed and I would look at it or someone would
21     drop it off and I would look at it.
22 Q.  Oh, so someone actually dropped these things off to
23     you?
24 A.  I think there was one time someone dropped one off.
25 Q.  And who dropped it off to you?

Page 20

1  A.  Bill Sauget.
2  Q.  And what -- did he have any notes or anything written
3      on it when he dropped it off?
4  A.  No.
5  Q.  And you threw that away?
6  A.  After I finished it, yes.
7  Q.  Do you know where he got it from?
8  A.  No.
9  Q.  Do you know if he printed it at work?
10 A.  I have no idea.
11        MR. KOHN:  And I'm going to make a similar
12     request for his computer.  I want to get his legal
13     research that he has done and if it's -- I don't know
14     if you're able to but I'd also like to know if he
15     accessed like the ECF, I don't know if you can track
16     that, but every time he accessed the ECF on the motion
17     to compel.
18        MR. SMITH:  We'll discuss it later.
19 BY MR. KOHN:
20 Q.  Who else did you talk about it with?
21 A.  Talk about what?
22 Q.  The Ashenfelter motion to compel.
23 A.  I don't recall talking about it with anyone else.
24 Q.  Did you ever talk about it with Mr. Ashenfelter?
25 A.  No.

Page 21

1  Q.  When is the last time you spoke with Mr. Ashenfelter?
2  A.  I don't recall, it's been a while.
3  Q.  Do you remember what the topic of the conversation was
4      last time you spoke to him?
5  A.  Yes.
6  Q.  And what was it?
7  A.  I think.  The last time I believe I spoke to him was
8      last fall.  There was a trial going on, I went over to
9      observe some of the proceedings, and after I was there
10     he came into the courtroom.  They were waiting for a
11     note from the jury and he asked, just sort of in
12     general, what is the note about.
13 Q.  What trial was that?
14 A.  There were two defendants, one was named Dawn Hannah
15     and the other was Darren Hannah.
16 Q.  Do you know what perjury is?
17 A.  Yes.
18 Q.  Could you please tell us for the record what perjury
19     is?
20        MR. SMITH:  I'm going to let him answer the
21     question based on his personal understanding.
22 BY MR. KOHN:
23 Q.  Based on your personal understanding, what is perjury?
24 A.  There's several different statutes.  Perjury -- I
25     think, I can't tell you the exact definition of


41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 22

1    perjury.
2    Q.  Okay.  Would you agree with me that it would include
3       lying under oath?
4    A.  That's certainly an element.  I don't know if that is
5       the entire offense.
6           MR. SMITH:  I just want to say, I'm going
7       to leave -- he can answer as to his own understanding.
8       He's not representing, you know, what the law is.
9           MR. KOHN:  Absolutely.  I want to get this
10      witness's understanding of his obligation to tell the
11      truth since he's been sworn under oath.
12          MR. SMITH:  Okay.  As long as you
13      understand.
14          MR. KOHN:  Yes, it's not a legal
15      conclusion, not binding on a court in terms of matter
16      of law.
17   BY MR. KOHN:
18   Q.  I'm looking at your personal understanding.  What
19      about misleading, if someone asks you a question under
20      oath and you give a misleading answer, do you think
21      that constitutes perjury or not?
22   A.  My personal understanding of the law?
23   Q.  Yes.
24   A.  I think that's a very complicated legal question.
25      There's a supreme court case called Applebaum which

Page 23

1       deals with that question.
2    Q.  And when's the last time you looked at that decision?
3    A.  It's been a while.  I had brief in the Sixth Circuit
4       sometime in the last several years that dealt pretty
5       extensively with that issue.
6    Q.  Misleading as perjury?
7    A.  Well, perjury as such and that was an issue.
8    Q.  What if someone asks a question and you give an
9       incomplete answer, is that perjury?
10   A.  I would say it's the same answer that I gave about
11      Applebaum.
12   Q.  Complex?
13   A.  It's a complex legal question.
14   Q.  Now, you said lying was one element in your
15      understanding of perjury.  What else do you have to
16      prove to show perjury?
17   A.  My understanding?
18   Q.  Yeah.
19   A.  I think for the actual perjury statute, you have to
20      have two witnesses and it has to be a material matter.
21   Q.  Have you ever been concerned, I'm not saying you did
22      it, but a concern that someone may think you committed
23      perjury?
24   A.  I'm not sure I understand the question.
25   Q.  Have you personally in your own mind ever had a

Page 24

1       concern that someone else out there in the world, an
2       investigator, policeman, someone from the inspector
3       general's office, somebody thought, they thought you
4       committed perjury?
5    A.  I'm not sure what you mean by a concern.  Can you --
6    Q.  Okay.  Have you ever thought that someone else thought
7       you committed perjury?
8           MR. SMITH:  I'm going to object on
9       relevance but you can answer the question if you're
10      able to.
11   A.  Repeat it once more please.
12   BY MR. KOHN:
13   Q.  Okay.  Have you ever formed the opinion that another
14      person thought you committed perjury?
15          MR. SMITH:  Same objection.
16   A.  Have I ever formed the opinion.  I don't know that I
17      formed the opinion.
18   BY MR. KOHN:
19   Q.  Did you ever think that someone may have thought you
20      committed perjury?
21   A.  Yes.
22   Q.  And who was that?
23          MR. SMITH:  Same objection.
24   A.  The -- well, you first of all or your client, and the
25      agents from the inspector general's office.

Page 25

1    BY MR. KOHN:
2    Q.  What made you think that the agents from the inspector
3       general's office thought you committed perjury?
4           MR. SMITH:  Same objection.
5           You can answer.
6    A.  My interactions with them.
7    BY MR. KOHN:
8    Q.  Now, what's obstruction of justice?
9           MR. SMITH:  Same thing goes.  This is his
10      personal understanding, it's not necessarily the law.
11   A.  Yeah.
12   BY MR. KOHN:
13   Q.  I understand.  What's obstruction of justice?
14   A.  In my opinion, it's a very broad concept, not amenable
15      to snippet definitions.
16   Q.  Can you give me just a broad definition of it?
17   A.  Well, there's many, many different scenarios for
18      obstruction of justice.
19   Q.  Okay.  Let me ask another one.  If the federal
20      government's conducting an investigation and someone
21      takes steps to impede it, might that be considered
22      obstruction of justice?
23   A.  It might be considered that, yes.
24   Q.  Okay.  And are you familiar with the obstruction of
25      justice statutes?



BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 26

1   A.  Many of them.
2   Q.  Have you ever worked on a case in which obstruction of
3       justice was an element of the crime?
4   A.  Yes.
5   Q.  Have you ever -- again, same question, have you ever
6       thought that someone else thought you may have
7       obstructed justice?
8   A.  I don't know that I can answer what's -- what someone
9       else might have thought.
10  Q.  I'm talking about what you thought.  Did you ever
11      think this person thinks I might have obstructed
12      justice?
13              MR. SMITH:  Objection, relevance.
14  A.  Again, as to that question, I don't think I can form
15      an opinion as to what someone else might have been
16      thinking.
17  BY MR. KOHN:
18  Q.  I'm now going to ask you to -- did you -- are you
19      aware that Mr. Ashenfelter has pled the 5th Amendment
20      as to who his sources are?
21  A.  Yes.
22  Q.  Have you read those briefs?
23  A.  Yes.
24              MR. SMITH:  I was going to say can you be
25      more specific as to which briefs.  I guess he

Page 27

1       understands you.
2   BY MR. KOHN:
3   Q.  This would be the briefs in the motion to compel
4       Mr. Ashenfelter and Mr. Convertino, correct?
5   A.  Yes.
6   Q.  After reviewing those briefs what crimes are your --
7       I'm just looking for speculation here, your best
8       guess, what crimes you think Mr. Ashenfelter could
9       have a good case he violated?
10              MR. SMITH:  Objection, calls for
11      speculation.
12          You can answer if you can.
13  A.  Could you --
14  BY MR. KOHN:
15  Q.  I'm going to repeat that.  You read his briefs, you
16      know about the case, correct?  You've read about the
17      Convertino case?
18  A.  Yes.
19  Q.  You know about the motion to compel, correct?
20  A.  Yes.
21  Q.  You were interviewed by the inspector general,
22      correct?
23  A.  Yes.
24  Q.  So you have a general understanding of the facts
25      surrounding that are known of the Plymouth Free Press

Page 28

1       publication about Mr. Convertino, correct?
2   A.  Could you repeat that last part once more?
3   Q.  You have a general understanding of what's in the
4       public domain --
5   A.  Yes.
6   Q.  -- concerning the Plymouth Free Press article?
7   A.  Yes.
8   Q.  And you've now testified that you've read some of the
9       motions or papers related to Mr. Ashenfelter's
10      invocation of the 5th Amendment, correct?
11  A.  Yes.
12  Q.  Okay.  Based upon all of that information I'm asking
13      for your best assessment of what crimes you believe
14      Mr. Ashenfelter legitimately committed?  In other
15      words, not just pure speculation like could have, you
16      know, jaywalked.  Like what do you think he did?
17              MR. SMITH:  Objection, calls for
18      speculation.
19          If you're able to answer it, please go
20      ahead.
21  A.  I believe in one of those briefs there was a lengthy
22      list of possible statutes that Mr. Ashenfelter's
23      attorney stated they thought could have been
24      committed.
25  BY MR. KOHN:

Page 29

1   Q.  And which ones do you think he did?
2   A.  I have no idea.
3   Q.  What's your best guess?
4               MR. SMITH:  Objection, calls for
5       speculation.
6   A.  I'm not sure what you mean by best guess.
7   BY MR. KOHN:
8   Q.  Which ones -- do you think it was an espionage act,
9       you think it was possession of stolen property, which
10      one do you think he did?
11  A.  I don't know.
12  Q.  Who did you talk to about -- anyone you talked to
13      about Mr. Ashenfelter's invocation of the 5th
14      Amendment?
15              MR. SMITH:  Objection to form.
16          You can answer if you understand the
17      question.
18  A.  Could you rephrase that?
19  BY MR. KOHN:
20  Q.  Who have you spoken to about Mr. Ashenfelter's
21      invocation of the 5th Amendment?
22              MR. SMITH:  If anyone.
23  A.  I recall speaking to Ken Shadwell about it.
24  BY MR. KOHN:
25  Q.  What else?



BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 30

1  A.  I remember speaking to Bill Sauget about it.
2  Q.  And what did you talk about with Ken Shadwell?
3  A.  I just remember Ken Shadwell bringing it up and saying
4     in his opinion it's -- it's a strong argument.
5  Q.  And anything else?  Do you know why he brought it up
6     to you?
7  A.  We work together, we work a couple offices apart from
8     each other.
9  Q.  Does he know this is something that you're thinking
10    about a lot?
11        MR. SMITH:  Objection, calls for
12    speculation.
13        You can answer if you can.
14  A.  I don't know what Mr. Shadwell knows.
15  BY MR. KOHN:
16  Q.  How about Bill Sauget?
17        MR. SMITH:  What's the question?
18  BY MR. KOHN:
19  Q.  Same question.  Tell us about when you talked about
20    Mr. Ashenfelter's invocation of the 5th Amendment.
21  A.  Mr. Sauget mentioned it within the past two weeks.
22  Q.  What did he say?
23  A.  I think he said that there was something about it in
24    the newspaper.
25  Q.  Did he give any documents?

Page 31

1  A.  I don't recall.
2  Q.  Do you know why he told you about it?
3  A.  Because it's been a subject of interest throughout the
4     office.
5  Q.  Who else has interest in it?
6  A.  I don't know.
7  Q.  How do you then know it's a subject of interest
8     throughout the office if you only know these two
9     people?
10  A.  I've heard that other people talk about it in the
11    office.  I have not spoken to anyone else.
12  Q.  Who's told you that other people talk about it in the
13    office?
14  A.  Bill Sauget.
15  Q.  And what has he said about that?
16  A.  Some people talk about it in the office.
17  Q.  Did you listen to any tapes of your interviews with
18    the inspector general?
19  A.  No.
20  Q.  Have you ever -- have you ever seen the draft
21    inspector general reports?
22  A.  Explain to me what you mean by draft.
23  Q.  Have you ever seen the inspector general's report on
24    the leak?
25  A.  Not the final report.

Page 32

1  Q.  Have you seen drafts of the report?
2  A.  I believe I've seen drafts.
3  Q.  And who showed them to you?
4  A.  They were sent to my attorney, who shared them with
5     me.
6  Q.  And do you have any copies of these drafts?
7  A.  No, those were all done under a nondisclosure
8     agreement which required the return of the drafts.
9        MR. KOHN:  Was that nondisclosure agreement
10    produced, do you know?
11        MR. SMITH:  I don't know off the top of my
12    head.  It would have been several years ago, but the
13    drafts I believe were produced.
14        MR. KOHN:  Is it possible to look that up?
15        MR. SMITH:  I don't know whether we'll be
16    able to find it today or not.
17        MR. KOHN:  Okay.  That's fine.
18  BY MR. KOHN:
19  Q.  Who have you talked with about coming here to testify
20    today?
21  A.  What do you mean?
22  Q.  Have you -- who have you discussed the fact that
23    you're coming here and testifying with?
24  A.  All of these gentlemen, one other attorney from the
25    Department of Justice whose name I don't recall, my

Page 33

1     wife.  I believe that's all.  I don't recall anyone
2     else.
3  Q.  And do you know who else from the Department of
4     Justice has testified in this case?
5  A.  I don't know.
6  Q.  Have you heard anything from anybody about what other
7     witnesses have said at depositions?
8  A.  No.
9  Q.  When did you first meet Mr. Ashenfelter?
10  A.  I couldn't tell you exactly, I don't recall.
11  Q.  Was it before or after you started working for the
12    justice department?
13  A.  After.
14  Q.  And how did you meet him?
15  A.  He was one of the reporters who regularly covered the
16    federal court beat.
17  Q.  And did you interact with him?
18  A.  Explain what you mean by interact.
19  Q.  Did you ever talk to him?
20  A.  Sure.
21  Q.  To the best of your recollection, how many
22    conversations have you had with Mr. Ashenfelter?
23  A.  During what time period?
24  Q.  Ever.
25  A.  I couldn't tell you that --



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 34

1  Q.  Was it --
2  A.  -- I don't recall.
3  Q.  Well, do you think it was more than 100?
4  A.  No.
5  Q.  In your entire life you've never had more than 100
6     conversations with Mr. Ashenfelter?
7         MR. SMITH:  Asked and answered, objection.
8         You can answer again.
9  A.  I don't think so.
10 BY MR. KOHN:
11 Q.  And did you ever have him over your house?
12 A.  No.
13 Q.  Were you ever over his house?
14 A.  No.
15 Q.  Did you ever have lunch with him?
16 A.  No.
17 Q.  A cup of coffee?
18 A.  No.
19 Q.  Did you ever sit down and give him an interview?
20 A.  Well, he wrote an article about me when I was going to
21    Washington to do a detail for the Deputy Attorney
22    General.  He did interview me, but we didn't sit down.
23    It was all done over the phone.
24 Q.  Okay.  What was the origin of that article?
25 A.  He called me up one day and said, I hear you're going

Page 35

1     to Washington.  I said, that's true, and he said, how
2     come no one's written anything about it, and I said,
3     it didn't really strike me as something all that
4     significant, and he said, I'd like to do something
5     with it, is that okay.
6  Q.  And what did you say?
7  A.  I said, yeah, if you want to.
8  Q.  And then what happened?
9  A.  He asked me some questions, we talked over a period of
10    a couple days and he wrote an article.
11 Q.  Has -- this is an article about what?
12        MR. SMITH:  Objection to form.
13 BY MR. KOHN:
14 Q.  I mean, he wrote an article.  What was the subject
15    matter of the article?
16 A.  It was sort of like a semi biographical piece saying,
17    local Department of Justice employee going to
18    Washington.
19 Q.  Has any other journalist ever written a biographical
20    piece about you?
21 A.  Not that I recall.
22 Q.  Did you find that article flattering?
23 A.  I actually found it embarrassing.
24 Q.  But you cooperated with him in writing it?
25 A.  Yes.

Page 36

1  Q.  And did you give him any leads to follow for the
2     article, like names of people to call, anything like
3     that?
4  A.  No.
5  Q.  And did you keep a copy of that article?
6  A.  I have a copy of every article involving every case
7     I've worked on and it's tucked in with that.
8  Q.  Okay.  So if we wanted to see articles written by
9     Ashenfelter about any case you've ever been involved
10    in, we could get that document and look at it and see?
11 A.  What document?
12 Q.  Whatever book you have with all these articles.
13 A.  It's a file, but yeah, I don't even know if there are
14    any in there by him, but if there are, that's where
15    they'd be.
16 Q.  And where's that file kept?
17 A.  In my basement.
18 Q.  And did you put the leak story in it?
19        MR. SMITH:  Objection to form.
20        You can answer if you are able to.
21 A.  I don't recall.
22 BY MR. KOHN:
23 Q.  Did Mr. -- did Mr. Ashenfelter tell you how -- what
24    triggered him to do this article about you?
25 A.  Yes, I think I mentioned, he said that he had heard

Page 37

1     that I was going to Washington to do this job and
2     people had talked about it.
3  Q.  When you were going to Washington, what -- did -- did
4     you move to Washington?
5  A.  Well, I did and the plan was that my entire family was
6     going to, we had our house for sale, but my children
7     were very young at the time and they stayed, it was
8     during the summer.  They wanted me in Washington
9     sooner rather than later, so I went with the plan that
10    after they sold the house, they would move.
11        Shortly after I got there I was working
12    with the deputy attorney general who was Larry
13    Thompson at the time.  He announced he was leaving the
14    justice department, and with the family situation, I
15    ended up just deciding to come back to Plymouth.  It
16    was easier that way.
17 Q.  So my question is was the job in D.C. a promotion or a
18    detail?
19 A.  It started out it was really a promotion but I was
20    working on a detail, and I had the option of
21    converting from civil service to Schedule C political
22    appointee but that never occurred, and it was a
23    detail, it was a one-year detail, and when Mr.
24    Thompson left, I exercised my option to end the
25    detail.



JONATHAN TUKEL
April 24, 2009

Page 38

1  Q.  Do you know Ann Coulter?
2  A.  I do.
3  Q.  How do you know her, from what?
4  A.  Law school.
5  Q.  Are you friends with her?
6  A.  Yes.
7  Q.  Have you ever discussed Richard Convertino with Ann
8      Coulter?
9  A.  No.
10 Q.  Did you ever provide her any information whatsoever
11     about the Koubriti case?
12 A.  No.
13 Q.  Did you ever provide her any information whatsoever
14     about any Department of Justice matter?
15 A.  What do you mean by provide her?
16 Q.  Give her stuff about anything to do with the
17     Department of Justice.
18 A.  You're talking about particular cases?
19 Q.  Anything.
20 A.  Well, I don't know what anything means.
21 Q.  DOJ matters.
22 A.  Well, let me say it this way.  She's a legal analyst,
23     she writes about legal issues.  I sometimes discuss my
24     understanding of legal issues with her without talking
25     about specific cases, if that's what you mean.

Page 39

1  Q.  And did you communicate with Ann Coulter, have
2      communications with her in the August of 2003 through
3      January 2004 time frame?
4  A.  Say the dates again.
5  Q.  August of 2003, January 2004 time frame, did you have
6      any communications with her?
7  A.  On any subject?
8  Q.  Yeah.
9  A.  I don't recall.
10 Q.  Did you tell her or send her an e-mail or anything to
11     alert her to the fact that the Plymouth Free Press was
12     going to do an article about Mr. Convertino?
13 A.  No.
14 Q.  Are you aware that she works for Fox News?
15 A.  I don't believe she does.  I don't believe she ever
16     did.
17 Q.  Do you know what network she works for?
18 A.  I don't believe she works for a network.  I'm sorry.
19         MR. SMITH:  I was going to object on
20     foundation grounds but --
21 BY MR. KOHN:
22 Q.  Have you ever had any communications with Fox News?
23 A.  No.
24 Q.  Did you make any person who's not a DOJ employee, any
25     person in the whole world, aware that Mr. Ashenfelter

Page 40

1      was going to write an article about Mr. Convertino?
2  A.  What time frame are you talking about?
3  Q.  January, maybe December or January -- December 2003,
4      January 2004.
5  A.  Did you say non-DOJ people?
6  Q.  Yes.
7  A.  The answer's no.
8  Q.  Did you -- when the article came out, did you notice
9      that there was an announcement of it on Fox News?
10 A.  No.
11 Q.  Getting back with Mr. Ashenfelter, have you ever
12     provided him any information whatsoever on background?
13 A.  Explain what background means.
14 Q.  Means you give him information, background on a matter
15     that he's not supposed to use in the newspaper or cite
16     to you.  You're just essentially giving him a heads up
17     on a matter.
18         MR. SMITH:  Objection to form.
19             You can answer if you're able to.
20 A.  When you say a matter, are you talking about specific
21     cases?
22 BY MR. KOHN:
23 Q.  Anything, anything.
24 A.  I recall, I believe it was Mr. Ashenfelter, once was
25     told there was a reporter, it was either

Page 41

1      Mr. Ashenfelter or Mr. Shepherdson, there was a murder
2      in a suburban community which was believed to be drug
3      related.  The chief of police of that community said
4      that he was going to send it to the Department of
5      Justice as a possible death penalty case.  Someone
6      called me and said, is this a potential death penalty
7      case and I remember providing that.
8  Q.  And you did that on background, in other words, like
9      your name wasn't used but you gave them that
10     information on background?
11         MR. SMITH:  Objection to form.
12 BY MR. KOHN:
13 Q.  In other words, did you -- at the time you gave that
14     information to the journalist, did you know if your
15     name was going to appear as the source of that
16     information?
17 A.  I think I did.
18 Q.  And did it appear as the source?
19 A.  I don't recall, but --
20 Q.  So you did not ask or say, this is on background,
21     don't use my name?
22 A.  No, I believe what I did was explain as best I could
23     my understanding of the federal death penalty statute
24     and say, if a law enforcement agency asks us to look
25     at a case, we will look at it and evaluate it.


41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 42

1  Q.  Okay.  But at the time you had the conversation were
2     you providing this information understanding that you
3     were going to be quoted as some type of expert or
4     department spokesperson or were you just giving him
5     the information because it's just information but you
6     didn't -- but you didn't want to be quoted, like, you
7     know, Mr. Tukel, Assistant United States Attorney,
8     U.S. Department of Justice, you understand the
9     difference here?
10 A.  I didn't really follow the whole question.
11 Q.  Okay.  I'm trying to say --
12 A.  I thought there were several questions in there.
13 Q.  I'm trying to say background means -- and I'm not
14    trying to say there's something wrong with this, but
15    when you give a journalist information on background,
16    you're giving them information which might be 100
17    percent legitimate, but you just don't want your name
18    associated with it when it goes into print.
19 A.  I did --
20       MR. SMITH:  There's no question pending.
21 BY MR. KOHN:
22 Q.  That's my definition.  And this conversation you had,
23    did you give it to the journalist on background or did
24    you anticipate that you'd be quoted in the newspaper?
25 A.  I didn't know what they would do, but I was willing to

Page 43

1     be quoted saying if a law enforcement agency brings us
2     a case and asks us to look at it to determine if there
3     are potential federal criminal charges, we will
4     evaluate it.
5        MR. SMITH:  I just wanted you to let him
6     finish.
7  BY MR. KOHN:
8  Q.  Okay.  And are there rules concerning who can speak on
9     the record to the press, you know, and identify
10    themselves as a United States Department of Justice
11    employee?
12       MR. SMITH:  Are you talking specifically
13    about --
14 BY MR. KOHN:
15 Q.  Press rules.
16       MR. SMITH:  -- press rules at the U.S.
17    Attorney's Office in Plymouth or some broader?
18 BY MR. KOHN:
19 Q.  Where you worked.  Did you know that?
20 A.  What time frame are you talking about?
21 Q.  Since you've worked there.
22 A.  Yes, there are.  There are Eastern District of
23    Michigan rules and there are U.S. attorney general
24    rules -- or Department of Justice general rules.
25 Q.  Under those rules could you have been quoted in this

Page 44

1     article as an official Department of Justice
2     spokesperson?
3  A.  As to that it was a local media representative and it
4     was simply saying, we will listen to any information
5     that a law enforcement agency brings us, yes, I could.
6  Q.  Next question, did you ever speak to any journalist in
7     your entire life off the record?
8  A.  Explain what you mean by off the record.
9  Q.  Well, where you go to the journalist and say this is
10    off the record.
11 A.  No.
12 Q.  Your entire life you've never done that?
13 A.  Not that I recall.
14 Q.  How many times have you spoken to Mr. Shepherdson?
15 A.  Numerous times.
16 Q.  Was it at one point almost once a day or something?
17       MR. SMITH:  Objection to form.
18 BY MR. KOHN:
19 Q.  I mean, was there a time in your life when you spoke
20    to him almost once a day?
21 A.  There was a time where we spoke frequently, yes.
22 Q.  And never once during that entire series of
23    conversations you ever -- you asked him to keep
24    something off the record?
25       MR. SMITH:  Objection to form.

Page 45

1        You can answer.
2  A.  My relationship with Mr. Shepherdson was more that I
3     found out information from him than I was telling him,
4     which is the primary reason that I spoke with him.
5  BY MR. KOHN:
6  Q.  I understand, but as you spoke to him was this for
7     attribution to be published in the newspaper?
8  A.  Sometimes.
9  Q.  All these con -- sometimes but sometimes it was not?
10 A.  Sometimes he would call me up to tell me something.
11    He would say, such and such happened in court, what do
12    you think about that case.  It so happens that at that
13    time we did not have a very good policy of how
14    information about what was going on in court came to
15    senior staff and it was a very effective way of
16    finding out what was going on in court.
17 Q.  And on -- my question is during all of these
18    conversations did you have any understanding with
19    Mr. Shepherdson that some of the stuff you said to him
20    would not be used in a newspaper or at least
21    attributed to you?
22 A.  No.
23       MR. SMITH:  Objection to form.
24       You've already answered.
25 BY MR. KOHN:


41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 46

1  Q.  Did -- how many times did he put your name in the
2      newspaper with all these conversations, how many times
3      did he quote you?
4  A.  I don't know.
5  Q.  But that would be in this file you have, we could look
6      at all your quotes in the newspaper?
7  A.  My file is about cases that I personally litigated,
8      worked on.
9  Q.  So would you answer questions about cases you aren't
10     working on?
11 A.  At times when I was first assistant that was one of my
12     responsibilities.
13 Q.  No, with Mr. Shepherdson, you'd give him information
14     or answer questions about cases you weren't working
15     on?
16 A.  If I was the first assistant and he had a specific
17     case related question and it was something which was
18     permissible, I would answer.
19 Q.  So every time you spoke -- in 2003 and 4, about how
20     many conversations did you have with Mr. Shepherdson?
21 A.  I don't recall.
22 Q.  Was it over 100?
23 A.  I don't recall that.
24 Q.  When it was on a daily basis what was that time frame?
25 A.  I wouldn't say it was always on a daily basis.  I

Page 47

1      think that's a mischaracterization.
2  Q.  Okay.  But there was a time when it was on a daily
3      basis?
4  A.  It was on an approximate daily basis.
5  Q.  Okay.  During what time period?
6  A.  I don't recall exactly when that started.
7  Q.  Best guess.
8  A.  2002, 2003.
9  Q.  And when did it end?
10 A.  Through the years, after I was no longer first
11     assistant it declined, and then he moved to Washington
12     and we rarely speak now.
13 Q.  Okay.  And when did he leave to Washington?
14 A.  I can't tell you the exact day.
15 Q.  Best guess.
16 A.  Within the last two years.
17 Q.  Was this daily or almost daily communication in place
18     between the -- between August of 2003 and January
19     2004?
20 A.  Repeat that please.
21 Q.  Was this daily or almost daily communication with
22     Mr. Shepherdson in place, happening, between August of
23     2003 and January, including January 2004?
24 A.  I don't recall that.
25 Q.  You don't remember?

Page 48

1  A.  Not in terms of those specific dates.
2  Q.  But if you said it kind of started around sometime in
3      '02 and '03?
4  A.  Right, but then I left for a while.
5  Q.  Okay.  And when did you come back, September?
6  A.  Right.
7  Q.  Okay.  Let's talk September.  When you came back
8      through the time period that the article in the
9      Plymouth Free Press was published, were you having
10     communications with Mr. Shepherdson on an almost daily
11     basis?
12 A.  I don't know if that was the case throughout that
13     period but at some point in that period, yes.
14 Q.  And during these communications did you talk about the
15     Koubriti case, yes or no?
16 A.  I don't recall.
17 Q.  And during this time period did you ever talk about
18     Mr. Convertino with Mr. Shepherdson, yes or no?
19 A.  I don't recall that.
20 Q.  I want to get back to this I don't recall.  Wasn't the
21     Koubriti case a big thing between September 2003 and
22     January 2004?
23 A.  Not during that entire time period.
24 Q.  But during that time period, wasn't that a major case
25     of sorts?

Page 49

1  A.  Yes.
2  Q.  And you had daily or almost daily contact with a
3      journalist during that time period, yes or no?
4  A.  Yes or no what?
5  Q.  Did you have daily or almost daily contact with a
6      journalist during that time period?
7  A.  Yes.
8  Q.  And you are now testifying that you cannot remember if
9      you discussed the Koubriti case during that time
10     period with that journalist.  I'm giving you an
11     opportunity to correct this testimony right now or let
12     it stand that you can't remember, what is it?
13 A.  Are you saying did I ever discuss the Koubriti case
14     with him?
15 Q.  During that time period did you discuss the Koubriti
16     case with him?
17 A.  Even one time?
18 Q.  Yes.
19 A.  Oh, yeah.
20 Q.  More than one time?
21 A.  I don't recall how many times.
22 Q.  Give me your best guess on how many times.
23          MR. SMITH:  With David Shepherdson?
24 BY MR. KOHN:
25 Q.  David Shepherdson, best guest.



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 50

1  A.  I couldn't tell you that.
2  Q.  More than once?
3  A.  You have to understand, Mr. Shepherdson would call and
4     would say things to me. I wouldn't necessarily
5     respond to what he was saying.
6  Q.  How many times did he call about the Koubriti matter
7     during that time period?
8  A.  Well, I think you also have to understand, he wouldn't
9     really call about any particular matter. He would
10    call and say, this is going on in the courthouse,
11    there's these other things going on, you know.
12 Q.  And how many times during that time period did he call
13    in which the subject of the call related to the
14    Koubriti matter?
15 A.  I couldn't tell you that. I don't --
16 Q.  But more than once?
17 A.  I suspect it was more than once.
18 Q.  A lot of times, multiple?
19 A.  I don't recall but I believe that probably around the
20    time of the December hearing there were probably
21    several calls.
22 Q.  Do you keep a log or a diary --
23 A.  No.
24 Q.  -- of any sort?
25 A.  No.

## Page 51

1  Q.  Do you have a personal calendar, a personal calendar
2     where you put notations in it?
3  A.  Yes.
4  Q.  Do you know if that was turned over to the Department
5     of Justice Office of inspector general?
6  A.  I don't know.
7  Q.  Do you know if it was turned over to the lawyers here
8     today?
9  A.  I don't know.
10 Q.  Okay. Do you still have that calendar?
11       MR. SMITH: For what time period?
12 BY MR. KOHN:
13 Q.  The time period of 2003 all the way through now.
14 A.  Well, I have some, but I doubt I have anything going
15    back that far.
16 Q.  I'm interested now also just in terms of contacts and
17    communications you may have had so I'm just going
18    to -- and I'll discuss that.
19 A.  Well, back up, I'm not sure I understood your
20    question. When you say calendar, I calendar meetings.
21 Q.  Yeah, I'd like to take a look at that.
22 A.  Okay. I mean, I understand your question, but --
23 Q.  Do you keep time records?
24 A.  No. Well, not billable hour records if that's what
25    you mean. We fill out something called a USA 5.

## Page 52

1  Q.  Is there any log kept of phone calls that you make or
2     that come in to you through the office?
3  A.  Not that I know of.
4  Q.  Now, I understand -- did you ever speak to
5     Mr. Ashenfelter about Mr. Convertino?
6  A.  Yes.
7  Q.  And when was that?
8  A.  The day of that hearing in December he called me.
9  Q.  Tell me what happened, where did he call you, at home
10    or at work?
11 A.  We spoke at home. I don't recall exactly where he
12    called me.
13 Q.  And so you -- did he have your home phone number?
14 A.  I believe he had my cell phone number because he had
15    it from when he wrote that article about me.
16 Q.  And so he called you on your cell or did he call you
17    on your home line?
18 A.  I'm sure he didn't call me on my home line because I'm
19    don't think he had that. He may have left me a
20    message at the office or he may have called on my
21    cell.
22 Q.  Okay. So at home, what time of the evening, if it was
23    in the evening, was this call made?
24 A.  I don't recall the exact time. It was after baths and
25    kids went to bed.

## Page 53

1  Q.  What time do they usually go to bed?
2  A.  Well, at the time they were very young. I don't know,
3     7:30 or 8:00 I would guess.
4  Q.  So sometime after 8:00 p.m. you received a call from
5     Mr. Ashenfelter at home?
6       MR. SMITH: Objection, foundation.
7  A.  I think the call might have been earlier and I was
8     busy and I called him back.
9  BY MR. KOHN:
10 Q.  Okay. So you had a discussion and approximately how
11    long was this discussion?
12 A.  I don't recall that.
13 Q.  Was it more than 15 minutes do you think?
14 A.  At this point I really don't recall.
15 Q.  Was it two hours? Do you have any idea --
16 A.  No, it would not have been two hours.
17 Q.  How about one hour?
18 A.  I don't think so.
19 Q.  30 minutes, what's your best guess?
20 A.  Something in that vicinity.
21 Q.  And during this telephone conversation you talked
22    about Mr. Convertino?
23 A.  Well, he brought up the subject because he was asking
24    about the hearing that day.
25 Q.  In regards to Mr. Convertino, what do you remember of



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 54

1    the conversation?
2    A.  I recall that it was his impression that it was the
3        beginning of the -- it was the beginning of the
4        undoing of that case.
5    Q.  That's what he said to you?
6    A.  Words to that effect.
7    Q.  And what did -- how did you respond to that?
8    A.  I told him that I thought that was a premature
9        conclusion and you can't ever tell what a judge is
10       planning to do and I would not -- I would not reach
11       that conclusion at that time.
12   Q.  And then what else was said during this conversation?
13   A.  We discussed things that had gone on in the office
14       during the time I was gone and cases that were
15       pending.
16   Q.  What types of things did you discuss that had gone on
17       in the office?
18   A.  What cases were going on, what cases seemed
19       significant.  I'd been gone -- as I said, we learned a
20       lot of information from reporters telling us what they
21       observed in court at the time.  I mean, that was well
22       understood throughout the office.
23   Q.  So at 8:00 p.m. you're having a chat with him at home
24       about what's been going on in the office --
25   A.  Well --

Page 55

1    Q.  -- the day after the hearing -- was this the day of
2        that hearing or the day after?
3    A.  I think it was the day of.
4    Q.  So on the day of that hearing related to the Koubriti
5        case where he thought the Koubriti case might be
6        undone, you guys are having an nice friendly chat
7        about what's going on in the office, correct?
8            MR. SMITH:  Objection, argumentative, asked
9        and answered.
10           You can answer it.
11   BY MR. KOHN:
12   Q.  That's what was going on?
13   A.  Well --
14           MR. SMITH:  Same objection.
15   A.  -- at the time, first of all, it was a very long day
16       and at the time I had at home a two-year-old and a
17       less than one year old and my wife was expecting our
18       third child, and after a long day and baths and
19       putting kids to sleep, it was actually just sort of
20       pleasant to talk to an adult and he happened to call
21       me.
22   BY MR. KOHN:
23   Q.  And what else do you remember talking about
24       Mr. Convertino?
25           MR. SMITH:  Objection to the form.

Page 56

1    A.  In that conversation?
2    BY MR. KOHN:
3    Q.  Yes.
4    A.  I don't think we talked about anything else because I
5        didn't think it was appropriate to talk about
6        specifics like that, but I did want him to understand
7        that I didn't think it was the undoing of that case.
8    Q.  Did you think it -- did he ask you if it could lead to
9        the undoing?
10   A.  He didn't really ask, he -- that was his opinion.
11   Q.  Did you tell him, well, maybe but it's too early to
12       tell?
13   A.  That's exactly basically what I told him.
14   Q.  Now, this call occurred 10 days after Mr. Convertino
15       was given his OPR referral letter, correct?
16           MR. SMITH:  You can answer if you know.
17   A.  I don't know the date.
18   BY MR. KOHN:
19   Q.  Well, wasn't that hearing on or about December 12th,
20       2003?  Does that ring a bell?
21   A.  That sounds familiar.
22   Q.  And didn't you -- didn't the letter get sent to
23       Mr. Convertino about his OPR on December 2nd, 2002?
24   A.  I'm not sure of the dates.
25   Q.  I'm sorry, December 2nd, 2003?

Page 57

1    A.  I'm sorry, could you repeat the full question?
2    Q.  Do you remember that his referral to the OPR, meaning
3        when he got the letter being told he was under an OPR
4        investigation, that was on or about December 2nd,
5        2003, correct?
6    A.  I think that's right.
7    Q.  And that hearing was on or about December 12th, 2003,
8        correct?
9    A.  On or about.
10   Q.  So this call at eight -- with an adult at 8:00 p.m. at
11       your house was about 10 days after Mr. Convertino was
12       given the OPR charge, correct?
13   A.  Right.
14   Q.  And you knew that Mr. Convertino was given that
15       charge, correct?
16   A.  Yes.
17   Q.  And now you're talking to Mr. Ashenfelter at home
18       about Mr. Convertino, correct?
19           MR. SMITH:  Objection, asked and
20       answered --
21   BY MR. KOHN:
22   Q.  Yes or no?
23           MR. SMITH:  -- several times.
24   A.  I don't think that's what I was doing.
25   BY MR. KOHN:



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 58

1  Q.  But you were talking about -- Mr. Convertino came up
2      in the conversation, didn't he?
3  A.  He brought it up in the case.  I discussed my
4      conclusion about what the effect on the case was.
5  Q.  Now, this friendly conversation about what was going
6      on in the office, did any of that also include
7      Mr. Convertino?
8  A.  I don't believe so.
9  Q.  So you talked about the hearing, somehow Convertino
10     came up and then you started talking about what's
11     happening in the office but none of that talk
12     concerned anything to do with Mr. Convertino, correct,
13     yes or no?
14 A.  I think that's correct.
15 Q.  Did you also talk about personal things during that
16     phone call?
17 A.  What do you mean by personal things?
18 Q.  You know like how your kids are doing, that type of
19     thing?
20 A.  I don't think we talked about my kids.  We talked
21     about what I had done in Washington and why I had come
22     back from Washington.
23 Q.  And did you consider if every single thing you said
24     during that conversation word for word was published
25     in the newspaper, would you have been surprised?

Page 59

1  A.  Yeah.
2  Q.  So during that conversation you did have an
3      expectation that at least some of the things you were
4      talking about would not be put into print, correct,
5      yes or no?  You can explain.
6  A.  I would say no with the explanation that I believed
7      that very little of what we talked about was
8      newsworthy.
9  Q.  How many other times -- okay.  This was a December
10     2003 call, have you ever spoken to Mr. Ashenfelter at
11     your home before?
12 A.  I believe when I was leaving for Washington he called
13     me several times writing that piece.  I don't know if
14     they were at home.  I remember being on the cell
15     phone, because I remember one of them I was at the
16     48th District Court, which is a local district court,
17     filing something there.
18 Q.  After your conversation with Mr. Ashenfelter on or
19     about December 12th, did you ever talk in your entire
20     rest of your life to Mr. Ashenfelter at home again?
21 A.  I don't recall doing so.
22 Q.  After the article appeared about Mr. Convertino on or
23     about January 16th or 17, 2004, did you ever again
24     talk to Mr. Ashenfelter, yes or no?
25 A.  Ever?

Page 60

1  Q.  Yes.
2  A.  Ever?
3  Q.  Yeah.
4  A.  In person on phone?
5  Q.  Yes.
6  A.  Yes.
7  Q.  How many times?
8  A.  I couldn't tell you that, I don't recall that.
9  Q.  How about from your home, did you ever talk to him?
10 A.  I don't think so.
11 Q.  You don't think so but you could have?
12 A.  Well, I don't recall.
13 Q.  Is it I don't recall but no, or I don't recall but it
14     could have happened?
15     MR. SMITH:  Objection, form.
16 A.  It's I don't recall.
17 BY MR. KOHN:
18 Q.  Okay.  Now, after the article appeared in the
19     newspaper about Mr. -- and this is the article from
20     January, published on January 16th or 17, 2004, do you
21     know the article I'm talking about?
22 A.  Yes.
23 Q.  After that article appeared in the paper, did
24     Mr. Ashenfelter ever contact you about, one, to find
25     out who the source of that article was -- excuse me,

Page 61

1      to find out anything in the office, like discussions,
2      internal office discussions, et cetera, about that
3      article?
4  A.  No.
5  Q.  Did he ever call you about any of the subject matters
6      in the article?
7  A.  You're talking about subsequent to it appearing?
8  Q.  Yeah, after the article.  Did he ever call you up
9      about say Marwan Farhat?
10 A.  No.
11 Q.  Did he ever call you up about the Makalda matter after
12     the article?
13 A.  I don't believe so.
14 Q.  Did he ever call you after that article about
15     Mr. Convertino?
16 A.  I don't believe so.
17 Q.  Did he ever call you to tell you about anything to do
18     with what was going on in -- whether he was going to
19     have to divulge any sources?
20 A.  No.
21 Q.  I'm going to show you a document we're going to mark
22     as Exhibit 1 and this is the article.
23 A.  Okay.
24     MARKED BY THE REPORTER:
25     DEPOSITION EXHIBIT 1



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 62

1      10:08 a.m.
2           MR. KOHN:  And for the record I'm showing
3      the witness a document marked as Exhibit 1 which is
4      the January -- it's dated January 17, 2004, the
5      headline, Terror Case Prosecutor is Probed on Conduct
6      by David Ashenfelter.
7    BY MR. KOHN:
8    Q.  Do you see this document?
9    A.  I do.
10   Q.  And when we've been talking about the Ashenfelter
11     article or the article about Mr. Convertino, is this
12     the article you understood?
13   A.  Yes.
14   Q.  Now, I want you to look at this article please and
15     tell me what in this article Mr. Convertino --
16     Mr. Ashenfelter, after January -- on or after January
17     17, 2004, ever called you up about to talk to you on
18     or off the record, confidential or not?
19          MR. SMITH:  Do you want him to read the
20     entire article?
21   BY MR. KOHN:
22   Q.  Yeah, I want you to go through it.
23   A.  I will do that.  Is your question anything that's in
24     this article that he ever subsequently asked me about?
25   Q.  Yes.  That's what I want to know and thank you for

Page 63

1      rephrasing that.
2           MR. SMITH:  I think it'll take him a few
3      minutes to read the article.
4           MR. KOHN:  Okay.  We can go off the record,
5      sure.
6           (Recess taken at 10:09 a.m.)
7           (Back on the record at 10:19 a.m.)
8    BY MR. KOHN:
9    Q.  Mr. Tukel, have you had an opportunity to read Exhibit
10     1, the Ashenfelter article?
11   A.  Yes.
12   Q.  And upon review of that can you tell me which parts of
13     that article -- the subject matters in there you had
14     conversations with Mr. Ashenfelter after January 17,
15     2004?
16   A.  I don't recall having conversation with him as to any
17     of this.
18   Q.  Okay.  Thank you.  Now, I want to call your -- now
19     when you say any of this, what do you mean by any of
20     this?
21   A.  Any of the content of that article.
22   Q.  I want to again go back to your relationship with
23     Mr. Ashenfelter.  Can you remember the circumstances
24     of your first meeting with him?
25   A.  Not specifically.

Page 64

1    Q.  Would he ever come by the office?
2    A.  He was by the office sometimes.
3    Q.  When he would come by the office did he ever talk to
4      you?
5    A.  I don't know what coming by the office means.  We used
6      to have a policy where we would leave press releases
7      in the lobby, people would come and pick up press
8      releases.  I remember seeing him there once or twice.
9      I don't know that he came to speak to people after
10     that.
11   Q.  Did he ever come by and just say hello to you?
12   A.  No, and the setup of our office wouldn't allow that
13     anyhow.
14   Q.  How about at the courthouse, did you ever see him at
15     the courthouse?
16   A.  Sure.  I mean that's how I knew him.
17   Q.  And when you would see him there, would you say hello?
18   A.  Generally.
19   Q.  Would you sometimes have some chit-chat with him, you
20     know, how are things going?
21   A.  Yes.
22   Q.  Do you know what his favorite baseball team is?
23   A.  No.
24   Q.  Do you have a favorite baseball team?
25   A.  Plymouth Tigers.

Page 65

1    Q.  Do you know if he has any children?
2    A.  I don't know.  I don't know anything about his
3      personal life.
4    Q.  Did you ever talk to him about your personal life?
5    A.  I certainly did when we -- when he was writing that
6      article when I was going to Washington.
7           MARKED BY THE REPORTER:
8           DEPOSITION EXHIBIT 2
9           10:22 a.m.
10   BY MR. KOHN:
11   Q.  Do you recognize this document?
12   A.  Yes.
13   Q.  And what is this?
14   A.  That is the article that Mr. Ashenfelter wrote about
15     me when I was going to Washington.
16   Q.  Did you cooperate with him on this article?
17   A.  I spoke to him about it, if that's what you mean.
18   Q.  I'm going to call your attention on page two --
19   A.  Can I have a chance to read the whole thing please?
20   Q.  Oh, please, absolutely.
21   A.  Okay.  I've read it.
22   Q.  Okay.  Is this the article that he wrote about you?
23   A.  Yes.
24   Q.  And my question is, did you fully cooperate with this
25     article, the writing of this article, I mean giving



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 66

1    him information for this article?
2    A.  I answered the questions he asked me.
3    Q.  If you look on page two, it mentions this Bloomfield
4        Hills attorney?
5    A.  Yes.
6    Q.  Who's he, who is him (sic)?
7    A.  He's a friend of mine.
8    Q.  And who gave Mr. Ashenfelter his name?
9    A.  I don't know.
10   Q.  Do you think that Mr. Ashenfelter knew before he
11       started writing this article that this lawyer had
12       information about you?
13   A.  I think he probably knew that, he knew that we were
14       friends.
15   Q.  How did he know you were friends?
16   A.  It's a well-known fact.  Mr. Pizitowski (phonetic)
17       who's referred to in the article is a very well-known
18       criminal defense attorney who's a former assistant
19       U.S. attorney.
20   Q.  So I assume then you told him you were married and had
21       two children?
22   A.  Right.
23   Q.  And did you share with him also your political
24       beliefs?
25   A.  I don't know if he asked me that or if someone else

Page 67

1        told him that.
2    Q.  Lifelong Republican, I'm looking on page two of the
3        document where it says you're a lifelong Republican.
4    A.  Yeah, I know, I saw that, but something just occurred
5        to me about this, because this is a web version
6        article and I don't think this is identical to the
7        print article, because the print article made
8        reference to Ann Coulter.
9    Q.  So the print article may have more substance in it?
10   A.  Yes.  And I definitely did not discuss Ann Coulter
11       with him so someone had -- had brought that up with
12       him, and the same person or persons may have brought
13       up lifetime -- lifelong Republican, I don't -- I don't
14       know.
15   Q.  Did you tell him you had a friendship with Ann
16       Coulter?
17   A.  I did not.
18   Q.  Did you ever ask Ms. Coulter how it came that she was
19       identified in the article?
20   A.  Did I ever ask Ann how?
21   Q.  Yeah.
22   A.  No.
23   Q.  What about, did you tell them you were a lifelong
24       Republican?
25   A.  I don't know, I mean, I don't recall.  It wouldn't

Page 68

1    surprise me, it was a Republican administration and it
2    was probably something he had asked, but if I didn't
3    tell him, it's not a secret.  A lot of people could
4    have told him that.
5    Q.  And in terms of -- did you tell him that you came to
6        the attention of the Attorney General through your
7        membership in the Federalist Society?
8    A.  Yes.
9    Q.  And did you tell him that you used to work for the
10       National Republican Congressional Committee?
11   A.  Yes.
12   Q.  And the National Republican Senatorial Committee?
13   A.  Yes.
14   Q.  Now, you said the position you were going to was -- at
15       this time was a detail?
16   A.  It was set up as a detail.
17   Q.  Okay.  So therefore it was a career civil service
18       position at the time, correct?
19   A.  Correct, with the opportunity to convert it if I
20       wanted to at some point.
21   Q.  So what would your political leanings have to do with
22       your selection for a civil service position?
23           MR. SMITH:  Objection to form.
24           You can answer.
25   A.  Well, number one, I wasn't making relevancy objections

Page 69

1    to the questions he asked me.  He was asking me
2    biographical questions and I answered.  Number two, it
3    is very common in Washington for, I'm talking
4    Department of Justice in Washington, for jobs which
5    are slotted as political positions, as are all but I
6    believe one of the jobs in the department -- in the
7    deputy attorney general's office, to be filled by
8    detailees.
9    BY MR. KOHN:
10   Q.  So it's your --
11   A.  So detailees can fill political positions.  So I don't
12       know if that answers your question, but --
13   Q.  Okay.  It does, if that's your understanding.  And
14       you've asked -- and I have a question.
15           When you went and took this job and you
16       went to Washington, did anyone ever talk to you about
17       the Koubriti case?
18   A.  When I went to Washington?
19   Q.  Yeah, when you were in this position and I'm -- were
20       you ever actually the associate deputy attorney
21       general, yes or no?
22   A.  Well, there was more than one, but I was Associate
23       deputy attorney general.
24   Q.  Okay.  So, I'm just talking all the technicalities.
25       So you were that, but on a detail, that was your



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 70

1     position?
2   A.  That's right.  That's right.
3   Q.  Okay.  So when you were in that position did anybody
4       ever talk to you about the Koubriti case?
5   A.  Not that I recall.  I was not working on those types
6       of issues.
7   Q.  Did you ever try to apply to become U.S. Attorney for
8       the Eastern District?
9   A.  Pardon?
10  Q.  Did you ever apply to become the U.S. Attorney for the
11      Eastern District?
12  A.  Yes.
13  Q.  When was that?
14  A.  2000.
15  Q.  And is there an application for that somewhere?
16  A.  I don't know if it still exists.  There was.
17  Q.  And were you offered the position?
18  A.  No.
19  Q.  And now going back, so it's your testimony that during
20      your time period as the associate deputy attorney
21      general, you were never -- no one ever talked to you
22      about the Koubriti case?
23  A.  That's my best recollection.
24  Q.  Did the name Richard Convertino ever come up while you
25      were in that position?

Page 71

1   A.  I think David Nahmais brought it up once.
2   Q.  Okay.  What did he bring up?
3   A.  It was -- I don't remember the specifics.  It was at
4       the very end of my detail there.  Everyone knew I was
5       coming back and I think he just said, you know,
6       there's something going on with that case in your
7       office.
8   Q.  What did you say in response?
9   A.  Nothing.  I didn't really -- I didn't know much about
10      the case.  I had followed it in the papers.  Before I
11      left I was a line assistant.  I had no supervisory
12      involvement or role in that case.
13  Q.  Did you ever hear -- do you know Eric Straus?
14  A.  Yes.
15  Q.  Is he a friend of yours?
16  A.  Yes.
17  Q.  Did you ever hear him make statements while the case
18      was -- you know, before the jury verdict, you know,
19      during the preparation phase of the case or the trial
20      phase of the case, words to the effect that he thought
21      the case was bad?
22  A.  Tell me the time frame again you're asking about?
23  Q.  Any time up until the jury returned its verdict.
24  A.  I don't recall ever hearing that.
25  Q.  Or words to the effect that he hopes the case is lost?

Page 72

1   A.  I'm sure he never said that.
2   Q.  Or he thinks the case will go down the tubes?
3   A.  I'm sure he never said that.  That would have stood
4       out.
5   Q.  Or he hopes that Convertino gets in trouble for the
6       case?
7   A.  Never.
8   Q.  Did you ever talk to Eric -- let me -- when you say
9       you're friends, have you ever socialized with
10      Mr. Straus?
11  A.  Occasionally.
12  Q.  Are you both members of the Federalist Society?
13  A.  He's not a member.
14  Q.  Does he attend meetings?
15  A.  He may have come to a meeting or two.
16  Q.  Have you ever been to his house?
17  A.  No.
18  Q.  Has he ever been to your house?
19  A.  He was at my house once I think.  I know he was there
20      once.  I think that was the only time.
21  Q.  And what about after work, have you ever --
22  A.  Occasionally.
23  Q.  How about -- I'm sorry.
24  A.  We socialized a lot more when we were younger and
25      didn't have kids.  Now everybody gets home because

Page 73

1       they have family responsibilities.
2   Q.  Did you kind of start working at the office at a
3       similar time that he started?
4   A.  He was there a little bit before me.
5   Q.  And what about lunch, you ever have lunch with him?
6   A.  Very occasionally.  He tends to eat in.
7   Q.  Okay.  And now with Mr. Straus, did you ever talk to
8       him about the newspaper article, Exhibit 1?
9   A.  I'm looking at 2.
10  Q.  1 is the -- I'm sorry.
11  A.  The Ashenfelter piece?
12  Q.  Yes, Exhibit 1.  Ashenfelter-Convertino, not
13      Ashenfelter-Tukel.
14  A.  Right.  I know we talked about it shortly after it
15      came out.
16  Q.  How about before it came out?
17      MR. SMITH:  Whether he talked about the
18      article before it came out?
19  BY MR. KOHN:
20  Q.  Yeah, about that Ashenfelter was doing an article.
21  A.  I don't think so.
22  Q.  What about -- when you talked to -- and after, what
23      did you talk about this article after it came out?
24      MR. SMITH:  Objection to form.
25      You can answer.



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 74

1  A.  I remember talking about it with him the day it came
2      out or the day after it came out.
3  BY MR. KOHN:
4  Q.  What do you remember of that conversation?
5  A.  Did you see that article that came out.
6  Q.  Did you ever talk with him about who the source was?
7  A.  I think we did.
8  Q.  Did he ask you whether you were the source?
9  A.  I don't think he ever asked me like that.
10 Q.  Did you ever ask him?
11 A.  No.
12 Q.  Is the reason you didn't do that because you each knew
13     who the source was --
14 A.  No.
15 Q.  -- you didn't need to ask?
16 A.  No.
17 Q.  And when he asked about who the source was, what did
18     you say?
19         MR. SMITH:  Objection, foundation.
20         You can answer.
21 A.  I don't think he ever asked like that, the way you're
22     asking.
23 BY MR. KOHN:
24 Q.  Did he ever ask you who you thought the source was?
25 A.  I don't think he ever asked it quite like that.  I

Page 75

1      think he said there was a lot of stuff floating
2      around.  Do you think he heard -- he meaning
3      Mr. Ashenfelter, heard these different things that
4      were floating around.
5  Q.  And what did you say in response to that?
6  A.  I don't know.
7  Q.  Did you agree with him?
8  A.  About what?
9  Q.  That there was a lot of stuff floating around.
10 A.  I was not aware of that, but I had not been in the
11     strike force at the time of the Koubriti trial and he
12     had.  I had never laid eyes on or heard of Marwan
13     Farhat, he had.  So he seemed to know more of things
14     like that than I did.
15 Q.  Did you ask him what these things floating around
16     were?
17 A.  Are you talking about any specific time frame or just
18     ever?
19 Q.  Just in that conversation, when he said these things
20     were floating around the office, did you ask him what
21     was floating around?
22 A.  He's mentioned things to me that were floating around.
23 Q.  Tell me, what were they?
24 A.  They're not necessarily things related to this.
25 Q.  Yeah.

Page 76

1  A.  You're talking about things --
2  Q.  Oh, no.  I'm talking context of this article, trying
3      to determine who the source or sources may have been.
4  A.  Well, I mean we talked -- and you're talking now after
5      the article came out?
6  Q.  Yes.  Yes.
7  A.  I know we talked about the Shishani stuff because
8      Shishani had been his case.
9  Q.  What did you talk about then?
10 A.  I don't recall the specifics.  I mean, I think it was
11     repeating what we had talked about during the OPR
12     referral process.
13 Q.  Did any discussion go on who may have been the source
14     on the Shishani materials?
15 A.  Not specifically like that.
16 Q.  Who would have known about the Shishani incident that
17     was reported in the press?
18 A.  I need to take a look again and see what it says.
19 Q.  Yeah, take a look.
20 A.  The pretrial services officer, I believe Mr. Straus,
21     and it's possible the three agents who had been
22     assigned to the case but I don't recall specifically
23     what they told me about that.
24 Q.  And you?
25 A.  Yes.  Well, at what time frame?

Page 77

1  Q.  Before the article came out.
2  A.  Well, once the OPR, yes.
3  Q.  So you knew about it through the OPR and Straus knew
4      about it and the pretrial services officer would have
5      known some of it?
6  A.  Uh-huh.
7         MR. SMITH:  Objection, compound.  I mean
8      are you asking him to --
9  BY MR. KOHN:
10 Q.  I'm going to -- okay.  Yeah, because actually we've
11     done the old thing where you have to say yes, you
12     can't do a nonverbal communication.
13 A.  Sorry.
14 Q.  That's okay.  I'll just go back and repeat myself.
15         So Mr. Straus knew it, correct?
16 A.  And we're talking about --
17 Q.  Shishani?
18 A.  Yes, and we're talking about during the OPR referral
19     period, right?
20 Q.  We're talking about actually before January 16, 2004.
21 A.  Okay.
22 Q.  Okay.  So Mr. Straus knew about it?
23 A.  Yes.
24 Q.  You knew about it?
25 A.  Yes.


41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 78

1   Q.  Now, let's look at --
2   A.  And the pretrial service officer and possibly the
3       three agents and Jeff Collins and Alan Gershel would
4       have known as well because they were involved in the
5       OPR preparation process.
6   Q.  And now let's go and look at the -- have you
7       identified where that is in the article?
8   A.  What?
9   Q.  The Shishani matter.
10  A.  It's the fifth paragraph down.
11      MR. SMITH:  Sixth.
12  A.  One, two, three, four, five, sixth paragraph down and
13      then I think it's mentioned maybe again.  No, I guess
14      that's the only reference to it.
15  BY MR. KOHN:
16  Q.  And going back to the reference in there, you
17      mentioned the three agents?
18  A.  Yes.
19  Q.  Why would the three agents have known about
20      Mr. Convertino's conversation with the pretrial
21      services employee?
22  A.  I think I said I'm not sure if they did, they might
23      have.  There was a time where I interviewed those
24      three agents because they somehow -- I heard that they
25      had information that they thought might be relevant.

Page 79

1   Q.  Did you keep notes of that interview?
2   A.  I did.
3   Q.  And during the course of that interview did you tell
4       them what the allegations were against Mr. Convertino?
5   A.  I don't think there were allegations at that time.
6   Q.  And other than that, do you remember discussing any
7       other aspect of this article with Mr. Straus?
8   A.  At any time?
9   Q.  Yeah, after the article came out.
10  A.  After the article came out.  I don't have any specific
11      recollections of that.
12  Q.  Now, did Mr. Straus ever give -- tell you who he
13      thought the leak or -- the leakers or the leaker might
14      be?
15  A.  I think his thought from what he said is that there
16      were these different things that were heard and put
17      together.
18  Q.  But he didn't put a name to the different things that
19      were heard and put together, like who might be saying
20      that?
21  A.  No.
22  Q.  And again, did you ever provide Mr. Straus any
23      speculation or opinion whatsoever as to who the
24      sources or source may have been?
25  A.  I don't think so.  But I do recall there was

Page 80

1       speculation early on, and I think including
2       Mr. Straus, that perhaps Mr. Convertino himself had
3       been the source of some of this.
4   Q.  And how did you learn about that speculation?
5   A.  I think I heard it from him.
6   Q.  And what did you say when he said that?
7   A.  I don't recall any specific comments.
8   Q.  Has anyone in the office ever asked you if you were
9       the source?
10  A.  I don't think anyone's ever asked me in those words.
11  Q.  And have you ever asked anyone in the entire office
12      whether they were the source?
13  A.  No.
14  Q.  In your last answer you said in those words.  What do
15      you mean by in those words?
16      MR. SMITH:  You're going back two answers.
17      MR. KOHN:  Two questions, we can read it
18  back.
19  A.  You're going to have to read it back.
20      MR. KOHN:  Can you read back the question
21  and answer from when he said in those words?
22      (The following portion of the record was
23      read by the reporter at 10:42 a.m.:
24      "Question.  Has anyone in the office ever
25      asked you if you were the source?

Page 81

1       Answer.  I don't think anyone's ever asked
2       me in those words.")
3   BY MR. KOHN:
4   Q.  Okay.  What do you mean by in those words?
5   A.  Meaning words to that effect were the source, were
6       you involved in that, something like that.
7   Q.  Did they ever like ask you indirectly, more like in an
8       more indirect way trying to probe whether you were the
9       source or knew who the source was?
10  A.  I don't think so.
11  Q.  Now, going back to Mr. Sauget --
12  A.  Yes.
13  Q.  -- did you interview him related to the Makalda matter
14      for the OPR referral?
15  A.  I spoke to him, I'm not sure I'd call it an interview.
16  Q.  Did you take notes of that interview?
17  A.  There was --
18      MR. SMITH:  Objection to form.  He just
19  said he didn't call it an interview.
20  BY MR. KOHN:
21  Q.  Or notes when you spoke to him?
22  A.  Well, I spoke to him on more than one occasion, but
23      specifically referring to the portion that's in the
24      OPR referral, I didn't take notes.
25  Q.  And can you remember during your interview process



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 82

1    with him or just when you were talking with him about
2    it, what -- how did -- what did he say happened at
3    the -- at that sentencing hearing?
4  A. I believe he said that he got to court in Ann Arbor
5    and there was something in a case file that he had not
6    been expecting or some sort of a motion or something.
7  Q. And then what did he tell you?
8  A. I can't recall that right now.  I'd have to look back
9    at the OPR referral to try and...
10 Q. Did he tell you that he was surprised about what
11   happened at the hearing?
12 A. There was something about being surprised involved.
13 Q. Did you -- did you ever talk to -- strike that.
14       Did you ever again after 2000 apply to the
15   U.S. attorney?
16 A. No.
17 Q. Do you have -- do you have any concerns that if you
18   are identified as the person who leaked the
19   information to the Plymouth Free Press that it could
20   harm your career?
21 A. Of course.
22 Q. Now, in this -- I'm going to call your attention again
23   to Exhibit Number 2.
24 A. All right.
25 Q. So according to this you worked on the staff, it says,

Page 83

1    to be of a congressman?
2  A. Yes.
3  Q. And you also worked for the National Republican
4    Congressional Committee?
5  A. Correct.
6  Q. And the National Republican Senatorial Committee?
7  A. Yes.
8  Q. How much time did you actually spend working on either
9    for congressman or senate or house related type of
10   activities?
11 A. You want that broken down or just an aggregate?
12 Q. Yeah.  It says here the next three years, is that
13   correct?
14 A. Yeah, that's correct.
15 Q. That was a three-year stint?
16 A. A three-year stint.
17 Q. And how much of that was in the congressman's office
18   versus these other two offices?
19 A. Approximately -- I worked for the congressman from --
20   I graduated college in May of 1982, started working
21   for the congressman probably in August.  I stayed
22   there until I think July the next year and I did that
23   for about a year, did the senatorial committee for
24   about a year and then I went to law school.
25 Q. Do you know anything about Senator Charles Grassley?

Page 84

1  A. A little bit.
2  Q. What do you know about him?
3  A. He was elected in 1980, he's from Iowa, he's a
4    Republican.  I believe that he grew up as a farmer and
5    entered politics as a second career.
6  Q. When you were in the position of associate deputy
7    attorney general, in your detail or whatever as
8    reflected in Exhibit 2, did his name ever come up in
9    any discussions at all?
10 A. It may have.  I'm trying to remember what his position
11   was.  It was a Republican controlled senate at the
12   time so he would have been chairman of something but I
13   don't remember.
14       When I was in the Deputy Attorney General's
15   Office it was very well delineated who had
16   responsibilities for what and in terms of really the
17   political on-the-hill legislative type of things, I
18   wasn't really involved in that and so it would have
19   been unusual for me really to hear nuts and bolts,
20   putting together legislation, legislatures' names
21   coming up.
22 Q. What was your function when you served as deputy
23   attorney general?
24       MR. SMITH:  Associate deputy attorney
25   general.

Page 85

1  BY MR. KOHN:
2  Q. Associate deputy attorney general.  What did you do?
3  A. My responsibilities?
4  Q. Yeah.
5  A. I had oversight authority for the Bureau of Alcohol
6    Tobacco and Firearms which had only recently become a
7    Department of Justice agency, there were a lot of
8    transition issues, and then subsumed in all that was
9    everything involving firearms and firearms laws, which
10   I didn't know a whole lot about.
11       I mean, there were things I had
12   responsibility for on paper that I never really did
13   much with.  Do you want to hear those too?
14 Q. No, just what you were actually working on.
15 A. Working on.  ATF; recommendations for death penalty
16   cases to the attorney general and the deputy attorney
17   general; the computer crimes and intellectual property
18   section of the department.  I'm sure there's a couple
19   others but I'd have to think for a few minutes.
20 Q. Were you aware at any time while you worked there that
21   Senator Grassley had placed holds on some Department
22   of Justice nominees?
23 A. No, I don't think so.
24 Q. Have you ever been made aware that?
25 A. No, my recollection is that the hold process is



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 86

1    confidential and so that doesn't get -- no one finds
2    that out.
3  Q.  When -- are you aware that there did come a time that
4      staff representatives from the finance committee or
5      people who worked for Senator Grassley had asked to
6      talk with Mr. Convertino?
7  A.  Did you say did I ever learn that?
8  Q.  Yeah.
9  A.  Yes.
10 Q.  Okay.  In relationship to -- were you in -- okay.
11     When did you leave Washington?
12 A.  I don't remember the exact date.  It was early
13     September.
14 Q.  Okay.  Early, so before or after Labor Day, do you
15     know?
16 A.  I think it was -- I think Labor Day was on a Monday
17     and I think I finished that week.  But it could have
18     been a week either way.
19 Q.  Do you remember that there was any type of controversy
20     related to Senator Grassley and Rick Convertino right
21     at that time when you were coming back in?
22 A.  You mean in Washington?
23 Q.  In Washington or in Plymouth.
24 A.  Well, I took a week off before I got back to Plymouth.
25     I don't -- I mean -- I was transitioning out of

Page 87

1    Washington and I had a week off before I came back to
2    Plymouth.
3  Q.  Did you have any involvement over the Butch Jones
4      death penalty matter when you were an associate?
5  A.  No, I think --
6          MR. SMITH:  Associate deputy attorney
7      general.
8  BY MR. KOHN:
9  Q.  Associate deputy attorney general.
10 A.  No, I think that case was much older than that, and I
11     would have been recused from it anyhow.  There was
12     actually a Plymouth case that came up while I was
13     there and I did not handle that for that reason.
14 Q.  Did Ann Coulter, do you think she had anything to do
15     with your getting a job in D.C.?
16 A.  Ann?
17 Q.  Yes.
18 A.  I don't know.  It's -- I mean, if someone had called
19     her for a reference she might have --
20 Q.  Have you ever used her for a reference?
21         MR. SMITH:  You kind of cut off his answer.
22     She might have, was there more to that answer?
23 A.  I mean, she knows a lot of people.  If people, you
24     know, those types of jobs, networking is important.
25     If someone had called her to say, who is this guy, she

Page 88

1    would have answered I'm sure.  I never asked her to,
2    if that's what you're saying.
3  BY MR. KOHN:
4  Q.  Do you know if she's ever done that for you any time
5      in your career?
6          MR. SMITH:  Served as a reference?
7  BY MR. KOHN:
8  Q.  Yeah.
9  A.  I've never listed her as a reference.  I personally
10     think she's too controversial to use for that.
11 Q.  Are you currently looking for a job outside of the
12     justice department?
13 A.  No.
14 Q.  Getting back to Senator Charles Grassley, so when you
15     returned to work in Plymouth did you learn of anything
16     going on between Rick Convertino and Senator Grassley?
17 A.  Can I just back up to your last question?
18 Q.  Sure.
19 A.  A colleague and I were just accepted to teach in the
20     fall as a part-time position.  I've never taught
21     before, but I understood your question to mean
22     full-time employment.
23 Q.  Okay.  Did you apply for that job?
24 A.  We jointly applied.
25 Q.  And what is the -- what's the university or college?

Page 89

1  A.  University of Michigan.
2  Q.  At the law school?
3  A.  Law school.
4  Q.  And so that'll be in the fall?
5  A.  Correct.
6  Q.  In regards to Senator Charles Grassley, what was your
7      understanding when you came back from the detail of
8      Mr. Convertino and Senator Grassley?
9  A.  Could you --
10 Q.  Did you know there was any relationship anything going
11     on between Convertino and Grassley?
12 A.  Well, I think I had heard that there was a controversy
13     about his testimony.
14 Q.  Tell me who you heard that from.
15 A.  I think I heard that from Alan Gershel.
16 Q.  What did he tell you?
17 A.  There was controversy about his testimony.
18 Q.  What else did he say about it?
19 A.  I don't recall any specifics, but it was something to
20     do with whether he had gotten clearances to appear or
21     something like that.  It was a very formal process at
22     the Department of Justice.
23 Q.  And did you -- what was your comment on that?
24 A.  I had none.  I didn't -- I didn't know anything about
25     it.



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 90

1  Q. And do you know if the Department of Justice was
2     communicating with Senator Grassley about Rick
3     Convertino?
4  A. At what time?
5  Q. After -- from September 2003 through January 17, 2004.
6  A. At some point I learned that.
7  Q. How'd you learn that?
8  A. There were some letters that -- or -- well, there was
9     at least one letter that was written, there may have
10    been more than one.
11 Q. What was this?
12 A. There was a letter from Senator Grassley, I don't
13    remember to whom it was addressed, asking about
14    Mr. Convertino and whether he was being reassigned or
15    something to that effect.
16 Q. Did you see that letter?
17 A. Yes.
18 Q. And did you help write a response to it?
19 A. I don't remember, I may have. My recollection is
20    there was a conference call involving some people in
21    the DAG's office with whom I had recently been working
22    and I think they were -- nothing in the Department of
23    Justice gets written by any one person. They were
24    having input, I think they were seeking our input.
25    Ultimately, anything that goes to a member of congress

Page 91

1     gets signed off by the Office of Legislative Affairs
2     but I think they were putting together a working
3     response.
4  Q. Office of Legislative Affairs?
5  A. Right.
6  Q. And who from the DAG's office?
7  A. I remember Stuart Levy.
8  Q. Anybody else?
9  A. I don't remember anyone else. It would be fairly
10    typical in any DAG meeting that there's going to be a
11    whole bunch of people.
12 Q. And have you had other contacts with Mr. Levy?
13 A. Well, I had worked with him that summer.
14 Q. Was he also an associate deputy attorney general?
15 A. He was the Principal Associate Attorney General.
16    MR. SMITH: Associate deputy attorney
17    general or --
18 A. Principal associate deputy attorney general or as they
19    would refer to it, PA-DAG. Which means when
20    Mr. Thompson left, he became the acting deputy
21    attorney general for a short period of time.
22 BY MR. KOHN:
23 Q. Okay. So there's a -- and what do you remember about
24    this conference call?
25 A. That there was a letter from Senator Grassley -- I

Page 92

1     mean, yeah, a letter from Senator Grassley and they
2     wanted to know about this -- is there a reassignment
3     going on, is a secretary in our office being
4     reassigned, what are the facts.
5  Q. Do you remember about when that happened?
6  A. In the fall.
7  Q. Okay. Now, did there come a time when you were asked
8     to do some type of review about Mr. Convertino and --
9     which ultimately led to the OPR referral?
10 A. Not exactly.
11 Q. Okay. How did your involvement in putting together
12    what would ultimately become the OPR, how did that
13    originate?
14 A. Bob Cares had prepared a memo which he brought to Alan
15    Gershel and myself and the memo had to do with Marwan
16    Farhat and it documented some history. At the time,
17    this was the fall of 2003, we had formed a
18    counterterrorism unit at some point shortly after
19    9/11, 2001. Bob Cares was the chief of that. It had
20    something to do with Mr. Cares having wanted to use
21    Marwan Farhat as a witness in one or more cases and
22    that -- that never happened, and then Mr. Cares
23    learned somehow that there had been a significant
24    motion for reduction of Mr. Farhat's sentence and
25    Mr. Convertino and he brought that to our attention

Page 93

1     with that memorandum.
2  Q. And did he attach to that memo like e-mails?
3  A. There were a couple of attachments to it, one or two
4     e-mails. I mean, it wasn't a huge memo but there were
5     definitely one or two e-mails attached to it.
6     MR. KOHN: And once -- I'm going to show
7     you a document I'll now mark as Exhibit Number 3.
8     MARKED BY THE REPORTER:
9     DEPOSITION EXHIBIT 3
10    10:59 a.m.
11 BY MR. KOHN:
12 Q. And I'm going to ask you if you could please take a
13    look at that and tell me -- I'm going to have two
14    questions. First, if you have ever seen this before;
15    and second, if to the best of your recollection this
16    was one of the documents attached to the Cares memo.
17    MR. SMITH: Read it with those questions in
18    mind but let him then ask the questions before you say
19    anything.
20 BY MR. KOHN:
21 Q. Thank you.
22 A. Okay. Ask me the questions please.
23 Q. First of all, have you ever seen any of these e-mails
24    before?
25 A. Before this memo has been given to me --



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 94

1  Q.  Yes.
2  A.  -- when Bob Cares gave it to me?
3  Q.  Yes.
4  A.  Never.
5  Q.  And did Mr. Cares provide you these documents?
6  A.  Yes.
7  Q.  Can you remember about when that happened?
8  A.  It was the first week I was back from Washington.
9  Q.  Okay.  So he brought this issue to your attention?
10 A.  Well, actually I was in Alan Gershel's office and he
11     was bringing it to Alan's attention, and, you know, I
12     was sort of new on the job and I think everyone forgot
13     about me, but since I was there, he gave it to me
14     also.
15 Q.  And what happened next?
16 A.  I know Alan and I talked about it.  I assume we talked
17     about it with Bob Cares also, but I don't really
18     recall that.  Considered what was being told to us.
19 Q.  And how did that then lead into something to do with
20     Mr. Convertino, like what was the follow-up to that?
21 A.  I can tell you events that happened, I'm not certain
22     about the time frame --
23 Q.  Okay.
24 A.  -- the time line at this point.
25 Q.  So what happened next with the Cares memo?

Page 95

1  A.  I can't tell you exactly what happened next.
2  Q.  Okay.  So --
3  A.  But I can tell you things that happened.
4  Q.  Okay.  Tell me what happened.
5  A.  Okay.  Mr. Gershel and I were thinking about talking
6     to Mr. Convertino about this and finding out what had
7     happened, because the allegation here, either in this
8     memo or the implication from what we found out, was
9     that a motion had been made to reduce Mr. Farhat's
10    sentence and at that time that required approval from
11    Mr. Gershel.
12       We were thinking about whether we should
13    ask to schedule a meeting and how we should do that or
14    if we should do that, and Mr. Convertino sent either
15    us or me, meaning either myself and Mr. Gershel or
16    just me a memo asking for a meeting.
17 Q.  Okay.
18 A.  And that led to a meeting.
19 Q.  And then what happened?
20 A.  We met.
21 Q.  And then what happened after -- you met and then what
22    happened?
23 A.  We met, we discussed the case.  At some point
24    Mr. Gershel ordered the transcript of the sentencing
25    and --

Page 96

1  Q.  Who obtained a copy of the transcript of the
2     sentencing to the best of your knowledge?
3  A.  Mr. Gershel ordered it.
4  Q.  So he got it.  Who else got a copy?
5  A.  I'm not sure.
6  Q.  You got a copy?
7  A.  I think I did.  I either had --
8  Q.  You think you did or did you get copy of that
9     transcript --
10 A.  Well, I --
11       MR. SMITH:  Let him finish the question
12    before you start answering, and also please let him
13    finish his answer before you ask the next question.
14       MR. KOHN:  Thank you.
15 BY MR. KOHN:
16 Q.  Just saying, question, to the best of your
17    recollection did you obtain a copy of that sentencing
18    hearing?
19 A.  Me personally?
20 Q.  Yes.
21 A.  I don't know if I ever had my own copy.  The office
22    had received a copy, Alan had it and I had access to
23    it.
24 Q.  Did you ever read the transcript?
25 A.  Yes.

Page 97

1  Q.  Did you ever make a notation on the transcript?
2  A.  No.
3  Q.  Now, did you ever make a copy of the transcript?
4  A.  I don't recall.
5  Q.  Okay.  Going back, so you ordered the transcript.
6  A.  I did not order it, Mr. Gershel ordered it.
7  Q.  And then you read it?
8  A.  At some point I read it.
9  Q.  And then in terms of my question, this genesis of what
10    eventually led to your writing the OPR letter?
11 A.  Okay.
12 Q.  Okay.  So now you have the transcript, what -- you had
13    a meeting with Mr. Convertino.
14 A.  Right.
15 Q.  What are you talking about with Mr. Gershel and
16    Mr. Collins concerning Mr. Convertino?
17 A.  We were not -- we were not getting answers, I don't
18    believe, about what the approval process had been for
19    Mr. Farhat's sentence and it led to subsequent
20    meetings.
21 Q.  And then what?
22 A.  After the meetings?
23 Q.  Yeah.
24 A.  I mean, at some point two things happened.  One, we
25    decided to take a look at other cases of



JONATHAN TUKEL
April 24, 2009

Page 98

1    Mr. Convertino's in which there had been a motion to
2    reduce the sentence to see if there had been approval
3    given in those, and we decided to make an OPR referral
4    on it.
5  Q.  Now, who appointed you to undertake this job?
6  A.  I think it was Jeff Collins.
7  Q.  Okay.  Tell me about that, what did he say to you or
8    was it presented to him and he appointed you?
9  A.  Yeah, I don't think it was as formal as all that, but
10    Mr. Gershel and I met with him, we discussed what had
11    occurred in our meetings.  I think one of the things
12    that occurred was that Mr. Collins had sent a memo or
13    e-mail to Mr. Convertino saying that he needed to meet
14    with us to discuss that, and we reported back what the
15    results of that had been and I think that there was
16    then a decision between the three of us that this
17    needed to go to OPR.
18  Q.  Okay.  So that -- I think that meeting was on or
19    about -- I think it was like October 10?
20  A.  Which meeting?
21  Q.  The meeting you just testified to where you met with
22    Mr. Convertino.  I think that was in October.
23  A.  There were three meetings.
24  Q.  Okay.  Do you remember the dates?
25  A.  Not really without looking at my notes.  I mean, I

Page 99

1    think I remember the dates on two but I would need to
2    see my notes --
3  Q.  Okay.  What were the two dates?
4  A.  The first was I believe September 23rd.
5  Q.  Okay.
6  A.  And I believe the next was October 10.
7  Q.  Yeah, and the third one?
8  A.  I don't know.
9  Q.  Okay.  Which of these meetings was the one that you
10    came out of thinking that it was an OPR referral was
11    going to happen?
12  A.  I'm not sure.
13  Q.  And do you know in terms of time sequence how much
14    time went between that October 10th meeting and that
15    third meeting?
16  A.  I would know if I looked at my notes.
17  Q.  Do you have a copy of those?
18  A.  Not with me.
19        MR. KOHN:  Do you have a copy?
20        MR. SMITH:  I don't believe we have them.
21    They definitely were produced.
22        MR. KOHN:  Yeah.
23        (Discussion off the record at 11:07 a.m.)
24        (Back on the record at 11:08 a.m.)
25  BY MR. KOHN:

Page 100

1  Q.  Okay.  In any event, do you remember -- do you
2    remember the time frame of this conference call about
3    responding to Senator Grassley's letter?
4  A.  It was in the fall.
5  Q.  It was sometime in the fall.  Do you know if that
6    meeting happened before or after there was a decision
7    that what was going on -- that there might be a
8    referral to OPR with Mr. Convertino?
9  A.  I don't know.
10  Q.  Was there any discussion at that meeting that you
11    alerted the people in Washington that there might be
12    an OPR issue related to Mr. Convertino?
13  A.  In other words, when we were having the conference
14    call --
15  Q.  Yes.
16  A.  -- with the DAG's office --
17  Q.  Yes.
18  A.  -- about the Senator Grassley letter?
19  Q.  Yes.
20  A.  I don't recall that.
21  Q.  Would that be the type of information in your mind it
22    would be important for the DAG's office to know about?
23  A.  Very likely.
24  Q.  Why?
25  A.  They don't like surprises.

Page 101

1  Q.  And did you ever inform the DAG's office that there --
2    do you have a recollection of ever informing the DAG's
3    office that there was in fact going to be or already
4    had been an OPR referral?
5  A.  Well, that's two questions.
6  Q.  Okay.
7  A.  I don't know if we told them that there was going to
8    be but -- well, I don't really know if we ever told
9    them that, but when the referral was being put
10    together and finalized I was told to send it to the
11    executive office of the U.S. attorneys and that
12    happened.  I don't know if that also got communicated
13    to the Deputy Attorney General's Office or not.
14  Q.  Who told you to send it to the executive office of
15    U.S. attorneys?
16  A.  Jeffrey Collins.
17  Q.  Do you know why he did that?
18  A.  I don't know why.
19  Q.  Do you know what need to know the executive office
20    had?
21  A.  I don't know specifically.
22  Q.  You just sent it off?
23        MR. SMITH:  Objection to form.
24        You can answer.
25  BY MR. KOHN:

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 102

1  Q.  What did you send to the executive office of U.S.
2      attorneys?
3  A.  I sent them a draft.
4  Q.  So the draft of --
5  A.  An OPR referral.
6  Q.  So that was done before there was a referral?
7  A.  Correct.
8  Q.  Did they have input into the referral?
9  A.  The executive office?
10 Q.  Yes.
11 A.  In terms of content?
12 Q.  Yes.
13 A.  I don't recall.  I mean, I think the reason it was
14     sent to them was to give them that opportunity.
15 Q.  And you wrote the referral, isn't that true?
16 A.  I wrote the majority of it.
17 Q.  Isn't it true that you wrote it and then Mr. Collins
18     just signed it?
19 A.  No.  He edited it and there were discussions
20     throughout, certainly with Mr. Gershel and I think
21     with Mr. Collins, about content and how it was being
22     put together.
23 Q.  Did the executive office of U.S. Attorneys provide you
24     any input into anything to do with the content of the
25     letter?

## Page 103

1  A.  I don't recall.
2  Q.  Who was your point of contact at the executive office?
3  A.  I did not really have a point of contact.  I believe
4      Mr. Collins had a point of contact and my recollection
5      from looking at the documents was that it was sent to
6      a gentleman by the name of Ken Blanco.
7  Q.  And did you ever talk to Mr. Blanco?
8  A.  Have I ever?
9  Q.  Yeah.
10 A.  I think I did when I was in Washington.
11 Q.  So you knew him at that time?
12 A.  I wouldn't say that.  I think I was introduced to him
13     once in the hallway.
14 Q.  So that office is in Main Justice?
15 A.  The AUSA's office is in Main.  It was at the time, I
16     don't know where they are now.
17 Q.  And so he got it, did you talk to him or anyone in
18     that office about what you -- was there oral
19     communications between you and the executive office of
20     U.S. Attorneys?
21 A.  You mean after this draft was sent to them?
22 Q.  Yeah.
23 A.  Not that I recall.
24 Q.  Did they ever send you something back?
25 A.  Not that I recall.

## Page 104

1  Q.  Now, were there any other communications with Main --
2      were there any other communications between you and
3      Main Justice before the formal letter was sent to OPR?
4  A.  Me personally?
5  Q.  Yeah.
6  A.  No.
7  Q.  Do you remember the date of the formal referral to
8      OPR?  I know it was in the November, do you remember
9      that date?
10 A.  No.
11 Q.  Okay.  I'll tell you what, from my notes here, if I
12     was to tell you it was November 3, does that sound
13     about right?
14 A.  That sounds right.  I was going to say 2nd or 3rd.
15 Q.  This sending of the draft to the executive office,
16     how -- about how much time was that done before
17     November 3rd?
18 A.  Perhaps a week to 10 days.
19 Q.  Now, in terms of the letter to Senator Grassley, you
20     talked about this conference call, do you know how
21     much time, you know, between the conference call and
22     the letter to Senator Grassley?
23 A.  I think the letter from Senator Grassley was first.
24 Q.  Yeah, and then back to Senator Grassley, so there'd be
25     a letter from Grassley, a conference call and then a

## Page 105

1      letter to Senator Grassley.
2  A.  Yeah --
3          MR. SMITH:  Is that a question?
4  BY MR. KOHN:
5  Q.  Do you know how much time expired between your
6      conference call and the letter to Senator Grassley?
7  A.  I'm not sure I ever even saw the letter from Senator
8      Grassley.  That would have been the Office of
9      Legislative Affairs, so, no, I don't know.
10 Q.  But what about the letter to, the response to Senator
11     Grassley?  Did you ever see that?
12 A.  Right, but -- I don't know.
13 Q.  And at that conference call was there a discussion --
14     were they going over the contents of the letter with
15     you?
16 A.  I don't think so.
17 Q.  Are you aware or ever made aware whether anyone from
18     the Office of Legislative Affairs was provided
19     information concerning the OPR referral?
20 A.  I don't know that.
21 Q.  Did you ever provide information to anyone from
22     legislative affairs to the -- about the OPR referral?
23 A.  The only way it would have been in that conference
24     call is if someone was sitting in on that and if that
25     subject came up.

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 106

1        MARKED BY THE REPORTER:
2        DEPOSITION EXHIBIT 4
3        11:16 a.m.
4   BY MR. KOHN:
5   Q.  And Exhibit 4 is a November 13, 2003 letter from
6       William Moschella to Senator Charles Grassley, dated
7       November 13, 2003.  Do you see this?
8   A.  Yeah, can I just have a chance to --
9   Q.  Please.
10       (Discussion off the record at 11:17 a.m.)
11       (Back on the record at 11:19 a.m.)
12  A.  All right.
13  BY MR. KOHN:
14  Q.  Okay.  Now, looking at -- does this letter help
15      refresh your recollection as to the dates that
16      Grassley communicated with the Attorney General and
17      the Attorney General's Office had communicated with
18      him?
19  A.  No.
20  Q.  Okay.  And looking at this letter and just -- you
21      know, I'm just going to be under the assumption that
22      the dates here are correct.  It says -- do you see
23      this where it says that the letter came into the
24      attorney general on November 10, 2003?
25  A.  Yes.

## Page 107

1   Q.  And then this letter is dated November 13, 2003?
2   A.  Right.
3   Q.  So would it be safe, I mean, to assume that this phone
4       conference you were on was sometime between the 10th
5       and the 13th?
6   A.  I don't think so because it makes reference to an
7       October 14th letter to Mr. Collins which was
8       specifically about personnel in the Plymouth office.
9   Q.  And now my question for you is the phone call -- I
10      understood your testimony, and I could be corrected,
11      that you were called in because there was a letter to
12      the attorney general?
13  A.  No, I don't believe so.  There was a letter from a
14      senator which needed to be responded to, I don't know
15      which one it was.
16  Q.  Okay.  So at the time of -- if at the time of that
17      phone conference there had been an OPR sent or about
18      to be sent concerning Mr. Convertino, in standard
19      operating procedure in your mind would that be the
20      type of information the DAG's office should be made
21      aware of so they're not surprised or you know,
22      blind-sided?
23       MR. SMITH:  Objection to form.
24       You can answer it if you understood the
25      question.

## Page 108

1   A.  I don't know of any specific procedures or policies.
2       I would have brought it to their attention because in
3       my opinion it would have been something they would
4       have known of.  It is also possible the way the
5       bureaucracy there works that if it had already been
6       brought, it would have been brought to their attention
7       some other way.  Most likely through EOUSA.
8   BY MR. KOHN:
9   Q.  But again, I understand you have a specific
10      recollection, but in terms of your understanding of
11      your job and your duties and what's expected of you,
12      it would be something that you would have called to
13      their attention?
14  A.  Yes.
15  Q.  Now, after that interaction did you have any other
16      interaction with the Attorney General's, you know,
17      Office or whatever that is?  Is that the DAG?
18  A.  No, the DAG is the Deputy.
19  Q.  Okay.  The DAG, the attorney general, you know,
20      that -- I don't know, what do you call the whole thing
21      in Washington there, the attorney general and his --
22      his direct little unit?
23  A.  The attorney general is usually referred to as OAG,
24      Office of Attorney General.
25  Q.  And then there's the DAG?

## Page 109

1   A.  Deputy attorney general or ODAG, Office of deputy
2       attorney general.
3   Q.  Do you remember whether the OPR matter to your
4       knowledge was ever again called to the attention of
5       the OHE or the DHE?
6   A.  Yes.
7   Q.  Okay.  When was that?
8   A.  I don't know the exact date.  Someone told me to fax a
9       copy of it to the attorney general's office.
10  Q.  Okay.  Someone told you to fax a copy of it.  What was
11      it?
12  A.  The OPR referral.
13  Q.  And who was the someone who told you this?
14  A.  I don't recall who told me to do it.  I know that it
15      was sent to Jeffrey Taylor in that office.
16  Q.  Do you know Mr. Jeffrey Taylor?
17  A.  I know him from my days in Washington.
18  Q.  Your days in Washington congressional or when you had
19      the detail?
20  A.  Detail.
21  Q.  Did you talk to Mr. Taylor?
22       MR. SMITH:  You mean ever?
23  BY MR. KOHN:
24  Q.  No, about this referral matter.
25  A.  At some point I did.

JONATHAN TUKEL
April 24, 2009

## Page 110

1  Q.  Tell me about that conversation.
2  A.  My recollection is that we were told to send it twice.
3      Once it went unredacted, the second time I --
4      Mr. Taylor called me on the telephone and said scrub
5      it of anything sensitive, and that was done and then
6      that was sent.
7  Q.  Did he tell you why he wanted it scrubbed?
8  A.  He did not.
9  Q.  Did he tell you what he was going to use it for?
10 A.  No.
11 Q.  Did the request come from him or did it come from
12     someone else in your office who told you to do it?
13 A.  I don't recall that.
14 Q.  So how did this request get communicated?
15 A.  I don't know.
16         MR. SMITH:  Objection, asked and answered.
17 BY MR. KOHN:
18 Q.  Okay.  So what you remember is -- all right.  Let's
19     break it down.
20         So in terms of the time sequence, is the
21     letter you're sending, is that the November 3rd letter
22     that you wrote to OPR or is it the letter that --
23     December letter that was written to Convertino?  Do
24     you remember which letter?
25 A.  That we were sending to the attorney general's office?

## Page 111

1  Q.  Yeah.
2  A.  It would be the OPR referral.
3  Q.  So that would be the one on November 3rd?
4  A.  Yeah, but once it was sent in a redacted form.
5  Q.  Yeah.  Okay.  So let's talk about the first time you
6      sent it off in an unredacted form.  Did that go to
7      Mr. Jeffrey Taylor?
8  A.  Yes.
9  Q.  Okay.  And how do you know that it was supposed to go
10     to Mr. Taylor?
11 A.  I don't know.
12 Q.  Okay.
13 A.  Someone told me to send it to him.
14 Q.  When someone told you to send it was that someone from
15     your office or someone from Washington?
16 A.  I don't recall that.
17 Q.  When someone told you to send it to him, did you ask
18     why?
19 A.  No.
20 Q.  Did they tell you why?
21 A.  I don't think so.
22 Q.  Where was -- where was the letter being stored at the
23     time you made the copy?
24 A.  In the safe in my office.
25 Q.  So you took it out of the safe and faxed it?

## Page 112

1  A.  I probably had an assistant do the actual faxing, but,
2      yeah.
3  Q.  What assistant?
4  A.  Could have been one of probably two or three.
5  Q.  Did you tell them not to read the letter or make any
6      precautions when you handed it to them to fax?
7          MR. SMITH:  Objection to form, compound.
8  A.  I don't recall making any restrictive comments on it.
9  BY MR. KOHN:
10 Q.  Okay.  So it got faxed to Mr. Taylor?
11 A.  Right.
12 Q.  Okay.  And then as I understand your testimony the
13     next thing you remember is a phone call from
14     Mr. Taylor to you?
15 A.  Correct.
16 Q.  Okay.  To the best of your recollection today tell me
17     what Mr. Taylor said to you.
18 A.  My recollection is that some time had gone by and that
19     Mr. Taylor hadn't ever really looked at the first one,
20     but it had some disclaimer on the top that says it may
21     contain grand jury material or something for which
22     disclosure is restricted, and he says something like,
23     it looks like you have some grand jury stuff in there,
24     redact that.  He used the word scrub, scrub that, and
25     any other sensitive information and resend it.

## Page 113

1  Q.  Okay.  Did you ask him why he wanted it scrubbed?
2  A.  No.
3  Q.  Did he tell you why he wanted it scrubbed?
4  A.  He may have, I don't know.
5  Q.  But you don't remember now?
6  A.  I don't recall specifically.
7  Q.  Did he tell you that -- and did you in fact scrub it?
8  A.  Yes.
9  Q.  And then did you fax it to him?
10 A.  I scrubbed it with Alan Gershel.
11 Q.  Okay.
12 A.  And then we -- and then I fax -- and then I had it
13     faxed.
14 Q.  And did you tell Mr. Gershel about this request from
15     Mr. Taylor?
16 A.  Well, he knew because we were scrubbing it together.
17     Oh, you mean was I the one who communicated that to --
18 Q.  In other words, when you took it to him, did you tell
19     him why you were scrubbing it and the origin of that?
20 A.  I don't know if he knew that already or if I was the
21     one who told him that.
22 Q.  So at the time you were scrubbing it he understood it
23     was going to be scrubbed and sent to Mr. Taylor at the
24     attorney general's office?
25 A.  Right.

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 114

1  Q.  Did he ask you to determine what use they were going
2      to make of this letter?
3  A.  I don't -- I don't think so.
4  Q.  Now, when you scrubbed it, did you -- do you remember
5      what you deleted?
6  A.  I remember specifically --
7          MR. SMITH:  Objection to the word deleted.
8      I think he redacted it.
9  BY MR. KOHN:
10 Q.  Or scrubbed.
11         MR. SMITH:  Redacted.
12 BY MR. KOHN:
13 Q.  Yeah, redacted.
14 A.  I remember specifically taking out Mr. Farhat's
15     Hezbollah association.
16 Q.  And what about -- did it say on the letter that it was
17     directed to OPR and it concerned Mr. Convertino?
18 A.  I'm sure it did because I think that was how it had
19     been written and I don't think any of that was taken
20     off.
21 Q.  Did you have any concern whatsoever that the attorney
22     general's office may use this for a political purpose?
23 A.  No.
24 Q.  Did you have any concern whatsoever that they may
25     provide this document to the United States congress?

## Page 115

1  A.  When you say did I have concern --
2  Q.  Yes?
3  A.  -- did I think that that would happen --
4  Q.  Yeah.  Did you --
5  A.  -- or did I think that that was not something that
6      should happen?
7  Q.  Thank you very much.  Did you think they may use this
8      letter to provide to members of congress, yes or no?
9  A.  I thought they were planning to show it to senator
10     Grassley.
11 Q.  And what was your basis for believing they were going
12     to show it to senator Grassley?
13 A.  Because this correspondence with senator Grassley had
14     been taking place.
15 Q.  And this means Exhibit Number 4?
16 A.  And associated redactions that we talked about.
17 Q.  But the thing you were just pointing to was Exhibit 4,
18     the letter?
19 A.  Correct.
20 Q.  My question is, so in your mind at the time you faxed
21     it you understood that this redacted or scrubbed
22     version may be provided to senator Grassley, correct?
23 A.  Repeat it once please.
24 Q.  At the time you faxed the scrubbed version it was your
25     understanding that the scrubbed version may be

## Page 116

1      provided to senator Grassley?
2  A.  I wouldn't say it was my understanding.  I would say
3      it was my assumption.
4  Q.  Okay.  Did you talk to anybody in your office about
5      whether the OPR letter could be sent to the attorney
6      general's office?
7  A.  No.
8  Q.  Did you talk to anybody in your office about whether
9      the scrubbed version of the OPR referral could be
10     given to the attorney general for use with a member of
11     congress?
12 A.  Can you explain to me what you mean by the use of the
13     word could?
14 Q.  Could, in other words, that they might take the letter
15     you just faxed and somehow either give it to or use it
16     in communications with congress.  Did you -- my
17     question is did you talk to like Collins or an ethics
18     officer about whether that -- whether you could --
19 A.  You mean permissibly within the law?
20 Q.  Permis -- exactly.
21 A.  No.
22 Q.  Did you communicate -- call anyone at OPR to seek
23     guidance as to whom you could send a copy of the OPR
24     referral letter to?
25 A.  No.

## Page 117

1  Q.  And did you in fact fax the scrubbed version of that
2      letter to the attorney general's office?
3  A.  Yes.
4  Q.  And did that happen in or about the month of November
5      2003, do you remember?
6  A.  I don't remember but I believe that the document I
7      produced had a fax cover sheet with it that should
8      show that.
9  Q.  Did that communication to the attorney general's
10     office occur before the leak or, excuse me, before
11     Mr. Ashenfelter published his story in the newspaper?
12     Did you fax the letter to the attorney general's
13     office before the article appeared in the Plymouth
14     Free Press, Exhibit Number 1?
15 A.  Yes.
16 Q.  And did you fax that letter to the attorney general's
17     office before you had your conversation with
18     Mr. Ashenfelter on December -- on about December
19     12, 2003?
20 A.  I don't know.
21 Q.  Did you know that the OPR referral letter should be
22     kept confidential, yes or no?
23 A.  When you say should --
24 Q.  Yeah.  Did you understand that there was a requirement
25     that the OPR referral that you wrote up, Collins

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 118

1   signed, on or about November 3, 2003, was required to
2   be kept strictly confidential?
3   A.  I'm not sure I knew in terms of statutes or
4   regulations but I assumed that.
5   Q.  Yet you willfully faxed it to the attorney general's
6   office, knowing that it might be given to a member of
7   congress, correct?
8        MR. SMITH:  Objection, argumentative, asked
9   and answered.
10       You can answer if you can.
11  A.  I was directed to fax it to the attorney general who
12  is the head of my agency, so I did.
13  BY MR. KOHN:
14  Q.  And in terms of the redacted version, who directed you
15  to do that, Mr. Smith or who?
16  A.  Who's Mr. Smith?
17  Q.  Excuse me, who directed you --
18       MR. SMITH:  Are you asking whether I
19  directed him?
20       BY MR. KOHN:  No, no, not you.  I just said
21  the name wrong, don't worry.
22  BY MR. KOHN:
23  Q.  Who directed you to redact a copy of the referral
24  letter?
25  A.  Jeffrey Taylor.

## Page 119

1   Q.  Is Jeffrey Taylor your boss, yes or no?
2        MR. SMITH:  You mean now or --
3   BY MR. KOHN:
4   Q.  No, at that time.  Was Jeffrey Taylor your boss?
5   A.  Arguably.
6   Q.  Oh, you didn't report to the U.S. Attorney?
7        MR. SMITH:  Objection, argumentative.
8   BY MR. KOHN:
9   Q.  Did you report to the U.S. Attorney for the Eastern
10  District, yes or no?
11  A.  Directly.
12  Q.  And who did the U.S. Attorney for the Eastern District
13  of Michigan report to?
14  A.  Deputy attorney general.
15  Q.  And who's that?
16  A.  At the time?
17  Q.  Yeah.
18  A.  I don't know.  It would depend on exactly when this
19  took place.  I don't think there was a deputy attorney
20  general when Mr. Thompson resigned, I came back to
21  Plymouth, I think there was an interim, later James
22  Colme became the deputy attorney general.
23  Q.  So did either Mr. Thompson, the interim or Mr. Colme
24  act or direct you to send that redacted version, yes
25  or no?

## Page 120

1   A.  Well, I don't think that can be answered yes or no.
2   Q.  Why not?
3   A.  Well, first of all, Mr. Thompson was no longer in
4   office so he couldn't direct me to do anything.  The
5   office in which he had held reported to the attorney
6   general.  Mr. Taylor was on the staff of the attorney
7   general.  I felt that I reported to him.
8   Q.  Did anyone from the staff of the attorney general ever
9   give you -- prior to -- ever like write your
10  performance reviews?
11       MR. SMITH:  Objection to form.
12  BY MR. KOHN:
13  Q.  Okay.  You -- so while you were working on
14  Mr. Convertino's OPR referral you understood that you
15  were reporting both to Mr. Collins and to the -- and
16  to the staff of the attorney general, correct?
17  A.  No.
18  Q.  On matters related to whether the OPR referral letter
19  should be kept confidential, you understood you were
20  reporting to the staff of the attorney general, isn't
21  that true?
22  A.  No.
23  Q.  You understood that the staff of the attorney general
24  could instruct you to make, at will, giving you no
25  justification, to make the OPR referral on

## Page 121

1       Mr. Convertino not confidential, correct?
2        MR. SMITH:  Objection to form.
3        You can answer if you understand the
4   question.
5   A.  I'm going to have to hear the question back.
6   BY MR. KOHN:
7   Q.  Okay.  Let me just rephrase it.
8   A.  Okay.
9   Q.  You willfully, in other words, no one forced you, you
10  did it on your own volition, knowingly sent the fax to
11  the staff of the attorney general of Mr. Convertino's
12  OPR referral, correct?
13  A.  I don't think that's correct.
14  Q.  You were forced to do it?
15  A.  I was ordered to --
16       MR. SMITH:  Objection.
17  BY MR. KOHN:
18  Q.  Yeah?
19  A.  I was ordered to do it.
20  Q.  So when Mr. -- what was the name of that individual
21  again?
22  A.  Jeffrey Taylor.
23  Q.  Jeffrey Taylor got on the phone and said, I order you
24  to do this?
25       MR. SMITH:  Objection, argumentative.

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 122

1     You can --
2 BY MR. KOHN:
3 Q. Did Jeffrey Taylor get on the phone and order you to
4    do it, yes or no?
5 A. My understanding from my years of --
6 Q. That's not my question. Did he order, did he say I am
7    instructing you to do this?
8     MR. SMITH: Will you let him answer the
9    question please?
10     MR. KOHN: It's a yes or no and then he can
11    explain.
12     MR. SMITH: I don't think the question can
13    be answered yes or no, but you can ask him if it can
14    be.
15 BY MR. KOHN:
16 Q. Can the question be answered yes or no?
17 A. Not in my opinion.
18 Q. Okay. Then let's go to the next one. Did you tell
19    Mr. Collins that you were going to fax this letter,
20    the OPR report?
21 A. I'm sure I did. Everything involving all of the OPR
22    matters I kept Mr. Collins completely informed of.
23 Q. And did you in your mind -- if they had asked you --
24    if the staff of the attorney general had said, would
25    you please leak the referral to the Plymouth Free

## Page 123

1    Press, would you have leaked it, yes or no?
2 A. No.
3 Q. You would have been -- what if the staff of the
4    attorney general called you up and said, would you
5    please fax the redacted version of the referral letter
6    to Mr. Ashenfelter, would you have complied with that
7    request, yes or no?
8 A. Not without an explanation.
9 Q. And the explanation was, we're ordering you to do it.
10 A. I -- I would not have taken that as satisfactory.
11 Q. If they said, in our discretion we've decided this is
12    the appropriate use of this letter?
13     MR. SMITH: Objection to form.
14     You can answer if you --
15 A. Hypothetically?
16 BY MR. KOHN:
17 Q. Yes.
18 A. I think I would have required them to come up with a
19    justification or do that themselves. What they were
20    asking me for was to give them for their own internal
21    use a Department of Justice document which I felt I
22    had no right to withhold from them.
23 Q. So it's your testimony that if the staff of the
24    attorney general in your supervisory chain of command
25    asked you or ordered you to provide the redacted

## Page 124

1    version of that referral letter regarding
2    Mr. Convertino to Mr. Ashenfelter, you would have
3    refused to comply with that instruction unless they
4    gave you sufficient justification?  Is that your
5    testimony?
6 A. Yes.
7 Q. Okay. So -- but you -- you were willing to fax the
8    exact letter to the staff of the attorney general,
9    knowing it might be turned over to a United States
10    senator, isn't that true?
11 A. Yes.
12 Q. And once turned over to the United States senator,
13    what would be the restrictions on what that senator
14    could do with that document?
15     MR. SMITH: Objection, calls for a legal
16    conclusion I believe.
17     You can answer if you know -- have any
18    knowledge of that.
19 A. There's an expression that I don't particularly like
20    that became famous during the campaign last year
21    called, above my pay grade.  I considered that
22    decision to be above my pay grade.  The attorney
23    general's office asked for it and it was a Department
24    of Justice document.  I gave it to them, what use they
25    made of it would be up to them.

## Page 125

1 BY MR. KOHN:
2 Q. Okay. Thank you.  Based on your experience with
3    Capitol Hill, you worked there I know, other than
4    working there or in and around congress for three
5    years, did you have any other interactions with
6    members of the congress or legislative activities?
7 A. Ever?
8 Q. Yeah.
9 A. Not that I recall.
10 Q. Well, based on your experience, whatever it -- you
11    know, at least those three years and your knowledge,
12    if a document's given to a senator, do you believe
13    there's a chance that that senator may leak it out to
14    the press?
15 A. Yes.
16 Q. When you faxed the letter to Mr. Taylor -- is that his
17    name Jeffrey Taylor?
18 A. Yes, and it's spelled T-A-Y-L-O-R.
19 Q. When you faxed it to him did you give him any
20    instruction as to limitations on how he could use the
21    document?
22 A. No.
23 Q. Did he ask you for any guidance as to potential
24    limitations on use of the documents?
25 A. He asked me to scrub it of grand jury material and

JONATHAN TUKEL
April 24, 2009

Page 126

1    anything that he called sensitive.
2    Q.  Do you believe that the fact that Mr. Convertino was
3       the subject of an OPR investigation was sensitive, yes
4       or no?
5    A.  I'm sure it was but Mr. Taylor already knew that.
6    Q.  So -- but -- and he also knew what the grand jury
7       information was.  He had the unredacted version,
8       correct?
9            MR. SMITH:  Objection.
10   BY MR. KOHN:
11   Q.  Correct?
12   A.  Yes.
13   Q.  I mean he had the unredacted version and he asked you
14      to take away anything that was sensitive, correct?
15           MR. SMITH:  Objection, asked and answered.
16           You can answer one more time.
17   BY MR. KOHN:
18   Q.  Right?  Okay.  I just --
19   A.  Yes.
20   Q.  Okay.  And you met with Mr. Gershel and together you
21      reviewed the referral to take out sensitive
22      information, correct?
23   A.  Right, but our review was to take out what we thought
24      could affect ongoing cases.
25   Q.  Okay.  Did the affect ongoing cases definition of

Page 127

1    sensitive, did that come from Mr. Taylor or was that
2    based on your discussion with Mr. Gershel?
3           MR. SMITH:  Objection.  It was an either or
4    but there are other possibilities.
5    BY MR. KOHN:
6    Q.  Okay.  Where did you come up with that definition of
7       sensitive information?
8    A.  I think that was my and Mr. Gershel's working
9       assumption.
10   Q.  Okay.  So when you -- did you call OPR to determine
11      what their definition of sensitive information was?
12           MR. SMITH:  You can answer.
13   A.  OPR had not given me any definition of sensitive.
14   BY MR. KOHN:
15   Q.  Okay.
16   A.  That was Mr. Taylor's words.
17   Q.  Okay.  But did you call OPR to determine what they
18      might consider sensitive information in that letter,
19      yes or no?
20   A.  No.
21   Q.  Did you talk to Mr. Collins to determine what he may
22      think sensitive information was in that letter, yes or
23      no?
24   A.  Very likely.
25   Q.  Okay.  So when you scrubbed the letter for sensitive

Page 128

1    information did you delete all reference to the fact
2    that Mr. Convertino was the subject of an OPR
3    referral?
4    A.  I would have to review the letter to be sure.
5    Q.  So today you don't remember if you scrubbed it in that
6       fashion?
7    A.  Correct.  Not specifically.
8    Q.  What about generally?
9    A.  I don't think I did but I would have to look at it to
10      be certain.
11   Q.  Okay.  I'm going to show you a document that's under
12      protective order so I'm not going to introduce it onto
13      the record.  I'm only going to show it to you for
14      purposes of refreshing your recollection and then you
15      can answer the question.
16           And for the record, this is a document
17      subject to Protective Order DOJ Number 20,341 through
18      20,353 and I'll show it and this is not for -- this is
19      only for the purpose of refreshing the witness's
20      recollection.
21           So don't talk about the contents of this
22      document on the record, it's just to refresh your
23      recollection.  I will show it to counsel first.
24           MR. SMITH:  Let me see it first.
25           MR. KOHN:  Okay.

Page 129

1           MR. SMITH:  There's no question pending
2    though.
3    BY MR. KOHN:
4    Q.  This is to refresh your recollection as to whether you
5       scrubbed the fact that Mr. Convertino was the subject
6       of an OPR referral from the letter you faxed up to --
7           MR. SMITH:  Why don't you let him look at
8    it and then reask the question.
9           MR. KOHN:  Sure.
10   A.  I really can't answer the question without getting
11      into the content.
12           MR. SMITH:  Okay.  What do you want to do?
13           MR. KOHN:  Nothing.  I want to come back to
14      that.
15           THE WITNESS:  You want to talk about it --
16           MR. SMITH:  I want to talk to you.
17           MR. KOHN:  Okay.  Just so you know I'll
18      probably --
19           THE WITNESS:  Can we just take a break
20      anyhow?
21           MR. KOHN:  Yeah, we'll just take a break
22      but what I will probably do is stuff that -- and there
23      might be other things subject to a protective order so
24      I am going to put that in another category and we may
25      do a separate piece of this where I have to use those

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 130

1    exhibits.
2             MR. SMITH:  And then put that part of the
3    deposition under protective order?
4             MR. KOHN:  Under, yeah.  Anything that
5    might be under that.  So see if that works.
6             (Lunch recess at 11:51 a.m.)
7             (Back on the record at 12:48 p.m.)
8    BY MR. KOHN:
9    Q.   Okay.  I'd like to call your attention to the time
10        period of November 2003.  In that time frame did you
11        consider the fact that your office was going to or had
12        made a referral of Mr. Convertino to OPR strictly
13        confidential, yes or no?
14   A.   What do you mean by strictly confidential?
15   Q.   Okay.  Now, I'll give you my next question.  During
16        that time period of November 2003 did you consider the
17        fact that your office was either going to or had
18        already communicated an OPR referral about
19        Mr. Convertino, was that a matter that you had
20        considered sensitive?
21   A.   Yes.
22   Q.   When you were asked by a representative of the U.S.
23        attorney general's office to fax you a copy of your
24        OPR referral and delete from it sensitive material,
25        did you delete the fact that there -- you know,

## Page 131

1         Mr. Convertino's name from the document you sent?
2              MR. SMITH:  I think that's asked and
3    answered but you can go ahead and answer it again.
4    A.   No.
5    BY MR. KOHN:
6    Q.   Same time frame, same basic question but did you
7         also -- did you delete the fact that a referral had
8         been sent to OPR, in other words, you blacked out
9         OPR's address?
10   A.   I don't believe so.
11   Q.   If somebody -- based upon your memory of what you sent
12        to the attorney general's office after you made the
13        deletions of sensitive information, if someone had
14        reviewed that document could they have inferred that
15        Mr. Convertino was going to be the subject of an OPR
16        investigation?
17            MR. SMITH:  Objection to the tense.
18            You can answer.
19   A.   Yes.
20   BY MR. KOHN:
21   Q.   Now, when -- you testified earlier that you spoke to
22        Mr. Ashenfelter on the phone on or about December
23        12th, correct?
24   A.   Yes.
25   Q.   And to be very clear on the time frame, that was after

## Page 132

1         you sent the OPR referral letter with the deletions
2    for sensitive information to the attorney general's
3    office, correct?
4    A.   Yes.
5    Q.   So when you spoke to Mr. Ashenfelter, you had already
6         made one communication to someone outside of the
7         Plymouth United States Attorney's Office in which the
8         fact that Mr. Convertino was going to be the subject
9         of an OPR investigation was not considered sensitive
10        enough to be kept -- to be redacted, correct?
11            MR. SMITH:  Objection, argumentative and
12   compound.
13            You can answer.
14   A.   I'm going to have to ask you to repeat it.
15   BY MR. KOHN:
16   Q.   Okay.  I'll say this.  So at the time when you spoke
17        to Mr. Ashenfelter on December 12th, 2003, in your
18        mind you'd already made a determination that the mere
19        fact of the referral to OPR was not sensitive, isn't
20        that true?
21   A.   No.
22   Q.   And you understood at the time you spoke to
23        Mr. Ashenfelter on or about December 12, 2003, in your
24        mind it would be appropriate for the fact that
25        Mr. Convertino was referred to OPR to be disclosed to

## Page 133

1         senator Charles Grassley, isn't that true?
2    A.   No.
3    Q.   What steps did you take to prevent the attorney
4         general's office from transmitting the letter you
5         communicated to them -- I'm talking about the one that
6         you took out the sensitive information, from being
7         sent to senator Charles Grassley?
8    A.   None.
9    Q.   Have you ever heard the phrase in reference to
10        Mr. Convertino by anybody that he had gone,
11        quote-unquote, off the reservation?
12   A.   I think it's in his civil complaint.
13   Q.   Have you read his civil complaint?
14   A.   Yes.
15   Q.   And when did you read that?
16   A.   Whenever it came out.
17   Q.   Did you make a copy of it?
18   A.   I don't think so.
19   Q.   Did you show it to anybody?
20   A.   No, I think it was shown to me.
21   Q.   By who?
22   A.   Our civil division probably, I don't know exactly.
23   Q.   Other than seeing it in his complaint, had you ever
24        heard anyone in the office use words to that effect in
25        reference to Mr. Convertino?

JONATHAN TUKEL
April 24, 2009

Page 134

1  A.  I think one of the memoranda that Mr. Convertino said
2      to me quoted those words but I had not heard anyone
3      orally speak those words.
4  Q.  What was your own personal opinion of Mr. Convertino
5      in the late 2003, early 2004 time frame?
6  A.  I didn't particularly know him very well.
7  Q.  Would it be true during that time period you did not
8      like him?
9  A.  I knew of his reputation and he was someone I declined
10     to socialize with, but -- if that's dislike, yes.  He
11     had invited me to a party at his house in December of
12     2001, a Christmas party, which I couldn't attend
13     anyhow because we had a new baby at home, and I
14     just -- he was not someone I wanted to socialize with.
15 Q.  Was there any -- do you know if there was anyone else
16     in the office who also didn't want to socialize with
17     Mr. Convertino?
18 A.  I don't know.  I mean, he had a reputation as being a
19     polarizing figure so it wouldn't surprise me but I
20     cannot think of specific names.
21 Q.  How about Mr. Eric Straus, do you know how he felt
22     about Mr. Convertino during that time?
23 A.  2002-2003?
24 Q.  Actually the time period that I'm focused on is from
25     about September 2003 through January and including

Page 135

1      January 2004.
2  A.  I don't know specifically.
3  Q.  Did he ever say anything that could be interpreted as
4      a negative -- representing some type of negative
5      opinion concerning Mr. Convertino?
6  A.  I don't recall during that time period that he did.
7  Q.  Have you ever heard him during any time period make a
8      negative comment about Mr. Convertino?
9  A.  Well, subsequent to the full review that was conducted
10     by Craig Moreford, I think there were some negative
11     comments about the conduct of the case.
12 Q.  What about Mr. Convertino personally?
13 A.  Personally no.
14 Q.  And when you say a polarizing figure, was the office
15     in some way polarized in its opinions of
16     Mr. Convertino?
17 A.  I don't think it's correct to say that the office was.
18     I think there were some law enforcement agents who
19     absolutely loved him and I think there were some who
20     did not.  And my impression, because again, this is
21     mostly reputation, is that there was not a lot of
22     middle ground.
23 Q.  You mentioned earlier in your testimony something with
24     Mr. Nahmais, and who is he?
25 A.  David Nahmais?

Page 136

1  Q.  Yeah.
2  A.  During what time frame?
3  Q.  September 2003.
4  A.  He was a deputy assistant attorney general in the
5      criminal division.
6  Q.  Did you have any interaction with him?
7  A.  Yes.
8  Q.  And what was that?
9  A.  One of my responsibilities in the deputy attorney
10     general's office was reviewing death penalty
11     litigation.  That fell within his jurisdiction also
12     and we were on the attorney general capital case
13     review committee together.
14 Q.  And when you returned to Plymouth did you have any
15     communications with him?
16 A.  No.  He left shortly thereafter because he became a
17     United States attorney in Atlanta.
18 Q.  In September 2003, that time period, did you ever hear
19     Mr. Nahmais make any negative comments concerning
20     senator Grassley?
21 A.  No.
22 Q.  Did anyone ever tell you that Mr. Nahmais had made
23     statements such as Grassley's not our friend?
24 A.  I've seen writings of Mr. Convertino's that said that.
25     No one told me that.

Page 137

1  Q.  Marwan Farhat, who's he?
2  A.  He was an individual who had been a defendant in a
3      case.
4  Q.  And what -- do you know what service -- in the time
5      period before the publication of -- of Exhibit 1,
6      the article in the Plymouth Free Press about
7      Mr. Convertino, tell me what you knew about
8      Mr. Farhat.
9  A.  I'm sorry, you have to tell me the time frame again.
10 Q.  Prior to the publication of the Plymouth Free Press
11     article about Mr. Convertino, the Exhibit Number 1, so
12     that would be prior to January 17, 2004, what did you
13     know about Marwan Farhat?
14 A.  All I knew was what I had learned in the course of
15     preparing the OPR referral.
16 Q.  And tell me what you knew, tell me what you remember.
17 A.  Well, I -- I had gotten that memo from Bob Cares.  I
18     heard that he had spent, he meaning Mr. Farhat, had
19     spent a lot of time walking around unrestricted in the
20     U.S. Attorney's Office and I don't recall anything
21     else specifically right now.
22 Q.  Do you know what -- at the time did you know what
23     services he was rendering for the United States?
24 A.  No.
25 Q.  At the time do you know what agencies he was providing



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 138

1    information to?
2    A.  I'm going to have ask you again what time frame you're
3       talking about.
4    Q.  September --
5    A.  Are we always going to stick with this time frame,
6       unless you tell me otherwise?
7    Q.  I don't know if I can actually say that per se, but
8       for this question specifically I'm talking about in
9       September -- actually these questions are everything
10      you knew before that article came out --
11   A.  Okay.
12   Q.  -- about Mr. Farhat, because after the article came
13      out is a different story.  We want to know what
14      happened before, what you knew.
15   A.  Okay.
16   Q.  So before the article came out did you know what
17      agencies he had provided information to?
18   A.  I knew that he had worked with the FBI.
19   Q.  Do you know who with the FBI he was working with?
20   A.  As to none of this do I have first-hand knowledge, I
21      had been told these things.
22   Q.  Did anyone tell you who in the FBI he had been working
23      with?
24   A.  Bob Pertuso.
25   Q.  Anyone else?

## Page 139

1    A.  Kevin Tias (phonetic).
2    Q.  Did you ever talk to Kevin Tias about Mr. Farhat?
3    A.  Never met him in my life.
4    Q.  You never met Kevin Tias?
5    A.  No.
6    Q.  When you were writing the OPR referral did you make
7       any effort to speak with Kevin Tias before you
8       finished the product?
9    A.  I don't think so.
10   Q.  Are you aware that Mr. Tias worked for the FBI?
11   A.  I was told that.
12   Q.  And were you told he may have information related to
13      the cooperation and assistance he was giving to the
14      United States?
15   A.  I don't think so.
16   Q.  Did you think he might have that information?
17   A.  I don't think so.
18   Q.  Pardon?
19   A.  I don't think so.
20   Q.  Then so it never entered your mind that Mr. Kevin Tias
21      would know -- that's your testimony, that you don't
22      think he would know the level of assistance he was
23      providing --
24         MR. SMITH:  Objection, form.
25   BY MR. KOHN:

## Page 140

1    Q.  -- or the type of assistance?
2         MR. SMITH:  Same objection.
3    A.  I thought the question was did I think that he had
4       information.
5    BY MR. KOHN:
6    Q.  Okay.  Did you think Mr. Tias had information
7       concerning the level -- the type of assistance
8       Mr. Farhat had provided to the United States?
9    A.  The way it was presented to me, my understanding was
10      that Mr. Pertuso was the lead agent and was the person
11      with the more significant knowledge.
12   Q.  And who told you that?
13   A.  I think it was Mr. Convertino.
14   Q.  And did you talk to Mr. Pertuso about Mr. Farhat?
15   A.  I did not.
16   Q.  Was one of the issues concerning Mr. Farhat related to
17      a recommendation -- reference a 5K1.1 motion?
18   A.  In his own personal sentencing?
19   Q.  Yes.
20   A.  And what is a 5K1.1 motion.
21   Q.  Well, at the --
22         MR. SMITH:  You can ask him his
23      understanding.
24   BY MR. KOHN:
25   Q.  Yeah, your understanding.

## Page 141

1    A.  At that time, the guidelines were mandatory.  Since
2       the Supreme Court has issued a series of rulings they
3       no longer are.  At that time Section 5K1.1 of the
4       guidelines was a mechanism by which the United States
5       Attorney or whatever DOJ component was prosecuting the
6       case could make a motion asking the court to reduce a
7       defendant's sentence for cooperation.
8    Q.  Okay.  And in order to know the validity of a 5K1.1
9       motion, do you think it would be important to know the
10      level of cooperation that the individual who's the
11      subject of the motion was providing to the United
12      States?
13         MR. SMITH:  Objection to form.
14         You can answer.
15   A.  For whom to know that?
16   BY MR. KOHN:
17   Q.  Well, for anyone reviewing the validity of a 5K1.1
18      motion on behalf of an individual.
19         Should they know the level of cooperation
20      that individual was giving to the United States in
21      order to make a determination as to the validity or
22      the soundness of such a motion?
23         MR. SMITH:  Same objection.
24   A.  Well, a sentencing judge should certainly know that,
25      the probation department should certainly know that.

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 142

1  BY MR. KOHN:
2  Q.  In terms of their recommendations --
3  A.  Yes.
4  Q.  -- or decision.
5        What about you when you were drafting the
6     OPR, do you think it would have been helpful
7     information to know precisely how much cooperation he
8     was giving to the United States?
9           MR. SMITH:  He being Mr. Farhat?
10 BY MR. KOHN:
11 Q.  No, he being -- he being Mr. Farhat.
12 A.  In other words, would it have been useful for me in
13    preparing the OPR referral to know what level of
14    cooperation?
15 Q.  Yes.
16 A.  Mr. -- that was not the focus of what I was doing.
17    The focus of what I was doing was whether or not the
18    motion itself had been authorized --
19 Q.  Okay.
20 A.  -- not whether it was justified.
21 Q.  Now, you knew at the time you obtained the information
22    to draft the OPR referral that Mr. Farhat was helping
23    out the United States in some way, correct?
24 A.  I was told that.
25 Q.  By who?

Page 143

1  A.  Mr. Convertino.
2  Q.  But also you reviewed information that pretty much
3     confirmed that, didn't you?
4  A.  Specifically what?
5  Q.  Didn't you look at documents?
6  A.  I'm not sure what you're referring to.
7  Q.  Okay.  We'll get back to it.
8  A.  Okay.
9  Q.  Did you know prior to the Plymouth Free Press
10    publishing his name in the newspaper that the Plymouth
11    Free Press might publish Mr. Farhat's name in the
12    newspaper in relationship to Exhibit Number 1?
13 A.  I think so.
14 Q.  Okay.  And when you found that out, before the article
15    was published, did you know that Mr. Farhat was a
16    cooperating witness or a confidential informant for
17    the United States, yes or no?
18          MR. SMITH:  Objection, compound.
19 A.  I don't -- I didn't know that then because I don't
20    know if that's true now.  I mean, confidential
21    informant and cooperating witness are technical
22    defined terms and I don't know what his status was.
23 BY MR. KOHN:
24 Q.  Did you know beyond the technical defined terms
25    whether, prior to this newspaper article being

Page 144

1     published, that Mr. Farhat was working in some
2     capacity for the United States at the request of law
3     enforcement officials of the United States, yes or no?
4  A.  I had been told that.
5  Q.  When you -- and in fact, you also knew that
6     Mr. Farhat's cooperation was such that he could never
7     testify in court, correct?
8  A.  I don't think that that's a question that could be
9     answered yes or no.
10 Q.  Okay.  But did you have information that the type of
11    assistance Mr. Farhat was providing the United States
12    was consistent with his maintaining his identity
13    completely confidential, including not appearing as a
14    witness in court?
15          MR. SMITH:  Objection to form.
16          You can answer.
17 A.  I don't think so.  I don't think that's correct.
18 BY MR. KOHN:
19 Q.  Weren't you provided information that Farhat was
20    not -- well, let's -- okay.  I'm going to show you a
21    document, I'll make it easy.  This is, again, look at
22    Exhibit Number 3.
23          Now, you testified earlier today that this
24    was one of the documents provided in September of 2003
25    when you were reviewing allegations by Mr. Cares,

Page 145

1     C-A-R-E-S, correct?
2  A.  Yes.
3  Q.  So did you read this when you were preparing
4     allegations?
5  A.  Yes.
6  Q.  Okay.  And if you look here, don't you see that part
7     of the controversy between Mr. Cares and
8     Mr. Convertino dealt with Mr. Convertino's insistence
9     that Mr. Farhat not testify in open court?
10 A.  Yes.
11 Q.  So you knew that at least at some point there was an
12    interest in Mr. Convertino, in keeping his identity
13    confidential to the extent that he not testify in
14    court, isn't that true?
15 A.  Yes, but that's not what you asked before.
16 Q.  Okay.  I'm not -- I'm just trying to find out what you
17    knew and when.
18          And in fact for whatever reason, at least
19    as of September 2002, Mr. Cares wanted to use
20    Mr. Farhat in some, it looks here like a RICO
21    investigation, isn't that true?
22 A.  Yeah, you know, I'm looking at this and you mentioned
23    2002 and I'm not sure why it says 2002.  I mean, I
24    think this was all 2003.
25 Q.  I think -- maybe to help, I think what happened is

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 146

1    this was presented to you in 2003 because of the
2    sentencing but these were then attached to what was
3    sent up, the earlier controversy.
4    A.  Oh, that's possible because it's September so I
5       assumed it was -- okay.  What was your question?
6    Q.  My question was you understood that Mr. Cares wanted
7       to use him for a RICO investigation.
8    A.  Uh-huh.
9    Q.  And if you see here where it says consensual phone
10      calls?
11   A.  Where are you?
12   Q.  On page one of Exhibit 3, we're looking at the Cares
13      e-mail, consensual phone calls?
14   A.  Yes.
15   Q.  Wouldn't consensual phone calls generally be made by
16      someone whom the target of the phone calls didn't know
17      was working for the government?
18   A.  That's usually the idea, yeah.
19   Q.  But then in this document, again we're looking at Bob
20      Cares's memo, then it says possibly trial testimony.
21      Do you see that?
22   A.  Yes.
23   Q.  So if Mr. Farhat was used at trial his identity may be
24      publicly exposed, correct?
25   A.  Yes.

Page 147

1    Q.  Now, let's look at Mr. Convertino's memo, second
2       paragraph, it says, it was always understood by the
3       FBI and me that Farhat would not testify.  Do you see
4       that?
5    A.  Yes.
6    Q.  As a general matter in your office, aren't informants
7       or cooperating witnesses put into two general
8       categories, those that you might expect might testify
9       in open court but informants who will never -- or you
10      don't anticipate they will ever testify, isn't that
11      true?
12          MR. SMITH:  Objection to form.
13          You can answer.
14   A.  In criminal cases the terms are source who won't
15      testify and cooperating witness who will.
16   BY MR. KOHN:
17   Q.  And could a source also be considered a confidential
18      informant?
19   A.  Confidential informant is sort of a lazy shorthand
20      that blurs the distinctions.  And now under the
21      current attorney general guidelines there is no such
22      distinction anymore.
23   Q.  But at the time Mr. Farhat was in the category of
24      someone -- in the time meaning at least as of 2002
25      whose concern over his identity was such that the

Page 148

1    United States had, according to Mr. Convertino, had
2    agreed that they would not make him testify, isn't
3    that true?
4    A.  According to what this says that's true.  I don't know
5       how he was opened, I don't know which form he signed,
6       I don't know what promises were made to him.
7    Q.  When you learned that his name would appear in the
8       Plymouth Free Press, did you attempt to learn any of
9       those things you just mentioned?
10          MR. SMITH:  Objection, foundation.
11          MR. KOHN:  Okay.  The witness just gave an
12      answer where he listed a couple things he didn't know.
13      Could you read that back please?
14          (The following portion of the record was
15          read by the reporter at 1:15 p.m.:
16          "According to what this says, that's true.
17          I don't know how he was opened, I don't
18          know what forms he signed, I don't know
19          what promises were made to him.")
20   BY MR. KOHN:
21   Q.  When you learned before Mr. Farhat's name was put on
22      the front page of the Plymouth Free Press that his
23      name would -- likely would be in the paper, did you
24      take any steps to determine how he was opened?
25          MR. SMITH:  Same foundation objection as to

Page 149

1    the would or likely would.
2    BY MR. KOHN:
3    Q.  Did you take any steps to determine how he was opened?
4    A.  No.
5    Q.  Any attempt to determine what type of forms he signed?
6          MR. SMITH:  Objection to form.
7          You can answer.
8    A.  No.
9    BY MR. KOHN:
10   Q.  Any attempt to determine what promises were made to
11      him?
12          MR. SMITH:  Same objection.
13   A.  I think later there were attempts made to do that.
14   BY MR. KOHN:
15   Q.  I'm talking about before the article was published.
16   A.  No.
17   Q.  How important is it to keep the identity of a
18      confidential source confidential?
19   A.  Are you speaking about a source or a cooperating
20      witness or both generically?
21   Q.  Well, let's talk -- start with -- if a cooperating
22      witness is acting in a confident -- is still
23      confidential, in other words, they're doing stuff and
24      their identity has not yet been publicly revealed as a
25      cooperating witness how important is it to keep that

JONATHAN TUKEL
April 24, 2009

## Page 150

1    identity confidential?
2  A.  It's very important.
3  Q.  Okay.  If you're a confidential informant, and again
4      you're doing what confidential informants do and your
5      identity has not yet been exposed, how important is it
6      to keep that identity confidential?
7          MR. SMITH:  I object because he's already
8      said that confidential informant is what he considers
9      to be a lazy shorthand and he talked about sources --
10         MR. KOHN:  I understand --
11         MR. SMITH:  -- but if you want him to
12     answer the question he can try, if he can.
13 BY MR. KOHN:
14 Q.  As the way the term confidential informant was used in
15     the U.S. Attorney's Office in or about January 2004,
16     how important would it be to keep that confidential
17     informant's identity confidential?
18 A.  It's always very important but it's understood, and if
19     it is a cooperating witness which is almost always
20     going to be the case in any sort of drug
21     investigation, in fact I think it's probably routinely
22     the case in drug investigations, they are cooperating
23     witnesses and are told that they might have to testify
24     because the nature of making tape recordings and doing
25     things like that is you may have to authenticate

## Page 151

1      those.
2  Q.  But at least in September 2003 the promise given to
3      Mr. Farhat at least as recorded by Mr. Convertino was
4      that he would not have to testify, isn't that true?
5  A.  That's what this says, yes.
6  Q.  So what was the official name in your office for a
7      cooperating witness that was not expected to ever
8      testify in court, what did you call that person?
9  A.  It could depend if they are truly a cooperating
10     witness in which they're not receiving consideration
11     in a case and that would be called a source.
12 Q.  Okay.
13 A.  And if someone is cooperating in a case because
14     they're hoping to get some sort of consideration, that
15     would most usually be referred to as a cooperating
16     defendant.
17 Q.  Okay.  Cooperating defendant.  And what if someone was
18     both cooperating in their own case but also
19     cooperating for other cases they had no relationship
20     with, what are they called then?
21 A.  There's probably no uniform description of that and
22     different agencies will do it different ways.  Some
23     will actually open them as a registered cooperating
24     witness and some will just -- they take their
25     cooperation, if it works, they get some sentence

## Page 152

1      consideration and if not, you know, they're not given
2      those -- they don't sign the formal agreement that a
3      cooperating witness would.
4  Q.  Okay.  And for all these people, if they're acting --
5      if they're in the process of being confidential and
6      acting in a confidential capacity how important is it
7      to preserve that confidentiality?
8  A.  It's important.
9  Q.  And if that confidentiality is inadvertently exposed
10     could it be life threatening to those people?
11 A.  Certainly, depending on the type of case.
12 Q.  And when you reviewed the allegations against
13     Mr. Convertino in the September-October 2003 time
14     frame, were you aware that Mr. Farhat was still
15     providing assistance to the United States?
16 A.  I don't know.
17 Q.  But according to this memo, Exhibit 3, the line under
18     the September 12th, 2002 line, it states that he had
19     already provided more assistance than was expected or
20     anticipated.  Do you see that?
21 A.  I do but you asked if he was continuing a year later
22     and I don't know the answer to that.
23 Q.  So your testimony, to be very clear here, that in the
24     September -- okay, between September 2003 and before
25     this article was published, Exhibit Number 1, you did

## Page 153

1      not know if Mr. Farhat was still working with the
2      United States government in some capacity on cases or
3      did you know he was?
4  A.  I'm sorry, I'm going to have to ask you to repeat
5      that.
6  Q.  Sure.  Between September 2003 and the time that the --
7      and say the minute before the article, January 17,
8      2004, that article was published, did you know if
9      Mr. Farhat was still providing help to the United
10     States?
11 A.  No, I did not know.
12 Q.  And so when you reviewed the controversy over the
13     sentence recommended by Mr. Convertino, you did not
14     inquire as to the status of Mr. Farhat?
15         MR. SMITH:  Objection, foundation.
16         MR. KOHN:  I just want to know that.
17         MR. SMITH:  I know that you do but I still
18     have an objection.
19         MR. KOHN:  Sure.
20 A.  I'm going to have to ask you to repeat that.
21 BY MR. KOHN:
22 Q.  So when you wrote up your OPR allegations that related
23     to Mr. Farhat, you are testifying now that you did not
24     know the current status of Mr. Farhat?
25 A.  I don't recall if I knew or not.

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 154

1  Q.  Okay.  When thinking back to it, hindsight, do you
2     think you should have taken some steps when you
3     learned that Mr. Farhat's name was going to be in the
4     paper to try to mitigate the potential harm that could
5     be caused by the disclosure of his identity?
6           MR. SMITH:  Objection, foundation.
7           You can answer.
8  A.  I think it would have been a good idea in hindsight.
9  BY MR. KOHN:
10 Q.  Have you ever been subject to any type of reprimand or
11     discipline for failing to take steps upon learning
12     that a potential confidential source was about to be
13     publicly exposed?
14          MR. SMITH:  Objection, same foundational
15     objection.
16          You can answer.
17 A.  No.
18 BY MR. KOHN:
19 Q.  Are you aware that because of that article, what was
20     in that article, Mr. Farhat was shot at -- or excuse
21     me, his house was shot at within a day or two of the
22     article appearing?
23          MR. SMITH:  You can -- I mean you can
24     answer based on your knowledge.
25 BY MR. KOHN:

Page 155

1  Q.  Yeah, do you know that?
2  A.  Well, I obviously have no personal knowledge and I
3     have heard otherwise.
4  Q.  And did you know that he had to be removed from the
5     United States shortly after the article was published?
6  A.  I don't have personal knowledge of it but I have heard
7     otherwise.
8  Q.  You've heard otherwise, that he didn't leave the
9     United States?
10 A.  No, that he --
11          MR. SMITH:  Objection, argumentative.
12          You can answer if -- I mean, what's the
13     question.
14 BY MR. KOHN:
15 Q.  Okay.  Do you know what investigations he was helping
16     on at the time that article was published, yes or no?
17 A.  No.
18 Q.  Do you know how the publication of that article
19     interfered with those investigations, yes or no?
20 A.  No.
21 Q.  When you learned that his name was going to appear in
22     the paper, were you surprised?
23 A.  That his name was appearing?
24 Q.  Yeah.
25 A.  Yes.

Page 156

1  Q.  And you took no action upon learning that?
2  A.  I took no action with regard to trying to do anything
3     to protect his security, if that's your question, yes.
4  Q.  Now, based on the relationship you had developed with
5     Mr. Ashenfelter, do you think you were in a position
6     to talk to Mr. Ashenfelter about the wisdom of
7     printing that person's name, Mr. Farhat's name?  Maybe
8     run the story without actually using the specific
9     name?
10 A.  I don't know.  I don't think so.
11 Q.  Do you know or have any information that
12     Mr. Convertino talked to Mr. Ashenfelter and tried to
13     convince him not to use the name?
14 A.  I read that in his complaint.
15 Q.  And do you know whether Mr. Convertino's attorney
16     Mr. Sullivan attempted to talk to Mr. Ashenfelter to
17     convince him not to use the name?
18 A.  I don't have any knowledge of that.
19 Q.  Did the thought enter your mind when you learned from
20     Mr. Ashenfelter that Mr. Farhat's name would be in the
21     paper that maybe you could just politely ask him,
22     maybe you don't want to run that name?
23          MR. SMITH:  Objection, foundation.
24 A.  Could you repeat it?
25 BY MR. KOHN:

Page 157

1  Q.  When you learned from Mr. Ashenfelter that
2     Mr. Farhat's name was going to be in the newspaper,
3     did the thought even enter your mind to maybe just ask
4     Mr. Ashenfelter, hey, maybe you just -- why don't you
5     just not run that name?
6          MR. SMITH:  Same objection.
7  A.  I don't think it did enter my mind.
8  BY MR. KOHN:
9  Q.  Have you ever been directly or indirectly responsible
10     for the exposure of the identity of a confidential
11     source?
12 A.  No.
13 Q.  Do you know anyone in the Department of Justice who is
14     responsible for the exposure of a confidential source?
15 A.  Yes.
16 Q.  Who?  Strike that.
17          Is that a serious offense in your mind,
18     exposing the identity of a confidential source?
19 A.  Well, when you say offense, do you mean a criminal
20     offense?
21 Q.  Could it be criminal to expose the identity of a
22     confidential source?
23 A.  Probably under some circumstances it could.
24 Q.  And even if it's not criminal what about just work
25     performance, a performance type of infraction,



BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 158

1    exposing a confidential source?
2  A.  I assume it could, yes.
3  Q.  If you were the manager and a subordinate of yours
4    exposed a confidential source what do you think you'd
5    do?
6  A.  I don't know.  I remember one instance it happened in
7    our office and nothing really happened.
8  Q.  So -- okay.  And did you -- did you know about that
9    incident where nothing really happened at the time
10   when Mr. Ashenfelter told you that Mr. Farhat's name
11   was going to appear in the newspaper?
12 A.  I probably did.  It didn't occur to me.
13 Q.  Do you have any -- since this happened, do you have
14   any idea whatsoever to the negative impact to law
15   enforcement caused by Mr. Ashenfelter's putting that
16   name in that newspaper article?
17       MR. SMITH:  Can you read that question back
18 to me?
19       (The requested portion of the record was
20       read by the reporter at 1:27 p.m.:
21       "Question.  Do you have any -- since this
22       happened, do you have any idea whatsoever
23       to the negative impact to law enforcement
24       caused by Mr. Ashenfelter's putting that
25       name in that newspaper article?")

Page 159

1        MR. SMITH:  Objection to form.
2        You can answer.
3        MR. KOHN:  Okay.  I can rephrase it if
4    you'd like.
5        MR. SMITH:  Okay.
6  BY MR. KOHN:
7  Q.  Do you know the impact on law enforcement activities
8    caused by the exposure of Mr. Farhat's identity in the
9    January 17, 2004 Plymouth Free Press article?
10 A.  Not firsthand, no.
11 Q.  So you have researched the law on exposure of
12   confidential leaks by newspaper reporters, you follow
13   the Ashenfelter motion to compel, but you did not
14   undertake any type of review to the damage caused to
15   the United States by exposing Mr. Farhat's identity.
16   Isn't that the case?
17       MR. SMITH:  Objection, compound,
18   argumentative.
19       You can answer to the extent that you
20   understand it and are able to.
21 A.  I'm not really sure what you mean by conduct research.
22 BY MR. KOHN:
23 Q.  Okay.  There have been comments by various -- okay.
24   Have you ever heard anyone say they didn't
25   care about the exposure of Farhat's identity, he was a

Page 160

1    thug and they don't care if he got beaten up, words
2    like that?
3  A.  Some of that.
4  Q.  From who?
5  A.  Bob Cares.
6  Q.  What did he say?
7  A.  That he was a thug.
8  Q.  And he didn't care about the exposure?
9  A.  I don't remember him saying that.
10 Q.  Do you remember words, he didn't care if he got beat
11   up?
12 A.  I don't think so.
13 Q.  But what was the context of Bob Cares telling you he
14   was a thug?
15 A.  I don't remember that.
16 Q.  Did you tell Mr. Cares in that conversation that it
17   was very important to keep the identity of
18   confidential informant's confidential?
19 A.  Well, this was after the fact.
20 Q.  Did you tell him that?
21 A.  I don't think I needed to tell him that.  I think he
22   knew that.
23 Q.  What about Eric Straus, did he ever tell you he
24   thought Farhat was a thug?
25 A.  I don't think he used that word.

Page 161

1  Q.  Do you find it strange when Cares on the one level was
2    being very aggressive trying to get help from
3    Mr. Farhat which apparently was denied and then turns
4    around and says, he's just a thug, do you find
5    anything strange about that?
6  A.  I'm going to have to ask you to repeat that because I
7    was looking at the memo.
8  Q.  Okay.  In your mind when Cares called Mr. Farhat a
9    thug, did you find anything strange about the fact
10   that Cares had previously attempted to get his
11   assistance on a RICO case?
12 A.  No.
13 Q.  So if an informant or source or cooperating witness is
14   a thug, does that make them any less entitled to
15   having their confidentiality strictly protected?
16       MR. SMITH:  Objection to the term entitled.
17       I mean, what's --
18 BY MR. KOHN:
19 Q.  Well, should your office keep confidential sources
20   identities confidential even if that source is a thug,
21   yes or no?
22 A.  Yes.
23 Q.  When you were sending your OPR referral to the
24   attorney general's office, it included the name of
25   Mr. Farhat in it, didn't it?

JONATHAN TUKEL
April 24, 2009

Page 162

1  A.  I'm pretty sure it did.
2  Q.  So you understood that there was a likelihood that the
3     attorney general's office would provide the name of
4     that source to senator Charles Grassley, isn't that
5     true?
6  A.  Well, I don't know that I understood that.  I assumed
7     that that was a possibility.
8  Q.  And you also previously testified that once something
9     is given to a senator or a congressman, there's a
10    likelihood that could get provided to or leaked to the
11    press, isn't that true?
12        MR. SMITH:  Objection, asked and answered
13    as the premise of your question states.
14        MR. KOHN:  Yeah, okay.
15        MR. SMITH:  You can answer it one more
16    time.
17  BY MR. KOHN:
18  Q.  You previously testified that you understood that when
19    something's given to a senator or congressman there's
20    a likelihood that that representative will release it
21    to the press either through a leak or give it to the
22    press?
23        MR. SMITH:  Separate objection as to
24    likelihood.
25  A.  I was going to say I don't know that there's a

Page 163

1     likelihood.  It increases the chance, sure.
2  BY MR. KOHN:
3  Q.  So again, when you sent -- when you were asked to
4     delete sensitive information from your referral you
5     did not delete the name of someone who is working in
6     your office or through your office in a confidential
7     way, isn't that true?
8  A.  That's true.
9  Q.  Prior to the publication of this article, Exhibit
10    Number 1, search your memory as deep and as far as you
11    can and I have a question for you, did you say
12    anything to Mr. Ashenfelter which in any way could be
13    interpreted that there was some type of OPR
14    investigation related to Mr. Convertino, yes or no?
15        And if you want time to think that and
16    really search your memory as hard as you can, we can
17    take a break and you can think through that or you can
18    answer it now.
19        MR. SMITH:  I object to the form, but you
20    can answer it if you understand it.
21  A.  I'm not sure I understand.
22  BY MR. KOHN:
23  Q.  Okay.  I'm going to repeat it.  I would like you, on
24    this particular question, to search your memory as
25    absolutely hard as you can, to really go back in time

Page 164

1     and try to remember, and the question is simple, might
2     you have said anything to Mr. Ashenfelter which could
3     have led Mr. Ashenfelter to believe that there was an
4     OPR investigation related to Mr. Convertino?
5        MR. SMITH:  Can you read it back from might
6     please, Might you have said?
7        (The following portion of the record was
8        read by the reporter at 1:35 p.m.:
9        "Might you have said anything to
10       Mr. Ashenfelter which could have led
11       Mr. Ashenfelter to believe that there was
12       an OPR investigation related to Mr.
13       Convertino.")
14       MR. SMITH:  I think that's a
15    nonobjectionable question which the witness -- you're
16    asking him to do the best he can to answer.
17       MR. KOHN:  Yes.
18  A.  Not that I recall.
19       MR. KOHN:  I'm going to show you a document
20    which we'll mark as Exhibit 5.
21       MARKED BY THE REPORTER:
22       DEPOSITION EXHIBIT 5
23       1:36 p.m.
24  BY MR. KOHN:
25  Q.  This is the December 2nd OPR referral.  Do you

Page 165

1     recognize this document?
2  A.  Can I review it?
3  Q.  Please.
4  A.  Okay.
5  Q.  If I -- I'd just like to ask you a question on another
6     matter before we get to this.
7  A.  Okay.  Do you want me to stop reading?
8  Q.  Yeah.  Let's try to say it right, my client may have
9     to help me once again, but, question.  Is the
10    answer -- okay, I'm now talking about the legal
11    definition or -- in other words, your understanding of
12    what may or may not constitute perjury, okay?
13       My question is, if you give an answer, I do
14    not recall or I cannot recall, is that in your mind a
15    safe harbor for being charged with the crime of
16    perjury?
17  A.  No.
18  Q.  Okay.  Now --
19       MR. SMITH:  Again, that's his personal
20    understanding.
21  A.  That's my personal understanding.  Although it is an
22    obvious case specific determination.
23  BY MR. KOHN:
24  Q.  And what does that mean?
25  A.  Well, everything -- it depends on the facts of the

JONATHAN TUKEL
April 24, 2009

## Page 166

1     case. If someone says -- my understanding of the law
2     is if someone says I do not recall and they do and you
3     can prove that, that could constitute perjury.
4  Q.  But then if they say I do not recall but they were
5     mistaken, then it might not be perjury?
6  A.  Correct. It is -- it turns on the intent.
7  Q.  Okay.
8  A.  That's my understanding.
9  Q.  Okay. Okay. If you could please review the
10    document --
11 A.  All right.
12 Q.  -- I'm going to ask you some questions on that.
13          (Off the record at 1:37 p.m.)
14          (Back on the record at 1:39 p.m.)
15 A.  I'm assuming you don't care if I review the
16    attachment.
17 BY MR. KOHN:
18 Q.  No, I'm not asking about the attachment right now.
19          And you -- what was your role in the
20    drafting of this document?
21 A.  Something came in from OPR which I believe was
22    identical text, it was just addressed to Jeff Collins
23    and it said something to the effect of communicate
24    this to Mr. Convertino, which we did by putting it on
25    our letterhead.

## Page 167

1  Q.  When you looked at what OPR had put together, the
2     communication back and you -- so it's your testimony
3     it came back from OPR and did any of these five -- the
4     way they worded these five charges strike you as not
5     being valid?
6  A.  What do you mean by valid?
7  Q.  Or -- in other words, the type of thing that you
8     should be charging an OPR offense on? I mean, did you
9     have a -- did you yourself have an issue with the --
10    with whether Mr. Convertino should be charged with
11    everything set forth here?
12          MR. SMITH: At the time he received --
13          MR. KOHN: Yeah.
14          MR. SMITH: -- saw the letter from OPR?
15 BY MR. KOHN:
16 Q.  In other words, you got it back, your testimony is you
17    pretty much took what OPR had, you put it into this
18    document and then sent it off to Mr. Convertino.
19          MR. SMITH: I don't know that he said he
20    did it.
21 BY MR. KOHN:
22 Q.  Okay. Had Mr. Collins sign it and send it off.
23          My question is, since your testimony is
24    that the numbers one through five here came from OPR,
25    and essentially -- I'm assuming -- and again these

## Page 168

1     aren't facts that -- I'm just assuming here that you
2     sent the referral up and they did something and sent
3     the letter back to you, correct?
4  A.  Well, not to me.
5  Q.  Okay. To Collins?
6  A.  Yeah.
7  Q.  And when they sent the letter back, they -- the
8     wording of numbers one through five was OPR's wording
9     correct?
10 A.  I believe the wording of the entire letter was OPR's
11    wording other than putting it on Eastern District of
12    Michigan letterhead.
13 Q.  Okay. I'm mostly concerned with numbers one through
14    five but I understand your testimony.
15          So my question is when you read one through
16    five was there anything in there, the way they worded
17    it, that you thought in your mind may not constitute
18    an appropriate OPR referral?
19 A.  I thought that was their decision to make. As I look
20    at it now and I don't recall what I thought at the
21    time, it seems to me that some of the language is
22    slightly different than what had been sent to them.
23 Q.  I would like to call your attention to the last
24    sentence on paragraph number one where it says, also
25    allegedly failed to obtain supervisory authorization

## Page 169

1     for a 5K1.1 motion made orally to the court.
2  A.  Right.
3  Q.  Do you see that?
4  A.  Yes.
5  Q.  Are 5K1.1 motions made from time to time orally to the
6     court?
7  A.  It's unusual.
8  Q.  But does it happen?
9  A.  I guess it probably happens. It's unusual.
10 Q.  Okay. So if one is made orally to the court, then
11    there may not be in that context a signed supervisory
12    authorization, correct?
13 A.  I'm sorry, could you repeat that?
14 Q.  If one is made orally to the court, a signed
15    supervisory authorization may not exist for that
16    motion?
17 A.  That's probably right.
18 Q.  And in fact do you have any knowledge other than this
19    one allegation, either directly or just through
20    hearsay in the office, that any other AUSA ever made
21    an oral motion to a court for a 5K1.1 motion in which
22    they did not have specific supervisory authorization?
23 A.  Have I ever heard that?
24 Q.  Yes.
25 A.  Or had I heard it as of that date?

JONATHAN TUKEL
April 24, 2009

## Page 170

1  Q.  Well, have you ever heard that that's happened in
2    other cases other than this one with Mr. Convertino?
3  A.  I think I have.
4  Q.  Okay.  And where have you heard it?
5  A.  Somewhere in the office, I couldn't tell you.
6  Q.  Someone said that, told you that?
7  A.  I think so.
8  Q.  Prior to December 2, 2003, had anyone told you that?
9  A.  I don't think so, but remember, I was not in a
10   supervisory position at that time or for most of that
11   time.
12 Q.  In looking at number two, failure to obtain
13   supervisory authorization for the 5K1.1 motions, do
14   you remember who you spoke to about number two?
15 A.  Mr. Convertino and Mr. Corbet.
16 Q.  Did you ever subsequently talk to Mr. Gershel about
17   it?
18          MR. SMITH:  Subsequent to what?
19 BY MR. KOHN:
20 Q.  After writing this at any point?
21          MR. SMITH:  Well, he didn't write this
22   document.
23 BY MR. KOHN:
24 Q.  Okay.  Did you ever talk to Mr. Gershel about number
25   two?

## Page 171

1  A.  Did I ever speak to him?
2  Q.  Yeah.
3          MR. SMITH:  About the allegations in number
4    two.
5  A.  Oh, sure.  He was helping me draft the OPR referral.
6  BY MR. KOHN:
7  Q.  Did he ever tell you that he had given authorization
8    to Mr. Corbet to essentially handle the 5K1.1 motions?
9  A.  I don't recall him saying that.
10 Q.  What did Mr. Corbet tell you about number two?
11          MR. SMITH:  About the information in number
12   two?
13          MR. KOHN:  Yeah.
14 A.  I would have to look at my notes to be sure.
15 BY MR. KOHN:
16 Q.  And were these three cases here part of a larger
17   prosecution?
18 A.  Yes.
19 Q.  And weren't all of the defendants pretty much treated
20   in the same way in that prosecution?
21 A.  I think they -- well, other than these three?  You
22   mean --
23 Q.  These and the others.
24 A.  I don't really know what happened with the others.
25 Q.  At the time you wrote this you didn't look and see

## Page 172

1    what type of 5K1.1 motions were filed for everybody
2    else?
3  A.  I don't remember if I did or not.
4  Q.  Did you discuss this with Mr. Convertino?
5  A.  I think we tried to and this was one of the cases he
6    did not want to discuss with us.
7  Q.  I would like you to look at number three, the savage
8    beating of the doctor and Mr. Farhat?
9  A.  Okay.
10 Q.  Okay.  I'm going to ask you some questions about that.
11   Did you do any type of review about the circumstances
12   behind this savage beating of a doctor?
13 A.  What do you mean?
14 Q.  What did you look into about that beating and
15   Mr. Farhat's relationship to it?
16 A.  I don't remember how that first came to my attention.
17   I did speak -- if you look on page two and it is the
18   end of paragraph three, quoting, further it is alleged
19   that you told a local policeman that the assault had
20   been taken into consideration, and it goes on, that's
21   the end of the quote?
22 Q.  Yeah.
23 A.  I did speak to him.
24 Q.  How did you know the identity of that policeman?
25 A.  I don't remember how I found that out but somehow I

## Page 173

1    did, and I can tell you his name and it's someone who
2    I knew before.
3  Q.  Oh, someone who -- and what did he tell you?
4  A.  Basically what was said here and some more.
5  Q.  Okay.  Can you please give me the name of that person?
6  A.  James Kiefer, K-I-E-F-E-R.
7  Q.  Are you sure that Kiefer was the police officer on the
8    case or was he just in the Dearborn Police Department
9    and had information on the case?
10          MR. SMITH:  Objection to form.
11 A.  I'm going to -- I'm not sure I understand the
12   distinction.
13 BY MR. KOHN:
14 Q.  Was Kiefer a policeman specifically working that
15   beating case, it was like his case, or was Kiefer a
16   policeman in the local police department who maybe had
17   information about it?
18          MR. SMITH:  Objection to form.
19          You can answer.
20 A.  I think at the time that Mr. Kiefer was assigned to a
21   federal task force and so I don't think he was
22   assigned as the officer in charge of that case.  He
23   may well have been relating other information to me
24   but my recollection is he also brought documents.
25 BY MR. KOHN:

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

---

Page 174

1  Q.  Okay.  Did you reach out to the officer assigned to
2      the case?
3  A.  I don't believe so.  I can't recall what the name is,
4      if I heard the name I might know.
5  Q.  And the documents he brought to you, do you remember
6      if they had a CC to a certain FBI agent on those
7      documents?
8  A.  I think he brought me a -- an investigator's report
9      and I think it was just an investigator's report with
10     some notes.
11 Q.  Okay.  Now, who else did you get information --
12 A.  There was some more information from Mr. Kiefer
13     though.
14 Q.  Okay.  What other -- other than Mr. Kiefer, where else
15     did you gather information about this incident of the
16     savage beating of a doctor?
17 A.  I think I talked to -- I think I talked to an FBI
18     agent who had knowledge of it.  I don't remember who
19     that was.
20 Q.  Which agent, do you --
21 A.  I don't remember the name.
22 Q.  Was it the case agent who was actually working on it,
23     Mr. -- Mr. Pertuso?
24 A.  No.
25 Q.  So you didn't speak to the case agent from the FBI

---

Page 175

1      working on the case and you didn't speak to the -- you
2      did not speak to Mr. Pertuso --
3  A.  Wait, wait, wait.
4  Q.  Who was the --
5          MR. SMITH:  Let him ask the question and
6      then I can object and you can answer.
7  A.  Okay.
8  BY MR. KOHN:
9  Q.  To the best of your knowledge who was the FBI case
10     agent working on matters related to the savage beating
11     of the doctor?
12 A.  I don't recall his name.  I think it was someone on
13     the health care squad.
14 Q.  And did you talk to him about this case?
15 A.  I think I did but I'm not certain because I can't
16     recall his name.
17 Q.  But you did not talk to Mr. Pertuso?
18 A.  No.
19 Q.  Do you know what Mr. Pertuso's relationship was with
20     Marwan Farhat?
21 A.  I have no firsthand knowledge of that.
22 Q.  Didn't you testify earlier that he was the main FBI
23     agent handling him?
24 A.  I testified that that is how it appeared to me from
25     what Mr. Convertino presented to me but I don't know

---

Page 176

1      and I don't believe I ever asked.
2  Q.  Okay.  Did you talk to anyone else about Mr. Farhat?
3  A.  In terms of what?
4  Q.  This incident, the savage beating of a doctor.
5  A.  It's possible I talked to the AUSA who had that case
6      because I think that doctor was a cooperating witness
7      in another case but I'm not certain.
8  Q.  What did you know about the doctor who was beaten?
9          MR. SMITH:  You can answer.
10 A.  At what time?
11 BY MR. KOHN:
12 Q.  At this time, December 2nd.  You said he was a
13     cooperating witness in another case?
14 A.  I don't think I knew that then.
15 Q.  Okay.  Do you know how the government came to learn
16     that Mr. Farhat had been involved in that beating of
17     the doctor?
18         MR. SMITH:  You mean the United States
19     government --
20         MR. KOHN:  Yeah.
21         MR. SMITH:  -- as opposed to the local
22     government?
23 A.  I think at one time I did know and I don't recall what
24     that is and I'm pretty sure I discussed that with
25     Mr. Kiefer.

---

Page 177

1  BY MR. KOHN:
2  Q.  And do you know that -- including do you know how the
3      Dearborn police came to learn that Mr. Farhat was
4      involved in the beating of the doctor?
5  A.  I think I did at one time when I talked to Mr. Kiefer
6      but I don't recall that.
7  Q.  Does this refresh your recollection, do you know that
8      Mr. Farhat signed a Kastigar letter related to the
9      beating of the doctor?
10 A.  I don't know that today.  I don't know if I ever did
11     know that.
12 Q.  And do you know if before Mr. Farhat signed that
13     Kastigar letter the police had -- the Dearborn police
14     had actually arrested an innocent person on that
15     beating charge?
16 A.  State that again.
17 Q.  Are you aware that the Dearborn police had arrested an
18     innocent person on the beating charge initially?
19 A.  If -- I may have at one time, I don't know now.
20 Q.  And are you aware that the doctor had made a -- an
21     identification -- yeah, had identified the wrong
22     person as a -- you know, made an eyewitness
23     identification of the wrong person in that case?  Did
24     you --
25 A.  I may have then, I don't now.

---

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 178

1   Q.   And when you say -- and are you aware that -- on the
2        basis of the Kastigar, Mr. Farhat admitted to his
3        participation -- of the Kastigar letter that
4        Mr. Farhat then admitted to his participation in the
5        beating?  Were you ever aware of that?
6   A.   I don't know if I was ever aware of it.  I'm not aware
7        of it now.
8   Q.   And are you aware that as a result of that statement
9        in the Kastigar the innocent person was released from
10       confinement?
11  A.   Again, I don't know today and I don't --
12  Q.   And --
13  A.   I don't know that today and I don't know when I knew
14       that.
15  Q.   And didn't Mr. Convertino tell you there was a
16       Kastigar and that you were free to arrest Mr. Farhat
17       at any time if you got information about him in that
18       beating independent of the Kastigar?
19  A.   No.
20  Q.   And didn't Mr. Convertino --
21  A.   He told me something different than that.
22  Q.   Did he tell you, we know his address and you can
23       arrest him whenever you want?
24  A.   He said, there's nothing in there, there's nothing
25       that took place that can stop him from being charged,

Page 179

1        you can go ahead and do that, but I have no
2        recollection of any mention of Kastigar or any issue
3        relating to that.
4   Q.   But when he said that to you, did he also say, as long
5        as you have independent information to charge him?
6   A.   No.  When I say no issue relating to that, that would
7        be the issue.
8   Q.   Okay.
9   A.   That was not said.
10  Q.   And do you know whether the information the Dearborn
11       police had was also related to the disclosures of
12       information from the Kastigar letter that Mr. Farhat
13       had signed?
14  A.   I don't know how the Dearborn police develop their
15       case as I sit here today.  It would surprise me if
16       they had information from a Kastigar letter because
17       that's a federal procedure.
18  Q.   Are you aware if Mr. Farhat passed a polygraph
19       concerning the doctor beating?
20  A.   Not today.  I don't know if I ever was.
21  Q.   Looking at number one did you talk to Kevin Tias?
22  A.   I've never spoken to Mr. Tias.
23  Q.   So then the answer would be in terms of getting
24       information or your investigation number one, you
25       never spoke to him?

Page 180

1   A.   I have never spoken to Mr. Tias.
2   Q.   At the time you -- this letter, as of December, excuse
3        me, 2nd, 2003, did you have any information that Kevin
4        Tias knew the level and extent of the cooperation of
5        Mr. Farhat?
6   A.   Could you repeat that?
7   Q.   As of December 2nd, 2003, did you know that Kevin Tias
8        was an FBI agent who had a lot of knowledge about the
9        level of cooperation and assistance Mr. Marwan Farhat
10       was providing to the United States?
11            MR. SMITH:  Objection, compound.
12  A.   As of that first meeting I had with Mr. Convertino,
13       which I think was September 23rd, he mentioned Kevin
14       Tias's name.  It was a new name to me.  As I said, the
15       way it came across to me and I can tell you, I mean,
16       ordinarily when you have two agents assigned to the
17       case, one knows more about it than the other, one is
18       lead and one is assisting.  It seemed to me from what
19       I was being told that Mr. Pertuso was the lead agent
20       so I would assume that he was the one who had more
21       information but I don't know specifically what you're
22       asking.
23  BY MR. KOHN:
24  Q.   But you knew that Mr. Tias -- you had specific
25       knowledge prior to December 2nd, 2003 that Mr. Tias

Page 181

1        had information regarding the level of cooperation of
2        Marwan Farhat?
3   A.   No.  I had been told that by Mr. Convertino.  I didn't
4        know Kevin Tias, I had never met Kevin Tias.  Until
5        Mr. Convertino mentioned his name to me, I had never
6        heard of him.
7   Q.   If you could please look at number five on this
8        letter.  Do you know a Mr. Jim Brennan?
9   A.   Yes.
10  Q.   And who is he?
11  A.   He's an FBI agent.
12  Q.   And do you know what his relationship was to the
13       Makalda case?
14  A.   Do I know today or did I know then?
15  Q.   Did you know then?
16  A.   I don't think so.
17  Q.   Did you ever speak to Mr. Brennan about matters
18       related to the Makalda matter -- strike that.
19            In -- when you were investigating what
20       became charge number five on Exhibit 6, did you talk
21       to Mr. Brennan?
22  A.   I don't think so.
23  Q.   Now, do you see the word blind-sided in number five?
24  A.   Yes.
25  Q.   What investigation did you undergo or did you take to

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

| Page 182 |
| --- |

1    determine whether Mr. Convertino had actually
2    blind-sided the -- Mr. Sauget in that matter?
3  A.  I spoke to Mr. Sauget, I believe Mr. Gershel had
4     information about that also and I think I -- I think I
5     saw one or two memoranda that were in files relating
6     to that.
7  Q.  What did those memoranda say?
8  A.  I don't specifically recall.  It's not something I
9     reviewed prior to today.
10          MR. KOHN:  Okay.  Were you aware -- okay.
11    I'm just going to show a document and ask him if he's
12    ever seen this before.
13          MARKED BY THE REPORTER:
14          DEPOSITION EXHIBIT 6
15          1:59 p.m.
16  BY MR. KOHN:
17  Q.  And have you ever seen this document before?
18  A.  Can I read through it?
19  Q.  Please.
20  A.  Okay.
21  Q.  Okay.  In looking at this document, have you ever seen
22    this document before?
23  A.  I am pretty sure I have.
24  Q.  And when you were doing the preparing the OPR
25    referral, were you provided a copy of this?

| Page 183 |
| --- |

1  A.  I was at least shown a copy of it, yeah.
2  Q.  Were you the source of any information whatsoever that
3     Ashenfelter put in the article, Exhibit Number 1?
4  A.  No.
5  Q.  Now, in regard to this document, Exhibit Number 6, if
6     you look at page four do you see reference under
7     paragraph number four, do you see reference to USA Jim
8     Brennan?
9  A.  I do.
10  Q.  So at the time you were preparing the OPR referral you
11    would have known that Mr. Brennan had some type of
12    involvement in this case, correct?
13  A.  Correct.
14  Q.  Did you ever talk to Mr. Brennan about this matter?
15  A.  No.
16  Q.  Now, if you also look on page one, it says that -- I'm
17    looking at the second sentence, it says, during the
18    pendency of the prosecution, that would be the
19    prosecution of Makalda, Assistant United States
20    Attorney Convertino of the strike force expressed an
21    interest in losing Makalda as a witness in a trial
22    scheduled to commence before Judge Rosen.  Do you see
23    that?
24  A.  Yes.
25  Q.  So you knew -- I mean, it was well known that

| Page 184 |
| --- |

1     Mr. Convertino had an interest in Makalda as a
2     witness, correct?
3          MR. SMITH:  Object to the term well known.
4  BY MR. KOHN:
5  Q.  Was it known to Mr. Sauget -- strike all that.
6          Did you understand that Mr. Sauget knew at
7     the time before the sentencing hearing in this case
8     that Convertino may want to use Makalda as a witness?
9  A.  I'm sorry, I'm going to have to ask you to repeat
10    that.
11  Q.  Sure.  Okay.  This says that there was a sentencing
12    hearing on January 16th, 2003?
13  A.  Right.
14  Q.  What I'm saying is do you understand that before that
15    sentencing hearing Sauget understood that
16    Mr. Convertino may want to use Makalda as a witness in
17    the case before Judge Rosen?
18  A.  Yes.
19  Q.  Okay.  And then what's your understanding?  So, okay,
20    what happened, tell me your understanding.
21  A.  Okay.  I'm not sure about the time line.
22  Q.  Okay.
23  A.  But Mr. Convertino wanted to use Makalda as a witness.
24  Q.  Okay.
25  A.  There were threats made regarding Mr. Sauget by

| Page 185 |
| --- |

1     Mr. Makalda in the county jail.  There was some sort
2     of a meeting at which the authorization to use
3     Mr. Makalda as a witness was discussed with
4     Mr. Convertino, Mr. Sauget and Mr. Gershel and that a
5     decision was made that given Mr. Makalda's history, he
6     could not be used as a witness.
7  Q.  And then what happened?
8  A.  Then it was something to the effect of when Mr. Sauget
9     got to Ann Arbor for sentencing, the defense attorney
10    was asking about a 5K1.1 motion for Mr. Makalda and
11    Mr. Sauget said, he didn't cooperate, and was told by
12    the defense attorney, no, he's been cooperating with
13    Mr. Convertino.
14  Q.  And how did Mr. Sauget respond to this statement at
15    the hearing?
16  A.  According to Mr. Sauget, he stated on the record facts
17    that are set forth in this memo that would have been
18    available to impeach Mr. Makalda's testimony if
19    Mr. Makalda in fact ever did testify.
20  Q.  Okay.  This meeting that you've testified to between
21    Gershel, Sauget and Convertino, where did you get
22    information about that?
23  A.  From Mr. Sauget and from Mr. Gershel.
24  Q.  Would it surprise you to learn that Mr. Sauget came
25    here and testified and there was no such meeting?

JONATHAN TUKEL
April 24, 2009

## Page 186

1      MR. SMITH: Objection to the form.
2  A.  My understanding could be wrong. I told you that this
3      was my understanding. I don't know the time line.
4  BY MR. KOHN:
5  Q.  Okay.
6  A.  But I believe that Mr. Sauget, and perhaps it was a
7      different meeting, but there was some discussion from
8      what I'm told by Mr. Sauget involving himself,
9      Mr. Convertino and Mr. Gershel where the use of
10     Mr. Makalda was discussed.
11 Q.  Okay. Exactly, and at that meeting, to help recollect
12     it, there was no decision not to use him in the
13     terrorism trial. It was still an open question.
14 A.  So are you saying --
15     MR. SMITH: I object because that's not a
16     question, that's a statement. You're not testifying.
17 BY MR. KOHN:
18 Q.  What I am saying is you testified to a meeting,
19     correct?
20 A.  I am testifying --
21     MR. SMITH: Let him ask a question.
22 BY MR. KOHN:
23 Q.  You testified that there was a meeting between
24     Gershel, Convertino and Sauget.
25 A.  I testified that I was told that.

## Page 187

1  Q.  By Mr. Sauget of this meeting?
2  A.  Correct, and I think Mr. Gershel also.
3  Q.  Okay. And you testified I guess that both Gershel and
4      Sauget told you that as a result of that meeting there
5      was a decision that Mr. Convertino was not going to
6      use Mr. Makalda as a witness.
7  A.  Oh, well, okay, that might have been a surmise on my
8      part. I think that what Mr. Sauget actually said when
9      he told me about this was that when it was discussed
10     that Mr. Makalda had talked about killing Mr. Sauget,
11     that that was understood by him and Mr. Gershel to
12     mean they couldn't use him but I'm not sure that was
13     ever expressed in words, if that's what you're getting
14     at.
15 Q.  And did they tell you why -- this -- killing him, did
16     Mr. Makalda ever say he would kill Mr. Sauget?
17 A.  I don't know what Mr. Makalda said.
18 Q.  Well, didn't --
19 A.  You're asking me by first-hand knowledge what he told
20     him?
21 Q.  What were you told? Did Mr. Sauget tell you that
22     Mr. Makalda said he would kill him, yes or no?
23 A.  I don't know what exact words Mr. Sauget used. That
24     was his -- that was the impression he conveyed to me.
25 Q.  Wasn't the words of Mr. Makalda, he was going to take

## Page 188

1      care of the bitch ass prosecutor?
2  A.  I think in that context that means kill.
3  Q.  Okay. You stated that Mr. Convertino blind-sided
4      Mr. Sauget, correct?
5  A.  I don't know if I used that word in the referral or if
6      that is the choice of words that OPR put in what they
7      sent back.
8  Q.  Are you aware that Mr. Convertino never told
9      Mr. Sauget that he would not use Mr. Makalda? Are you
10     aware of that?
11 A.  I'm not aware of what he said or didn't say.
12 Q.  Did you ever ask Mr. Sauget to his -- say, Mr. Sauget,
13     did Convertino tell you he wasn't going to use
14     Makalda? Did you ask that question?
15 A.  Mr. Sauget presented it in a way in which
16     Mr. Convertino said something like, is this written
17     down anywhere and -- and Mr. Sauget to my
18     understanding took that as, if it's not written down I
19     might go ahead and use him, and Mr. Sauget took
20     exception to that and expressed that. That's my
21     understanding of what happened.
22 Q.  Do you think Mr. Convertino blind-sided Mr. Sauget
23     based on the facts that you know of the Makalda
24     matter, yes or no?
25 A.  I don't have enough of a recollection of all of the

## Page 189

1      facts to really know.
2          MARKED BY THE REPORTER:
3          DEPOSITION EXHIBIT 7
4          2:11 p.m.
5  A.  I assume you want me to review this?
6  BY MR. KOHN:
7  Q.  You can just look at it. My question is quite simple,
8      do you remember getting a copy of this document at the
9      time you were reviewing or drafting the OPR on
10     Mr. Convertino?
11         And for the record Exhibit 7 is the
12     transcript of the sentencing hearing of Mr. Makalda
13     from January 16, 2003. Do you remember being shown a
14     copy --
15 A.  Yes.
16 Q.  -- or getting a copy of this?
17 A.  Well, I remember being shown it anyhow.
18 Q.  Okay. To the best of your knowledge, who in the U.S.
19     Attorney's Office had a copy of Exhibit Number 7?
20 A.  I was shown it by Mr. Sauget.
21 Q.  Did anyone else have a copy of this document?
22 A.  I don't know.
23 Q.  Did he -- do you know if you -- or maintained a copy
24     of it yourself?
25 A.  I don't think I did. I think, I mean, I've been told

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 190

1    that Mr. Gershel had some sort of additional file he
2    was keeping involving Mr. Makalda with another
3    memorandum so he may have.
4    Q.  Now, I want to be very specific here.  Today do you
5        know whether or not in between -- you know, between
6        September 2003 and the date that the article appeared
7        in the Plymouth Free Press whether you had a copy of
8        Exhibit Number 7 if you can remember?
9    A.  I don't know that.
10   Q.  Did you ever provide any documents whatsoever, ever,
11       to Mr. Ashenfelter in any context?
12   A.  I don't think so.  I take it back.  I gave him a
13       photograph of myself for that article that he wrote.
14       He asked for a photograph, I gave him that.
15   Q.  Okay.  Other than that, do you remember ever in any
16       case ever giving Mr. Ashenfelter a document?
17   A.  No.
18            MR. KOHN:  Why don't we -- let's take a
19       10-minute break, afternoon break.
20            MR. SMITH:  Okay.
21            MR. KOHN:  Thanks.
22            (Recess taken at 2:15 p.m.)
23            (Back on the record at 2:25 p.m.)
24   BY MR. KOHN:
25   Q.  Do you know someone in the deputy attorney general's

## Page 191

1        office, Mr. Margolis?
2    A.  Yes.
3    Q.  Who is he?
4    A.  David Margolis.
5    Q.  And what's his role?
6    A.  He is an associate deputy attorney general and I
7        believe he is the only nonpolitical person in the
8        office.  He's one of the senior most people in the
9        Department of Justice.
10   Q.  And what's -- what does he do?  So he was one of the
11       same -- like at the same level you were at?
12   A.  Well, he was nonpolitical.  He stays from
13       administration to administration, he had been doing it
14       a lot longer and he had different responsibilities.
15   Q.  But you were also one of the associate deputy attorney
16       generals?
17   A.  Yes.
18   Q.  Okay.  So what was his function?  He was there when
19       you were there.
20   A.  Yes.
21   Q.  Okay.  What was his function, what did he do?
22   A.  You mean his responsibilities?
23   Q.  Yeah.
24   A.  Gosh, I don't know exactly.  I couldn't -- I mean, I
25       once had a list that said what everyone's

## Page 192

1        responsibilities were, I can't tell you right now.
2    Q.  Did you ever discuss Mr. Convertino with him?
3    A.  At what time?
4    Q.  At any time.
5    A.  I don't believe so.
6    Q.  Do you know what responsibility -- what -- do you know
7        if he ever had any involvement in the OPR on
8        Mr. Convertino?
9    A.  I don't know but one of his responsibilities was to
10       deal with OPR issues from all the agencies, not
11       just -- not just attorneys, DEA, FBI.
12   Q.  So did you ever talk to him about Mr. Convertino's
13       OPR?
14   A.  No.
15   Q.  Did you ever talk to him about the Koubriti case?
16   A.  I don't think so.
17   Q.  Do you have any knowledge as to what Mr. Margolis's
18       involvement was in matters related to Mr. Convertino?
19   A.  No.
20   Q.  And do you know Judge Rosen?
21   A.  Yes.
22   Q.  Is he a member of the Federalist Society?
23   A.  I don't know -- I don't know if he pays dues.  He is
24       certainly a supporter and he has been to -- to
25       meetings.

## Page 193

1    Q.  And was he at meetings that you attended?
2    A.  I'm sure he was.
3    Q.  Did you ever talk to Judge Rosen on anything
4        whatsoever to do with the Koubriti case outside of,
5        you know, him sitting as a judge, like at a Federalist
6        Society meeting or after work or anything like that?
7    A.  You mean other than in his chambers or in his
8        courtroom?
9    Q.  Yeah.
10   A.  No.
11   Q.  What about Mr. Convertino, did you ever have a contact
12       with Judge Rosen about Mr. Convertino outside of his
13       chambers or the courtroom?
14   A.  There was one conversation that I recall.
15   Q.  Okay.  Tell me what you remember.
16   A.  I'm trying to remember the year, I think it was 2005,
17       it was a Saturday in November, a group of friends and
18       I were watching the Michigan/Ohio State game at a bar,
19       just a football game.  Just so happened that Judge
20       Rosen and his son walked in and ended up sitting with
21       us.  And he said at some point in the conversation,
22       these were a group of assistant U.S. attorneys, that a
23       complaint that Mr. Convertino had filed against him
24       with the 6th Circuit had recently been dismissed.
25   Q.  That's all he said?

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 194

1    A.   That's all he said.
2    Q.   Do you remember Judge Rosen -- getting any information
3         that Judge Rosen called into the U.S. Attorney's
4         Office in the Eastern District after the Plymouth Free
5         Press article, Exhibit Number 1 was published, seeking
6         information about matters that were in that article?
7    A.   No.
8    Q.   In regard to Mr. Rosen -- Judge Rosen --
9    A.   Can I back up and clarify something?
10   Q.   Yes.
11   A.   There was a time, but it was in chambers, that Judge
12        Rosen I think asked to see the OPR referral.  I think
13        he asked Craig Moreford who got it from me but I can
14        -- and I can't remember if I was there or not, but as
15        I understood your question is that was exempted.
16   Q.   Okay.  Well, my question was about a phone call after
17        the article.
18   A.   Yeah, I know nothing about --
19   Q.   Was this in-chambers discussion before or after the
20        article appeared in the Plymouth Free Press?
21   A.   After.
22   Q.   Do you know if a copy of the OPR referral was provided
23        to the judge?
24   A.   After the article?
25   Q.   Yes.

## Page 195

1    A.   I think it was.
2    Q.   Do you know who did that?
3    A.   I think it was Mr. Moreford.
4    Q.   Do you know what steps he undertook to determine
5         whether that referral could be provided to the court?
6    A.   I'm not sure what you mean by could be.
7    Q.   In other words, do you know what steps Mr. Moreford
8         took to determine --
9    A.   I'm not even sure Mr. Moreford is the one who provided
10        it.  I remember -- I'm pretty sure that was provided
11        to Judge Rosen, I don't remember by whom or how so I
12        don't know what steps were taken.
13   Q.   Do you know if Judge Rosen also asked for
14        Mr. Convertino's rebuttal to the OPR charges?
15   A.   I have no knowledge of that.
16   Q.   Do you know if your office provided a copy of the
17        rebuttal?
18   A.   I don't think we ever had the rebuttal.
19   Q.   Just going back to the -- when you had the interaction
20        with Judge Rosen in the bar, what -- what was
21        occurring in the conversation that caused him to the
22        best of your recollection to bring up this 6th Circuit
23        filing by Mr. Convertino?
24             MR. SMITH:  Objection, speculation.
25             You can answer it, if you know.

## Page 196

1    BY MR. KOHN:
2    Q.   To the best of your recollection, like what triggered
3         it?  Were you talking about the Koubriti case or other
4         people talking about Rick?
5    A.   No, it was five or six people, acquaintances more than
6         friends, sitting around watching a football game and
7         in pops Judge Rosen and as we're watching football, he
8         brings it up.
9    Q.   Did you make any statements, like, glad to hear that,
10        or something like that?
11   A.   No, I'm not even sure that I was aware that there had
12        been such a filing.  I think they're not public.
13   Q.   Have you ever heard of something known as the Butch
14        Jones letter?
15   A.   Yes.
16   Q.   And what was that?
17   A.   It was a letter written by Butch Jones.
18   Q.   Concerning what matter?
19   A.   Concerning the witness Hmimssa.
20   Q.   Related to the Koubriti case?
21   A.   Yes.
22   Q.   And I think there was some testimony earlier about the
23        phone call you had with Mr. Ashenfelter on or about
24        December 12, 2003?
25   A.   Yes.

## Page 197

1    Q.   And we talked about there was a discussion about a
2         hearing that occurred the day of that --
3    A.   Right.
4    Q.   -- you know, it was the evening.  Was that hearing
5         related to the Butch Jones letter?
6    A.   I think that was the purpose for the hearing.
7    Q.   Based on your under -- knowledge of the Butch Jones
8         letter matter, what was your own assessment as to the
9         seriousness of -- or the significance of that letter?
10   A.   Not very significant.
11   Q.   And why did you have that opinion?
12   A.   I didn't think it was material to any of the issues
13        that had gone on at trial.  I had a better defined
14        sense of that back then, but I remember thinking it
15        was not material, it would not effect the verdicts and
16        I can't, right now as we sit here, walk you through
17        the entire legal analysis but it seemed to me it was
18        something that should have been provided but was
19        harmless error.
20   Q.   And when you had the discussion with Mr. Ashenfelter
21        on the evening of the 12th or there -- on or about the
22        12th, did you state that to him, give him --
23   A.   Well, not like I just said it.
24   Q.   But you told Mr. Ashenfelter you didn't think it was a
25        big deal?

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 198

1   A.  I said I don't read too much into -- into any comments
2       that you think the judge made.  I don't think that
3       that's -- that's significant and I don't -- you know,
4       I don't believe that's the undoing of the case, which
5       was what his take was.
6   Q.  And that's what you told him that evening?
7   A.  To that effect.
8   Q.  Now, I want to call your attention now to the phone
9       calls you had with Mr. Ashenfelter before the article
10      appeared.  Did -- during any of those calls did
11      Mr. Ashenfelter ask you any questions about whether
12      Mr. Convertino had made unauthorized trips to Turkey?
13  A.  I don't recall him asking that.
14  Q.  Did you ever provide a copy of the OPR referral
15      letters to Eric Straus?
16  A.  I showed it to Eric Straus.  I showed it to Eric
17      Straus, Craig Moreford and Joe Capone.  On December
18      12th Judge Rosen said we needed to do a complete
19      review.  One of the first things we did was put Eric
20      in charge of that, he was the deputy chief of what was
21      then called the counterterrorism unit, and then
22      shortly thereafter Mr. Moreford was brought in to
23      assist, and at some point I printed that for them and
24      showed it to them because there were facts in there
25      that I thought they needed to be aware of.

Page 199

1   Q.  Okay.
2   A.  I don't -- I don't know if I gave them printed copies
3       to have or if I just showed it to them and kept it.
4   Q.  What instructions did you give Mr. Moreford concerning
5       the confidentiality of the information contained in
6       the OPR document you either showed him or maybe gave
7       him?
8   A.  I don't think I gave him any.
9   Q.  In terms of Mr. Straus, what instructions did you give
10      Mr. Straus in terms of the confidentiality of the
11      information in the OPR referral that you either showed
12      him or gave him?
13  A.  I don't think I gave him any.
14  Q.  And did those communications occur before or after the
15      publication of the article in the Plymouth Free Press?
16  A.  Before.
17  Q.  Can you describe for me the training that you received
18      in the Department of Justice concerning the Privacy
19      Act?
20  A.  I don't believe I've had any formal training.
21  Q.  Can you please describe to me the training you've had
22      in the Department of Justice concerning
23      confidentiality of OPR matters?
24  A.  I don't believe there is any formal training in that
25      regard.

Page 200

1   Q.  In regard to the Privacy Act, tell me to the best of
2       your recollection up until January 17, 2004, precisely
3       what you remember of any formal or informal training,
4       instruction, counseling, guidance that you were given
5       concerning the requirements of the Privacy Act?
6   A.  Did you say training or instruction?
7   Q.  What I'm trying to say -- I'm using your -- I don't
8       want to use the word training as like a formal,
9       sitting at a training watching.  I'm now using a much
10      more expanded concept.
11  A.  You're including on-the-job training?
12  Q.  If you picked it up and read it yourself on your own
13      initiative, no.  If you were given a document by a
14      superior and you looked it over, yes.  If you attended
15      a seminar and it came up for 15 minutes, yes.  It
16      doesn't have to be the focus of an all-day seminar.
17          MR. SMITH:  Answer whatever you think might
18      fit in there and he can decide what he thinks is
19      responsive.
20  BY MR. KOHN:
21  Q.  Coming back let me just restate the question.  Can you
22      tell me any formal or informal training or guidance
23      you were provided by the U.S. Department of Justice or
24      the Privacy Act prior to January 17, 2004?
25  A.  There was an instance where there was a -- there was

Page 201

1       a -- there was a note that I need to look at to really
2       refresh my memory.
3           Do you have the one regarding the second
4       OPR referral?  You know what I'm talking about?  There
5       was an OPR referral that I made sometime in January.
6       There were --
7   Q.  January of what year?
8   A.  2004.  A blogger named Debbie Schlussel (phonetic) and
9       she had information regarding a case that was going on
10      in the office, the assistant who was assigned to it,
11      and contemporaneous with that there was the Butch
12      Jones letter and the hearing on December 12th.
13      Sometime after that hearing, I received information
14      that a legal assistant in the office was trying to get
15      leave records for one of the AUSAs who had testified
16      at that hearing and I sent some e-mails to try and
17      find out what was going on with that and -- which I
18      did and I provided all that, and in that I called our
19      civil chief at the time, Michael Wicks, and asked him
20      without using names, let me give you a hypothetical
21      scenario.  Someone's trying to obtain leave records of
22      someone, is that a violation of the Privacy Act, and
23      he said, maybe.  You know, it was typical legal
24      answer, maybe.  I said, could we say it's possibly a
25      violation of the Privacy Act, and he said yes, you can

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 202

1  definitely say it's possibly, and I sent e-mails out
2  indicating that.
3       That I believe is the full extent of any
4  knowledge, training or discussion I had with regard to
5  the Privacy Act.
6  Q.  Okay.  Do you feel that in some way you're being
7  persecuted because people -- about this leak?
8       MR. SMITH:  Objection.
9       You can answer it if you're able to.
10 BY MR. KOHN:
11 Q.  Strike that.  Do you think you're being scapegoated
12 about the leak to the Plymouth Free Press?  Do you
13 feel that sometimes?
14 A.  I'm not sure what scapegoated means.
15 Q.  Do you think people are putting the blame on you, that
16 maybe they have the blame but they're putting it on
17 you for this leak?  Do you ever feel that way?
18 A.  I don't --
19      MR. SMITH:  I object to the vagueness of
20 the question but you can answer it to the best of your
21 ability.
22 A.  Yeah, I don't -- I don't think -- I'm not really sure
23 I understand the question.
24 BY MR. KOHN:
25 Q.  Okay.  You testified very -- at the beginning of the

Page 203

1  deposition that you thought some of the IG
2  investigators maybe thought you weren't being truthful
3  about the leak.  Do you remember that testimony?
4  A.  Well, I said I was concerned about it.
5  Q.  Yeah, concerned about it, okay.  My question for you,
6  do you think that you -- that these -- that other
7  people in the Department of Justice may have either
8  hidden their actions or done things that are making
9  you a potential scapegoat for the leak?
10 A.  I think that's possible.
11      MR. SMITH:  I'm going to object to that
12 last question as calling for speculation.
13      MR. KOHN:  Okay.
14      MR. SMITH:  The answer can stay on the
15 record.
16      MARKED BY THE REPORTER:
17      DEPOSITION EXHIBIT 8
18      2:46 p.m.
19      MR. KOHN:  I'm going to show the witness a
20 document we've marked as Exhibit 8.
21 A.  Did you want me to review this?
22 BY MR. KOHN:
23 Q.  Yeah, if you could please review that.
24 A.  All right.
25 Q.  Have you ever seen this letter before?

Page 204

1  A.  I don't think so.
2  Q.  So at the time you wrote up what became charge number
3  five in the OPR referral you had not reviewed this
4  letter?
5  A.  I don't believe so.
6  Q.  Had you pulled the case file on Mr. Makalda at the
7  time you drafted the information for charge number
8  five?
9  A.  Like I said, I think with Mr. Makalda I think there
10 were two different files.  I think Mr. Gershel had
11 something and I think Mr. Sauget had something.  I
12 think I saw all of Mr. Sauget's but I don't know.  I
13 don't know if I saw -- I believe I saw a memorandum in
14 Mr. Gershel's but I don't know if I reviewed the whole
15 thing.
16 Q.  What about the file related to -- this was to
17 Mr. Corbet and the case he was working on.  Did you
18 pull that file and look and see what type of
19 representations had been made?
20 A.  No, I wasn't even aware that Mr. Corbet had a file.
21 Q.  Well, you were aware that Mr. Corbet was assisting on
22 the Koubriti case with Mr. Convertino --
23 A.  Yes.
24 Q.  -- and Mr. Corbet's his supervisor --
25 A.  Yes.

Page 205

1  Q.  -- of Mr. Convertino at the time?
2  A.  Yes.
3  Q.  And you understood that during the course of the
4  controversy about the Makalda matter, the people in
5  the Koubriti case had an interest in Makalda and
6  Sauget essentially was wrapping up a prosecution on
7  Makalda, correct?
8  A.  Yeah, but Mr. Corbet's position was always that he had
9  not been involved in any of the discovery so I would
10 have had no reason to even think that he had anything
11 like this.
12 Q.  Okay.  Well, Mr. Convertino may have been in
13 possession of a file related to Mr. Makalda as it
14 related to the terrorism case, correct?
15      MR. SMITH:  He may have been?
16 BY MR. KOHN:
17 Q.  Well, are these type of documents put in some type of
18 file in the office?
19 A.  Well, normally they would be put in the file relating
20 to Mr. Makalda.  Since it was Mr. Sauget's case, I
21 would have expected everything pertaining to it would
22 be in Mr. Sauget's file.
23 Q.  Even if it's a different United States attorney on a
24 different case?
25 A.  Well, that's --

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 206

1        MR. SMITH: Objection to the form.
2        You can answer.
3   A.   That's the whole point of the issue was I was led to
4        believe that there shouldn't be any cooperation going
5        on with anyone other than Mr. Sauget because that had
6        been resolved, so there wouldn't be other documents.
7        Normally if there's going to be someone prosecuted by
8        assistant A and cooperating with assistant B they will
9        coordinate their efforts.  This to me was being
10       explained as almost the opposite of coordination.
11  BY MR. KOHN:
12  Q.   But you understood that the Rule 35 would be filed
13       after the plea that was entered by Mr. Sauget.  Isn't
14       a Rule 35 after to reduce a sentence --
15       MR. SMITH: Objection, compound.
16  BY MR. KOHN:
17  Q.   -- already made?
18  A.   I'm not sure I understand what you're saying.
19  Q.   What's a Rule 35 motion?  Isn't it --
20  A.   It's just like a 5K1.1 except that it's brought within
21       a year of sentencing.
22  Q.   Okay.  So when a sentencing occurs that Sauget did, he
23       did the sentencing and he got a sentence, correct?
24  A.   Right.
25  Q.   But there was a discussion --

## Page 207

1        MR. SMITH: Objection to the premise that
2        the AUSA does the sentencing.
3   BY MR. KOHN:
4   Q.   Obviously.  And there was a discussion before that
5        sentencing hearing that Mr. Makalda may be used as a
6        witness in another case sometime after, correct?
7   A.   Right.
8   Q.   So therefore, if he was used as a witness or became
9        some type of cooperating informant or witness in
10       another case, it would be a Rule 35 being filed, not a
11       5K1?
12  A.   If he was authorized to do that and if a Rule 35
13       motion was filed, yes, that would have been the case,
14       but from what I was told that was never authorized so
15       I had no reason to think there would be correspondence
16       or pleadings relating to Rule 35.
17  Q.   And if you could please look at Exhibit 8, second
18       paragraph --
19  A.   All right.
20  Q.   -- of Exhibit 8.  Look where it begins April 21, 2003.
21       Do you see that?
22  A.   Yes.
23  Q.   On April 21, 2003, you and I spoke by phone and you
24       specifically told me that you had authority from
25       Mr. Gershel to make a Rule 35 motion on Mr. Makalda's

## Page 208

1        behalf if he would agree to testify for the
2        government.  Do you see that?
3   A.   Yes.
4   Q.   Do you have any reason to think that Mr. Corbet was
5        lying to Mr. Mokov (phonetic) when he told him that?
6        MR. SMITH: Objection, foundation.
7   BY MR. KOHN:
8   Q.   Or strike that question.
9        Did you ever ask Mr. Gershel if he had
10       given Mr. Corbet authority to make a representation to
11       Makalda's counsel that if Makalda agreed to testify
12       for the government that he was authorized to follow
13       Rule 35?
14  A.   Are you asking me if I did that in the preparation of
15       the OPR referral?
16  Q.   Yes.
17  A.   I don't believe I would have asked that in that
18       specific way because I was working on that referral
19       with Mr. Gershel and had he done anything like that, I
20       would have expected him to catch it and say, oh no, I
21       already authorized that.
22  Q.   Do you remember a time when Mr. Convertino was
23       presented with a position of being a permanent duty
24       AUSA?
25  A.   No, that did not happen.

## Page 209

1   Q.   Was there ever discussion of removing Mr. Convertino
2        from the position he had in the office in or about
3        September-October 2003?
4   A.   Yes.
5   Q.   And what -- and he wanted to get a new position,
6        correct?
7   A.   Correct.
8   Q.   And what was this new position?
9   A.   It was discussed that he would be in charge of
10       handling duty court.
11  Q.   And when -- who did you talk about presenting this new
12       position, you know -- in other words, when you --
13       before you told Mr. Convertino that this might be
14       presented to him as an option, who did you discuss it
15       with in the office?
16  A.   Well, first off, I don't think we ever discussed it
17       with Mr. Convertino, but Jeffrey Collins, Alan Gershel
18       and some people at the Department of Justice.
19  Q.   And yourself, you were part of the discussion?
20  A.   Well, I didn't discuss it with myself but I was a
21       party to that.
22  Q.   Okay.  When you were having the discussions did anyone
23       talk about how they thought Convertino would react
24       should he be offered this type of position?
25  A.   I'm sorry, I think Mr. Corbet was -- Mr. Corbet was

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 210

1     included in those discussions as well.
2  Q.  Did anyone discuss how Convertino may react with being
3     presented with that position?
4  A.  I think Mr. Corbet reacted pretty strongly.
5  Q.  And what did he say?
6  A.  I think he said he won't like it.
7  Q.  And based upon what you know of Mr. Convertino, how
8     did you expect him to act, respond to it?
9  A.  I thought he probably wouldn't like it either.
10 Q.  And did you think that if that actually went
11    through -- did you recommend or did you want it to
12    happen?
13         MR. SMITH:  Objection, compound.
14 BY MR. KOHN:
15 Q.  Okay.  Strike that.
16         Did you at some point believe that
17    Mr. Convertino in this time period should be made
18    that -- given that position you just testified to?
19 A.  Well, it was a long, drawn-out discussion.  I mean,
20    there were a lot of things that went into it.  There's
21    something called EARS, E-A-R-S.  I can't tell you
22    exactly what that stands for but it's something,
23    evaluation and something.  It's an evaluation that's
24    done by the executive office of U.S. attorneys for
25    three or four-year intervals of office of each U.S.

## Page 211

1     Attorney's Office.  There had been one recently done
2  in Plymouth which was highly critical of the organized
3  crime strike force, so that was part of it.
4         There was the whole issue of what appeared
5  to be the unauthorized plea agreement or sentencing
6  agreement with Mr. Farhat.  There was discussion with
7  Mr. Corbet -- Mr. Corbet on his own initiative sent a
8  memorandum to Mr. Convertino, which he also copied me
9  on, telling him not to take action in any cases in
10 order to avoid further difficulties without specific
11 written approval from Mr. Corbet.
12        Part of what Alan Gershel and I and I think
13 Jeff Collins did was to meet with Mr. Corbet to say,
14 what's behind this, what's -- what's the level of
15 trust here, are you confident in him, you know, what's
16 going on.  And he said he was confident in him if he
17 was closely supervised and we asked him specifically,
18 there was a sensitive case going on involving some
19 wire taps, if he would be comfortable leaving him in
20 control of those cases in Mr. Corbet's absence and
21 Mr. Corbet said no, and that's what sort of led to the
22 discussion of well, his supervisor doesn't seem to
23 have confidence in him, what do we do.
24 Q.  And what was the position being -- what was the
25    position you came up with?

## Page 212

1  A.  The position was to handle arraignments, which are
2     normally done on a rotating basis a week at a time and
3     to make it a permanent position, and I don't know --
4     the proposal never went that far --
5  Q.  Who -- I'm sorry.
6  A.  The proposal never went that far so we never rounded
7     out what would have filled the rest of his time and
8     what else he would have done.
9  Q.  Who came up with the idea to give him that position?
10 A.  I don't know where that came from.
11 Q.  Was it Collins, do you remember?  Was he the one that
12    said, oh, let's have a good idea, let's put him in
13    charge of arraignments?
14 A.  I don't remember who came up with the idea.
15 Q.  But do you think it was Collins, of all the people do
16    you think it was Collins who came up with it, yes or
17    no?
18         MR. SMITH:  Objection, asked and answered.
19         You can answer one more time.
20 A.  I don't remember.
21 BY MR. KOHN:
22 Q.  What about Gershel, did he come up with it?
23         MR. SMITH:  Same objection.
24 A.  I don't remember.
25 BY MR. KOHN:

## Page 213

1  Q.  Did you come up with it?
2  A.  I don't remember but I don't think so.
3  Q.  Did you -- when someone first presented it, did you
4     agree with it or disagree when it was first proposed?
5  A.  Well, I, you know, my best recollection is it was an
6     initial idea to deal with the short term while there
7     was this question involving Mr. Corbet's confidence
8     and trust in Mr. Convertino and what we do in the
9     interim till we get that resolved somehow.
10 Q.  And what was Mr. Corbet's position on this idea?
11 A.  Well, I think I said that he didn't think
12    Mr. Convertino would like it.  I don't know if he
13    thought, notwithstanding that, it would be a good
14    idea.
15 Q.  Did he tell you that?
16 A.  What?
17 Q.  Did he say, notwithstanding Mr. Convertino's reaction
18    he supported it?  Did he tell you that?
19 A.  I don't think he told me one way or the other.
20 Q.  Did -- during that time did anyone make a reference
21    that this type of thing might get Convertino to resign
22    his position?
23 A.  No, that was not the --
24 Q.  Did you ever --
25         MR. SMITH:  Can he finish?

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 214

1  A.  That was not the point of it.
2  BY MR. KOHN:
3  Q.  Did you, between September 2003, January 17th, 2004,
4      did you form an opinion that Mr. Convertino should
5      be -- should leave the U.S. Attorney's Office?
6  A.  No.
7  Q.  Did you want Mr. Convertino to leave the office?
8  A.  No.  Although you just jogged my memory on something.
9      Mr. Convertino mentioned at one of the
10     meetings with Mr. Gershel and me that he had been
11     planning to leave anyhow.
12  Q.  How did you react to that?  Did you think that was
13      good news?
14  A.  I was really indifferent to it, frankly.
15  Q.  Did you ever hear of the public integrity section?
16  A.  Yes.
17  Q.  And who are they?
18  A.  They are a section within the criminal division of the
19      Department of Justice.
20  Q.  Did you ever provide any information whatsoever to the
21      public integrity section about Mr. Convertino?
22  A.  Yes.
23  Q.  And what did you provide to them?
24  A.  I can't tell you specifically.  I met with Mr. Noel
25      Hillman, who at the time was the head of the section.

Page 215

1      He was in our office on another case and I met with
2      him and discussed some issues with him.  It was at the
3      same time that Mr. Moreford was becoming involved and
4      Mr. Moreford quickly took over that function.
5  Q.  What -- did you provide Mr. Noel Hillman with a copy
6      of the OPR documentation?
7  A.  I don't think so, but I'm not certain.
8  Q.  And did you understand at the time that the public
9      integrity section would be looking into matters such
10     as a potential indictment of Mr. Convertino?
11  A.  Well, I thought they would conduct an investigation.
12  Q.  And is that the unit within the -- did you know that
13      to be the unit of the Department of Justice that would
14      pursue a criminal charge if one was ever to be filed?
15  A.  Not necessarily.
16  Q.  But would it be among them?  Is that their function?
17  A.  It's a potential one that could.
18  Q.  Does the public integrity section, if they are to file
19      a charge against somebody, do they do civil charges
20      also or is it pretty much all criminal?
21      MR. SMITH:  If you know.
22  BY MR. KOHN:
23  Q.  If you know.
24  A.  I don't know that, but well, they are in the criminal
25      division so my assumption would be they bring criminal

Page 216

1      charges.
2  Q.  And what do you remember Noel Hillman asking you
3      about?
4  A.  It was a very short meeting, they had a lot of other
5      business that they were in town working on, and I
6      think he said, we'll get back to you or something like
7      that.
8  Q.  And what's the best of your recollection of the
9      information you provided to Mr. Hillman?
10  A.  I believe it related to Mr. Farhat's departure from
11      the United States.
12  Q.  So the meeting with Mr. Hillman was after the article
13      appeared in the Plymouth Free Press?
14  A.  The Ashenfelter article?
15  Q.  Yes.
16  A.  And it was also after an article appeared in the
17      Plymouth News regarding Mr. Farhat's departure.
18      MR. KOHN:  Okay.  What I'm going to ask is
19      on this particular document that it's under protective
20      order so to move to a protective order provision of
21      the transcript.
22      (Discussion off the record at 3:07 p.m.)
23      (Back on the record at 3:15 p.m.)
24  BY MR. KOHN:
25  Q.  I want to -- I want to call your attention to

Page 217

1      Mr. Keith Corbet and you've made some testimony about
2      some remarks you've attributed to him.
3  A.  Yes.
4  Q.  How long was Mr. Corbet Mr. Convertino's supervisor?
5  A.  I would have to estimate.
6  Q.  What's your estimate?
7  A.  Well, I mean, I'm going to have to like sort of walk
8      you through it to try and estimate.  I think
9      Mr. Convertino came to the office around 1995 and I
10      think he started in the drug unit.  I think he was in
11      the drug unit for two years maybe and then he went to
12      the strike force, and so from whatever point he went
13      to the strike force thereafter Mr. Corbet was his
14      supervisor.
15  Q.  So like from 1997?
16  A.  Approximately.  Could have been a little earlier, I
17      don't --
18  Q.  Did you look at Mr. Convertino's personnel file when
19      you were drafting up this OPR referral?
20  A.  I've never seen it.  I don't even know if we keep
21      those in our office.
22  Q.  Do you know how Mr. Corbet rated Mr. Convertino
23      continuously while he was under his supervision?
24  A.  No.
25  Q.  Would it surprise you to learn that the ratings were

JONATHAN TUKEL
April 24, 2009

|  | Page 218 |
|---|---|

1    all at the very highest level?
2    A.  It would not surprise me at all.
3    Q.  And were you aware that Mr. Corbet worked very closely
4        with Mr. Convertino willingly on major cases?
5    A.  I know that they worked on a number of cases together.
6    Q.  And are you aware that Mr. Corbet -- do you remember a
7        meeting -- you've testified about a meeting that you
8        had or discussions with Mr. Corbet in say late
9        September or early October 2003 concerning
10       Mr. Convertino?
11   A.  Well, I think there were two meetings --
12   Q.  Okay.
13   A.  -- or three even.
14            MR. SMITH:  Okay.  Wait for him to ask a
15       question.
16   A.  Okay.  I thought that was the question.  I'm sorry.
17   BY MR. KOHN:
18   Q.  Do you remember ever telling Mr. Corbet that the truth
19       has little meaning?
20   A.  No.  In fact I did not tell Mr. Corbet that at all and
21       he completely twisted that.
22   Q.  So you're aware that Mr. Corbet wrote a memo in which
23       he said that you said that the truth has little
24       meaning, correct?
25   A.  That's correct.  I think he sent it to me.

|  | Page 219 |
|---|---|

1            MR. SMITH:  That's correct that he's aware
2        of it.
3    A.  Yeah, that's correct, right.
4    BY MR. KOHN:
5    Q.  And did you write a rebuttal memo?
6    A.  I may have sent him an e-mail, I don't recall.
7    Q.  And do you think Mr. Corbet was lying when he accused
8        you of saying, quote, the truth has little meaning?
9    A.  I think he was intentionally misleading in that
10       context, I do.
11   Q.  Did you write an OPR on Mr. Corbet?
12   A.  No.
13   Q.  Did you make a referral -- if a -- now, Mr. Corbet was
14       a senior assistant United States attorney at the time?
15   A.  There is no such classification within the office.  He
16       had a lot of years of service.
17   Q.  Okay.  And a lot of responsibility?
18   A.  He was a supervisor.
19   Q.  And all types of security clearances?
20   A.  I don't know what his clearance level was.
21   Q.  But would he have various security clearances to the
22       best of your knowledge?
23   A.  Well, I can tell you that I think at the time it was a
24       requirement that all strike force attorneys have a top
25       secret clearance.

|  | Page 220 |
|---|---|

1    Q.  Okay.  And you're saying that you thought, what were
2        your words, he was intentionally misleading?
3    A.  In that context.
4    Q.  And he put that in writing?
5    A.  Yes.
6    Q.  And do you know a Mr. Bruce Orr?
7    A.  Yes.  Well, I know who he is.
8    Q.  Who is he?
9    A.  He's either the chief or the deputy chief of the
10       organized crime and racketeering section.
11   Q.  In where, the eastern district?
12   A.  No, Washington.
13   Q.  So Mr. Corbet writes -- and Mr. Corbet put that
14       allegation against you in a written memo sent up to
15       Washington, correct?
16   A.  Yes.
17   Q.  And you believed that was not truthful, that Corbet
18       essentially lied about that, correct?
19            MR. SMITH:  Objection, compound question.
20   BY MR. KOHN:
21   Q.  Correct?
22   A.  I'm going to have to ask you to repeat it.
23   Q.  You believed that Corbet was lying when he accused you
24       of saying, quote, the truth has little meaning?
25   A.  Mr. Corbet is known for his exaggerations.

|  | Page 221 |
|---|---|

1    Q.  And you made -- did you file -- no, forget a formal
2        OPR, any type of complaint against Mr. Corbet for him
3        making that statement?
4    A.  Definitely not a complaint.  I think I --
5    Q.  Have you -- I'm sorry.
6    A.  I think I discussed it with him.
7    Q.  Okay.  Have you ever said to anybody words to the
8        effect that the truth has little meaning?
9    A.  That discussion was about a particular context and in
10       the particular context I was telling him that I think
11       something was accepted wisdom and whether what he is
12       saying is true or not, he's swimming upstream to
13       convince other people because it is the accepted
14       wisdom.  He translated that into the truth has little
15       meaning.
16            MR. KOHN:  Can you read back the witness's
17       last answer please?
18            (The following portion of the record was
19            read by the reporter at 3:22 p.m.:
20            "That discussion was about a particular
21            context and in the particular context I was
22            telling him that I think something was
23            accepted wisdom and whether what he is
24            saying is true or not, he's swimming
25            upstream to convince other people because

JONATHAN TUKEL
April 24, 2009

Page 222

1       it is the accepted wisdom.  He translated
2       that into the truth has little meaning.")
3    BY MR. KOHN:
4    Q.  If the accepted wisdom is not true, can it ever be
5       considered true?
6            MR. SMITH:  Objection to form.
7    BY MR. KOHN:
8    Q.  Strike that.
9            Do you -- if there's an accepted wisdom in
10      the office about something that is not true and it's
11      about an important fact, don't you have a duty to
12      correct it or do you just go along with the lie?
13           MR. SMITH:  Objection to form.
14   A.  I don't think I really understand your question.
15   BY MR. KOHN:
16   Q.  Okay.  If an accepted truth in the office like at work
17      on a material matter is not true and you know it not
18      to be true, should you just accept it?
19   A.  Well --
20           MR. SMITH:  Objection to form.
21   A.  -- are we speaking hypothetically or are we talking
22      about that specific point that was at issue?
23   BY MR. KOHN:
24   Q.  I'd like to talk in terms of your -- first, values as
25      to your concept of truth and then we can talk about

Page 223

1       the instance.
2            Okay.  My question for you is straight up.
3       If the accepted wisdom in an office you know not to be
4       true, is it your belief that you should just accept it
5       anyway, yes or no?
6    A.  Okay.  First of all, I'm pretty sure that that
7       discussion was not about something within our office
8       but it was about something at the justice department
9       in Washington, but -- I'm sorry, I don't remember the
10      rest of your question.
11   Q.  Okay.  So the DOJ in Washington has an accepted
12      wisdom, they have a belief in something, the U.S.
13      Attorney's Office should just, you know, okay, just go
14      along with it?
15           MR. SMITH:  Objection to form.
16   A.  Well, I don't really think that's capable of being
17      answered.
18   BY MR. KOHN:
19   Q.  And wasn't the context of this about what truly
20      happened, the truth about the Koubriti trial?
21   A.  I think it was about whether there was proper
22      consultation between the counterterrorism section and
23      Washington and the U.S. Attorney's Office.
24   Q.  And for someone like Mr. Convertino whose career may
25      hinge on what the truth was on certain factors, do you

Page 224

1       think you should just accept the correct -- the
2       wisdom -- the accepted wisdom and ignore the truth?
3            MR. SMITH:  Objection to form.
4    BY MR. KOHN:
5    Q.  That's my question for you.
6            MR. SMITH:  Objection to form.  You can
7       answer if you're able to.
8    A.  Are you saying should I accept it or should it be
9       accepted by people who have the ability to influence
10      it?
11   BY MR. KOHN:
12   Q.  Let's say if I -- accepted by people who have the
13      ability to influence it.
14   A.  No, it should --
15           MR. SMITH:  Same objection.
16   A.  If something in fact is not true and people who have
17      the ability to fix it can, they should.
18   BY MR. KOHN:
19   Q.  And so was it incumbent upon those in the Eastern
20      District who knew the truth to push as hard as they
21      could in Washington to make sure that they understood
22      what really happened?
23   A.  I think that was what Mr. Corbet was attempting to do
24      through that memorandum.
25   Q.  And but -- well, but you didn't think that was the

Page 225

1       right thing to do.
2    A.  I didn't say that.  I had no knowledge of what the
3       truth actually was so I could not weigh in on it.
4            MR. KOHN:  Just so the record's clear,
5       let's introduce the memorandum that we've been talking
6       about and I will have you identify it.
7            MARKED BY THE REPORTER:
8            DEPOSITION EXHIBIT 9
9            3:27 p.m.
10           MR. KOHN:  I'm going to ask the witness if
11      Exhibit 9 is the memo we've been testifying about that
12      was written by Corbet.
13   A.  I think so.  I haven't finished reading it.
14   BY MR. KOHN:
15   Q.  Okay.  Sure.  Is this the memo we've been talking
16      about?
17   A.  I think so.
18   Q.  I'd like to call your attention to the first sentence,
19      which reads, I have been advised by JONATHAN Tukel
20      that the truth concerning my conduct and that of
21      Richard Convertino during the terrorism trial has
22      little meaning, since the perception in Washington,
23      D.C., is that we did something improper and it is an
24      accepted fact.  Did you say words to that effect to
25      Mr. Corbet?

JONATHAN TUKEL
April 24, 2009

## Page 226

1      MR. SMITH: Objection, asked and answered.
2   You can answer.
3  A.  I don't think I used words to the effect of the truth
4   does not matter -- or I'm sorry -- words to the effect
5   that the truth concerning my conduct and that of
6   Richard Convertino during the terrorism trial has
7   little meaning.  I don't think I used words like that.
8  BY MR. KOHN:
9  Q.  Did you attempt to convey -- although you may not have
10   used these exact words, did you attempt to convey to
11   Mr. Corbet the essential, you know, what's being --
12   strike that.
13      In other words, my question is although you
14   may not have used these exact words did you in fact
15   tell Mr. Corbet words to these effect concerning the
16   reality of where Washington, D.C., was as vis-a-vis
17   the terrorism trial?
18      MR. SMITH: Objection to form.  You can
19   answer.
20  A.  I believe that I conveyed to him there was an accepted
21   fact that certain things had gone on.
22  BY MR. KOHN:
23  Q.  And that at this point it was not worth trying to
24   change that perception, correct?
25      MR. SMITH: Objection to form.

## Page 227

1      You can answer.
2  A.  I don't think I'm saying that it's not worth trying,
3   I'm saying that I think it's probably unlikely to
4   succeed.
5  BY MR. KOHN:
6  Q.  And looking at -- is it true that -- did you hear that
7   Vice President Dick Cheney had received a complaining
8   letter or a call from a senator and that Cheney had
9   made representations that there were rogue prosecutors
10   in Plymouth?
11  A.  What?
12  Q.  Did you hear that Dick Cheney had made a
13   representation that there were rogue prosecutors in
14   Plymouth?
15  A.  What time frame are you talking about?
16  Q.  This time frame.
17  A.  I've never heard anything like that until you just
18   said it.
19  Q.  If you can please -- if you could look at the exhibit
20   which is the December 2nd letter?
21      MR. SMITH: 5?
22      MR. KOHN: Yeah, if I can just see it for a
23   second and I'll show you what I'm looking at.
24  BY MR. KOHN:
25  Q.  Did you ever make a representation that Mr. Farhat was

## Page 228

1   a member of Hezbollah?
2  A.  Yes.
3  Q.  And where did you get that information from?
4  A.  That was from Eric Straus I believe.  I don't think I
5   said member, I think I said associate.
6  Q.  Okay.  Did you --
7  A.  Because my understanding from both Mr. Straus and Mike
8   Leibson is that when a search warrant was conducted at
9   Mr. Farhat's house a Hezbollah flag was seized by law
10   enforcement agents.
11  Q.  And do you know if Mr. Farhat was providing assistance
12   on terrorism related matters at the time of the
13   Plymouth Free Press article?
14  A.  I don't know.
15  Q.  Okay.  I'd like to call your attention to a meeting
16   you had, you -- I believe that you, Mr. Gershel and
17   Mr. Convertino attended on or about October 10, 2003.
18  A.  Okay.
19  Q.  Do you recall such a meeting?
20  A.  I recall three meetings and I believe one was on
21   October 10th.
22  Q.  Okay.  Now, I don't want to get hung up on the
23   specific date of the meeting.  As I understand the
24   three meetings occurred fairly close in time?
25  A.  Within about a month of each other.

## Page 229

1  Q.  Okay.  So if you remember something happening at a
2   meeting but you think it was maybe one of the other
3   ones and not the October 10th one, let me know.
4  A.  All right.
5  Q.  Our information is it was at the October 10th meeting
6   but --
7  A.  So we're talking substance, not dates?
8  Q.  Yeah.
9  A.  All right.
10  Q.  Do you remember at -- in or about the October 10, 2003
11   a meeting between you, Gershel and Tukel discussing --
12  A.  I think you mean Convertino, right?
13  Q.  Yeah, Convertino, Gershel and yourself discussing the
14   Farhat sentencing hearing?
15  A.  Well, I think we discussed it at more than one
16   meeting.
17  Q.  Okay.  So you did meet with Mr. Convertino and talk
18   about that sentencing hearing with Mr. Farhat?
19  A.  Yes.
20  Q.  Do you remember having a copy of the transcript of
21   that sentencing hearing?
22  A.  At the meeting or in general?
23  Q.  In general.
24  A.  We ordered a copy of the transcript.  I'm not certain
25   when we got it.

JONATHAN TUKEL
April 24, 2009

Page 230

1  Q.  When you say we, who's the we?
2  A.  Well, Mr. Gershel took the steps to order it and
3      obtain it.
4  Q.  Do you remember either you or Gershel showing
5      Mr. Convertino a copy of that sentencing hearing
6      transcript at one of those meetings?
7  A.  I don't specifically recall it, but I have notes from
8      those three meetings and that could help me.
9  Q.  Okay.  Why don't we just go off the record for a
10     moment.
11         (Discussion off the record at 3:34 p.m.)
12         (Back on the record at 3:37 p.m.)
13         MR. KOHN:  Back on the record now.
14 BY MR. KOHN:
15 Q.  What I'd like to do now is walk you through the time
16     sequence from before and immediately after the
17     publication of the article, Exhibit Number 1.
18 A.  Okay.
19 Q.  Which is the Plymouth Free Press article and
20     Mr. Convertino.  When is the very first time you heard
21     from anybody that Mr. Ashenfelter may be doing a story
22     about Mr. Convertino?
23 A.  It was a day or two before the story came out.
24 Q.  And who did you hear that from?
25 A.  I think I heard it from Gina Balaya, our press person.

Page 231

1      I think there were a couple of other people.  I
2      received a call.
3  Q.  Okay.  Now, again, if you can't get -- so would it be
4      your testimony the very first person who informed you
5      that Mr. Ashenfelter may be doing a story on
6      Convertino was Gina Balaya?
7  A.  I can't tell you precisely who the first person was.
8  Q.  Okay.  Then who else may it have been?
9  A.  I don't really recall that.
10 Q.  So let's go, what do you remember about Gina Balaya
11     and what she said to you?
12 A.  She came into Alan's office to say that there have
13     been a number of calls to people in the office talking
14     about this proposed story.
15 Q.  Did she say what the subject matter of the story was?
16 A.  I think she said that it had to do with an OPR
17     referral.
18 Q.  And she also mentioned Mr. Convertino?
19 A.  Yes.
20 Q.  Did she mention anything else about what it was about?
21 A.  I'm not --
22 Q.  Did she mention any -- give any other facts about what
23     Mr. Ashenfelter was looking into or what he might be
24     writing with a story about?
25 A.  I don't recall that.

Page 232

1  Q.  Okay.  So you were already in the office with
2      Mr. Gershel when she came into the office?
3  A.  Right.
4  Q.  Did -- based upon your perceptions of what happened in
5      the office, do you believe that Mr. Gershel already
6      knew of Mr. Ashenfelter's inquiries or he was also
7      learning for the first time when she came in?
8          MR. SMITH:  Objection, calls for
9      speculation.
10 A.  I don't know.
11 BY MR. KOHN:
12 Q.  Okay.  Did Mr. Gershel at the meeting indicate that he
13     already knew this?
14 A.  I don't think he indicated.
15 Q.  Okay.  Did he -- in other words, did he make any
16     statements, verbal or nonverbal, which would indicate
17     that he knew that Ashenfelter was doing the story?
18         MR. SMITH:  Objection.  That's the same
19     question.
20         You can answer.
21 A.  He made no verbal statements.
22 BY MR. KOHN:
23 Q.  And when Gina Balaya presented it, did she present it
24     as like a follow-up or as like new information?
25 A.  New information.

Page 233

1  Q.  Okay.  So after she made that statement what happened
2      next?
3  A.  Well, I think she said that there were other calls
4      though.
5  Q.  Okay.  Did you ask to who or any information?
6  A.  Either that or she offered it up.
7  Q.  Okay.  And what did she say?
8  A.  I think she said there were calls to other people.
9  Q.  Did she tell you who those other people were?
10 A.  I think she might have said Bill Sauget, she may have
11     said someone else and I don't recall who.
12 Q.  And then what did she say if anything that you
13     remember?
14 A.  I don't remember.
15 Q.  And did you say anything at the meeting?
16 A.  I think we said we don't -- we won't have a comment on
17     that.
18 Q.  That's what -- and who said that, you or Mr. Gershel?
19 A.  I think that was like a mutual statement.
20 Q.  Okay.  And then what happened next?
21 A.  She left.
22 Q.  And did you then discuss this with Mr. Gershel?
23 A.  I think I said, where's he getting this from.
24 Q.  And what did Mr. Gershel say?
25 A.  He said, I don't know.



BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 234

1  Q. And then what was said?
2  A. I think that was it. We were meeting about something
3     else so I assume we resumed with where we were.
4  Q. At that meeting was -- was there a discussion about
5     letting Mr. Convertino know this was happening?
6  A. I don't think so. I don't think he was in the office
7     at the time. I think he had left for Washington. I
8     don't -- I'm not sure.
9  Q. But did you like give him a call, give him a heads up,
10    any discussion about alerting Mr. Convertino to this
11    impending article?
12 A. I don't think so.
13 Q. Was there any discussion, since you knew calls were
14    coming into the office about issuing like an
15    interoffice memo like, no one's permitted to talk
16    about an OPR matter?
17        MR. SMITH: Objection to form.
18 A. Did you say was there any discussion?
19 BY MR. KOHN:
20 Q. Yeah, with Mr. Gershel.
21 A. I don't think so.
22 Q. Was there a way, did you do like an interoffice e-mail
23    where you could type out an e-mail, press a button and
24    it would go to the office?
25 A. You could, yes.

## Page 235

1  Q. Did anyone do a -- when you learned of that, do you
2     know if Mr. Gershel said, well, let's tell everyone if
3     these calls are coming in to keep their mouths shut,
4     let's send out a memo?
5  A. He didn't say that.
6  Q. Did you recommend it?
7  A. I didn't think of it.
8  Q. To the best of your knowledge did anyone type out an
9     e-mail and send it out to everyone in the office to
10    remind them that they should not be talking to
11    reporters about OPR matters?
12        MR. SMITH: Objection, argumentative, asked
13    and answered.
14        Go ahead.
15 A. No.
16 BY MR. KOHN:
17 Q. What happened next? Was there a discussion that
18    this -- right at that time did either you or
19    Mr. Gershel say, let's talk to Mr. Collins about it?
20        MR. SMITH: Objection, compound question.
21    Just answer the last question.
22 BY MR. KOHN:
23 Q. Okay. I'll rephrase it. At that meeting do you
24    remember a discussion about informing Mr. Collins
25    about what Ashenfelter was doing?

## Page 236

1  A. I don't remember and it's possible that Gina had
2     already informed him. I -- I don't know.
3  Q. Do you remember anything else about that meeting
4     related to the information you had gotten about
5     Mr. Ashenfelter and his -- the story he was working
6     on?
7  A. I'm not sure I understand.
8  Q. In other words, you've provided testimony about your
9     recollection about what occurred at that meeting when
10    Gina came in and made the presentation. Do you
11    remember anything else happening at that meeting?
12 A. About that?
13 Q. Yes, concerning the article.
14 A. I don't.
15 Q. Okay. And what's the very next thing you remember
16    occurring about the article?
17 A. I went back to my office and I think there was a
18    message for me.
19 Q. And what did you do?
20 A. I called back.
21 Q. And who was the message from?
22 A. Mr. Ashenfelter.
23 Q. And then what happened? You called him back, what
24    happened?
25 A. He discussed -- he said something to the effect of,

## Page 237

1     there's a story coming out or will you talk about a
2     story, if there's an OPR referral of Mr. Convertino.
3  Q. And then what did you say?
4  A. I said no.
5  Q. And then what else was discussed?
6  A. I don't remember the specifics. I don't remember if
7     he talked about specific -- specific facts that might
8     be in the story or if it was just more general.
9  Q. And so -- so, but you remember him telling you
10    either -- other information about what might be in the
11    story?
12 A. He may have done that, I'm not sure.
13 Q. The best of your recollection, can you remember what
14    he told you might be in the story?
15 A. I don't remember if he told me this or if I've heard
16    this from other people, but I think he talked about
17    Farhat and I think he talked about Makalda.
18 Q. Anything else?
19 A. I don't think so.
20 Q. What did you tell him?
21 A. I told him we will not comment on that story.
22 Q. And then what happened?
23 A. That was it.
24 Q. And what, you just hung up?
25 A. Yeah.



JONATHAN TUKEL
April 24, 2009

## Page 238

1    Q.  And then who did you tell about this phone call with
2        Mr. Ashenfelter?
3    A.  I think I went back and told Mr. Gershel.
4    Q.  And what did he say?
5    A.  He said, do you think we should send -- send an e-mail
6        to someone in Washington.
7    Q.  And what did you say?
8    A.  I said, that's probably a good idea.
9    Q.  And who did you want to send it to?
10   A.  I'm sorry?
11   Q.  Who did he want to send it to in Washington?
12   A.  I think he said OPR.
13   Q.  And you said that was a good idea and then what
14       happened?
15   A.  I think I sent an e-mail to OPR.
16   Q.  Who did?
17   A.  I think I did.
18   Q.  And did you show it to Mr. Gershel before you sent it?
19   A.  I don't know, it's possible, wouldn't surprise me.
20   Q.  When you were discussing sending an e-mail to OPR in
21       Washington, did it come up to send an e-mail to
22       anybody else?
23   A.  No.
24   Q.  What about an e-mail to Mr. Convertino?
25   A.  That did not come up.

## Page 239

1    Q.  Or to anyone in the office?
2    A.  I'm not sure where Mr. Convertino was at the time.  I
3        mean --
4    Q.  Could he be reached by e-mail?
5    A.  I assume.  I'm trying -- I don't know if he was on
6        detail or not.  I assume, if we would have thought of
7        that, we could have found a way to contact him.
8    Q.  Okay.  So you went back and talked to Mr. Gershel,
9        Mr. Gershel recommended an e-mail to Washington, you
10       wrote the e-mail and sent it off, is that --
11   A.  Correct.
12   Q.  -- what happened?
13   A.  Yes.
14   Q.  So when we find that e-mail that would indicate the
15       day within a matter of hours that you learned -- that
16       you had your first contact with Mr. Ashenfelter,
17       correct?
18   A.  About that, yes.
19   Q.  And it would also indicate when you -- that meeting
20       happened that Gina came in on, it would all have been
21       the same day?
22   A.  Should be.
23   Q.  Okay.  What do you remember next?
24   A.  I think there was a reply from OPR but I don't
25       remember when that came.

## Page 240

1    Q.  Okay.  And then what do you remember?
2    A.  I think that's it.
3    Q.  Did you ever have another interaction or a meeting
4        with Mr. Collins or Mr. Gershel about this incident?
5    A.  We may -- we probably met with Mr. Collins.
6    Q.  Okay.  What do you -- what do you remember about a
7        meeting with Collins?
8    A.  I think we just stuck our heads in his office and
9        said, you know, this is going on.
10   Q.  And what did he say?
11   A.  I think he said he knew.
12   Q.  And do you remember anything else?
13   A.  No.
14   Q.  Did anyone else who had been contacted by
15       Mr. Ashenfelter come and tell you what was going on?
16   A.  I don't think so.  I think they contacted -- I think
17       they may have contacted Gina.
18   Q.  Did Gina ever come back and tell you or give you more
19       information?
20   A.  That day?
21   Q.  Yeah.
22   A.  I don't think so.
23   Q.  And what's the next thing you remember happening?  Did
24       you have any more conversations with Mr. Ashenfelter
25       after the one you've just testified to regarding the

## Page 241

1        newspaper story?
2    A.  No.
3    Q.  Did you have -- did you ever ask anybody to contact
4        Ashenfelter on your behalf, like a third party
5        intermediary, ever?
6    A.  Meaning me personally?
7    Q.  Yeah, sort of like, I don't want to talk to him, but
8        why don't you give him this information, asking a
9        third party to relay information to Mr. Ashenfelter.
10           MR. SMITH:  Objection to form.
11   A.  What kind of information?
12   BY MR. KOHN:
13   Q.  Any type of information, ever.
14   A.  No.
15   Q.  Have you since this lawsuit was filed by
16       Mr. Convertino, have you ever had any indirect
17       communications with Mr. Ashenfelter through a third
18       party, through your attorney, through anybody, where
19       you sent a message or got any information to
20       Mr. Ashenfelter?
21   A.  No.
22           MR. SMITH:  Objection to form.
23   BY MR. KOHN:
24   Q.  Okay.  So now as I understand it, what's the next
25       thing happened vis-a-vis the story in the Free Press

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 242

1   or any information or interactions concerning
2   Ashenfelter and that story, what's the next thing you
3   remember?
4         MR. SMITH: Objection, form.
5   A. Yeah, I don't understand the question.
6   BY MR. KOHN:
7   Q. Okay. You testified that you believe you stuck your
8      head into Mr. Collins's office, told him about -- as I
9      understand, you told him about the Ashenfelter call
10     and had the impression he already knew about it?
11  A. Right.
12  Q. Okay. What happened next?
13  A. I'm not sure anything happened next.
14  Q. So the newspaper article then came out?
15  A. A day or two later.
16  Q. Okay. When did you first -- did you see the article
17     online or when it came out in the actual newspaper?
18  A. Actual newspaper.
19  Q. On the day it came out in the print?
20  A. Yes.
21  Q. Did you buy it?
22  A. It's delivered to the -- to my house.
23  Q. Okay. And did you read the article?
24  A. Yes.
25  Q. And what was your reaction to reading the article?

Page 243

1   A. I'm not sure what you mean.
2   Q. How did you react when you read the article?
3   A. I read it. I'm not really sure what you mean.
4   Q. I mean, were you -- did you have no reaction? It was
5      just news and move on with my day?
6   A. I was surprised by it.
7   Q. What made you surprised?
8   A. It was not the sort of thing I would expect to see
9      coming out in the newspaper.
10  Q. What do you mean by that?
11  A. Usually internal Department of Justice things don't
12     end up in the newspaper.
13  Q. And did you think at that time -- when you -- did you
14     read the whole article?
15  A. Yes.
16  Q. Was anything to your knowledge in that article not
17     true?
18  A. I think there are a couple things upon reflection that
19     were not true.
20  Q. At the time -- the day you read it, did you think
21     anything in the article was not true?
22  A. I'm not sure.
23  Q. Okay. Let's look at Exhibit Number 1 and if that
24     helps you I'd like to know upon reflection what you
25     think is not true in the article and I guess we can

Page 244

1   just go off the record while you do that, and again,
2   if you would like to mark it while you go through it,
3   this is the information that you believe was not true.
4   Okay.
5         Off the record.
6         I'm sorry, did you want to say something on
7   the record?
8   A. Yeah.
9   Q. Okay. Let's go back on the record.
10  A. Are you asking me what I think now is not true or back
11     then what is not true?
12  Q. I think the question is now. As I understood it --
13     let me just -- when you first read it I understood
14     your testimony that you weren't struck by something
15     being not true. Okay. Just -- strike it all. Let me
16     just go.
17         When you first read the article, did you
18     think anything in it was not true?
19  A. Okay. Now I can look at that and --
20  Q. Okay. And then my second question would be, upon
21     reflection is there anything in it that you think is
22     not true. So as you read that, think of those two
23     questions, the day you read it and upon reflection,
24     okay?
25  A. Okay.

Page 245

1         MR. KOHN: Let's go off the record.
2         (Discussion off the record at 3:56 p.m.)
3         (Back on the record at 4:02 p.m.)
4         MR. KOHN: If we can go back on the record.
5   BY MR. KOHN:
6   Q. Have you had an opportunity to examine Exhibit Number
7      1?
8   A. Yes.
9   Q. And my question is can you -- is there anything when
10     you read the article -- in looking at that, when you
11     read the article back in -- when it came out, that
12     struck you as not being accurate?
13  A. Well, I mean, I don't have a specific recollection of
14     what I thought when I read it.
15  Q. Okay.
16  A. But I think at the bottom of page one where it says,
17     withheld evidence that defense lawyers could have used
18     to attack the credibility of Hmimssa's trial
19     testimony, I don't think that's correct.
20  Q. Anything else?
21  A. I assume you're not asking about comments from
22     Mr. Convertino?
23  Q. No.
24  A. My understanding, I don't think it's correct at the
25     bottom of page two that Collins removed Convertino and

JONATHAN TUKEL
April 24, 2009

## Page 246

1    Corbet from the case in early September, just days
2    before Convertino and Hmimssa testified before the
3    senate financial committee in Washington about
4    document fraud.
5  Q.  Okay.
6  A.  On page two in the middle it says, Farhat, an illegal
7    immigrant from Lebanon with two prior weapons
8    convictions spent nine months in custody awaiting
9    trial in the drug case before Convertino arranged his
10   release in December 2001 to become an informant in the
11   terrorism case.  I knew nothing about him having been
12   released.
13 Q.  My question is actually whether it's true or not.
14 A.  Yeah, I don't know whether that's true or not.
15      MR. SMITH:  I think the question was
16   whether there was something that he knew to be untrue.
17      MR. KOHN:  Yeah.
18 BY MR. KOHN:
19 Q.  Go ahead.
20 A.  Next paragraph:  Farhat spent hundreds of hours at the
21   U.S. Attorney's Office translating Arab tapes seized
22   in a flat where three terror defendants lived.
23      Not that sentence but the one that follows:
24   Officials said he also frequented bars in Dearborn to
25   pick up information for terrorism investigators.  I

## Page 247

1    don't think that was in the OPR referral.
2      MR. SMITH:  That's not his question.
3  BY MR. KOHN:
4  Q.  My question is not whether it was in the OPR
5    referral --
6  A.  Oh, it's just whether it's correct information?
7      MR. SMITH:  Whether it's false, whether
8    it's something that you know to be false.
9  A.  Oh, well.  When -- then when you were asking me about
10   the part about withheld evidence that defense lawyers
11   could have used to attack the credibility of Hmimssa,
12   you were asking about the truth or falsity of that
13   statement?
14 BY MR. KOHN:
15 Q.  Yes.  So do you want to change your testimony?
16 A.  Yeah, I do.  I don't know if that's true or not.
17 Q.  Okay.  And I also understand that you don't need to
18   comment on the information that's attributed to either
19   Mr. Convertino or from Mr. Solomon.  You don't need to
20   comment on that.
21 A.  I don't know that any of it is incorrect if that's
22   your question.
23 Q.  Okay.  Okay.  Great, thanks.  Now, so you read the
24   article.  What is the next thing you remember doing in
25   relationship to this article?

## Page 248

1  A.  I remember calling Eric Straus and asking him if he'd
2    seen it.
3  Q.  And what -- and why did you choose to call him on
4    that -- this would be on the 17th of January?
5  A.  Uh-huh, yes.
6  Q.  Why him versus anybody else?
7  A.  He was a friend of mine and he was involved in the
8    case.
9  Q.  And you -- and did you reach him --
10 A.  I think so.
11 Q.  -- on the phone?
12 A.  I think so.
13 Q.  What did he say?
14 A.  I don't remember if he'd seen it or not.
15 Q.  And what's the next thing you remember happening?
16 A.  I'm not sure what you mean.
17 Q.  Vis-a-vis this article, what's the next thing you
18   remember?
19 A.  It was over the weekend, I don't think anything
20   happened.
21 Q.  Okay.  When you came back to work on Monday did
22   anything happen regarding this article?
23      MR. SMITH:  Objection, Monday was Martin
24   Luther King Day.
25 BY MR. KOHN:

## Page 249

1  Q.  Okay.  So the day after, the next work day when you
2    came into the office.
3  A.  I'm sure something did but I don't really remember
4    what it was.
5  Q.  In terms of this article, what's your next
6    recollection?  Like did somebody call you into a
7    meeting to talk about it, was there a discussion over
8    lunch or something that happened about this article
9    that you recall, the next thing?
10 A.  At some point Alan and I discussed that we should
11   refer it to someone to find out what happened and we
12   did that.
13 Q.  And tell me about the discussion you had with Alan
14   about referring it to somebody.
15 A.  Can't remember if it was e-mail or oral but he said,
16   you know, shouldn't we do something about that and I
17   said, yeah, we should, and I began working on another
18   OPR referral which included that.
19 Q.  Okay.  Going back to your testimony, so I think your
20   testimony was just -- can you read back his testimony?
21      (The following portion of the record was
22      read by the reporter at 4:08 p.m.:
23      "Question.  And tell me about the
24      discussion you had with Alan about
25      referring it to somebody.

JONATHAN TUKEL
April 24, 2009

## Page 250

1    Answer.  Can't remember if it was e-mail or
2    oral but he said, you know, shouldn't we do
3    something about that" --)
4    MR. KOHN:  Stop right there.
5  BY MR. KOHN:
6  Q.  When you said he said shouldn't we do something about
7    that, was that Mr. Gershel?
8  A.  Yes.
9    MR. KOHN:  And then if you can read back
10    again, following from where you just left off so we
11    get the identities down.
12    (The requested portion of the record was
13    read by the reporter at 4:08 p.m.:
14    "Answer.  Can't remember if it was e-mail
15    or oral but he said, you know, shouldn't we
16    do something about that and I said, yeah,
17    we should, and I began working on another
18    OPR referral which included that.")
19  BY MR. KOHN:
20  Q.  So was that you then -- yeah, we should was the way
21    you responded to him?
22  A.  Yes.
23  Q.  Okay.  I just wanted to clarify that.  And then you
24    typed up an e-mail?
25  A.  It became a second OPR referral and there were other

## Page 251

1    matters involved in it and I began working on that.
2  Q.  And do you know was that ever sent to OPR?
3  A.  It was sent to OPR.
4  Q.  And what were the other matters included in it?
5  A.  It was that thing about the Privacy Act that I told
6    you involving someone's leave records, it was matters
7    about Debbie Schlussel talking about matters involving
8    someone in the office and what her work schedule was
9    and her leave policy was.  May have been something
10    else too, I don't recall.
11  Q.  Do you know if there ever was an OPR or an IG
12    investigation opened up about the leave record matter
13    or the Debbie Schlussel matter?
14  A.  I don't believe there was.
15  Q.  Okay.  Do you remember Mr. Corbet sending an e-mail
16    and saying, if you don't call for an investigation,
17    I'm going to, or words to that effect?
18  A.  To me?
19  Q.  To you or Mr. Gershel or Mr. Collins.
20  A.  I think there was one from Mr. Kozar.
21  Q.  Okay.  What do you remember from him?
22  A.  I think it was forwarded to me by Mr. Gershel and it
23    said, did you see the article over the weekend,
24    shouldn't we do something about that, and Alan -- I
25    think that's what prompted the conversation with me.

## Page 252

1    Alan forwarded that and said, shouldn't we do
2    something, and we agreed to do so and it came to
3    include those other matters.
4  Q.  Okay.  And do you remember ever -- did you ever talk
5    with anyone employed by the United States Department
6    of Justice who expressed agreement with what was in
7    the article?
8  A.  I'm not sure what you mean.
9  Q.  In other words, someone said like, I agree with the
10    article?
11  A.  Agree?
12  Q.  With what's in the article.
13  A.  You mean the factual accuracy of it?
14  Q.  Yeah, yeah.
15  A.  I don't -- I don't think I ever heard anyone say that.
16  Q.  Did you ever hear anyone express a sentiment that it
17    was a good thing that this information got out?
18  A.  No.
19  Q.  Do you believe that the publication of this material
20    harmed Mr. Convertino's reputation?
21  A.  That's -- that's difficult for me to assess.  I mean,
22    there's been lot of things that have gone on with
23    Mr. Convertino's career.
24  Q.  But at the time when this came out on January 17th,
25    2004, do you think the publication of this information

## Page 253

1    harmed Mr. Convertino's reputation?
2  A.  I'm sure it probably did.
3  Q.  Did you ever get -- hear any feedback from defense
4    attorneys about this article?
5  A.  There were comments in the article by defense
6    attorneys.  I don't think I ever heard any from them
7    directly.  Jim Thomas who was a defense attorney
8    months before had asked me about an OPR referral.
9  Q.  And what did he ask you about that?
10  A.  He said, was there an OPR referral, we hear there was.
11  Q.  And what did you tell him?
12  A.  I said, we can't talk about that.
13  Q.  What about after the article came out, did any defense
14    attorney give you information that they were happy to
15    see this or this was -- you know, can't wait till
16    Convertino's taken down or something like that?
17  A.  I don't think so.
18  Q.  And what about, did you ever hear any comments from
19    any judges about this article?
20  A.  I don't think I heard anything from any judges.
21  Q.  What about from anyone in Washington, D.C., anyone
22    from the justice department in Washington, D.C.?
23  A.  No.
24  Q.  What about Ann Coulter, did you ever talk to her about
25    it?

64 (Pages 250 to 253)

JONATHAN TUKEL
April 24, 2009

Page 254

1  A.  No.
2  Q.  What about Mr. Shepherdson, the reporter you've had a
3     lot of contact with, did you ever talk about this
4     article with him?
5          MR. SMITH:  Objection to form.
6          You can answer it.
7  A.  Mr. Shepherdson called me that weekend, I don't know
8     if it was the day of the article or the day after the
9     article.
10 BY MR. KOHN:
11 Q.  And what did he say in that phone call?
12 A.  He said, I had heard things like that before.
13 Q.  And then what did you say to him?
14 A.  Not much.  It was the weekend and I was really -- I
15    was not focused on talking to him.  I don't think I
16    talked to him for very long but he said, I have been
17    hearing things like this, or something to that effect.
18 Q.  Did you report that conversation to anybody?
19 A.  I'm pretty sure I told the inspector general agents.
20 Q.  And what else did you say in that -- so he called you
21    at home.  Was that on your cell or your --
22 A.  On my cell phone.
23 Q.  And do you remember what else he said?  Did he tell
24    you that he would not have written such a story --
25 A.  No.

Page 255

1  Q.  -- because it's underhanded?
2  A.  No.
3  Q.  Did he indicate that he had information but decided
4     not to run the story?
5  A.  No, not in those types of words.
6  Q.  Did he indicate to you that he knew -- that -- called
7     you up and told you he knew that you had provided him
8     this type of information before?
9  A.  No.
10 Q.  Had you provided Mr. Shepherdson any information about
11    Mr. Convertino ever?
12 A.  No.
13 Q.  Did you tell Mr. Shepherdson about the OPR?
14 A.  Did I tell Mr. Shepherdson about --
15 Q.  Yeah.
16 A.  Before it was printed?
17 Q.  Yes.
18 A.  No.
19 Q.  Knowing -- do you -- you have an opportunity right now
20    to change the testimony you've prior given concerning
21    whether you were the leak or a source for that
22    article.
23          MR. SMITH:  Okay.  I just -- that's not a
24    question.
25 BY MR. KOHN:

Page 256

1  Q.  Okay, yeah.  You have an opportunity, I'm giving you
2     that opportunity right now to amend your testimony and
3     simply admit that you were a source for the story that
4     Mr. Ashenfelter wrote on January 17, 2004, Exhibit
5     Number 1, an opportunity to correct the record, change
6     your testimony, simply admit to that.  Are you willing
7     to do it right now?
8  A.  No.
9  Q.  And do you -- okay.  I'm now asking you a question in
10    your personal capacity, I'm not looking for you as a
11    professional U.S. attorney, some -- you as a person,
12    an individual, given what you thought of and knew of
13    Mr. Convertino, were you just a little happy that
14    this -- that some truth about Mr. Convertino got out
15    that could take him off his high horse?
16          MR. SMITH:  Objection to form.
17          You can answer.
18 A.  No, I actually thought it set back the work I had been
19    doing on the OPR referral.
20 BY MR. KOHN:
21 Q.  Well, you knew that that OPR referral was never going
22    to go anywhere, isn't that true?  I mean, you knew
23    when someone looked it over that he wasn't going to
24    get whacked by OPR, correct?
25          MR. SMITH:  Objection to form.

Page 257

1          You can answer.
2  A.  Did I think that OPR would do something based on that
3     referral?
4  BY MR. KOHN:
5  Q.  That's not my question.  My question is actually based
6     on that referral you had a strong suspicion that OPR
7     would do nothing --
8  A.  No.
9  Q.  -- against Mr. Convertino, isn't that true?
10 A.  No, that's false.
11 Q.  So you actually -- and you thought that if OPR wasn't
12    going to do something about it, well, the Plymouth
13    Free Press will?
14          MR. SMITH:  Objection --
15 BY MR. KOHN:
16 Q.  Isn't that true?
17          MR. SMITH:  Objection to form.
18 A.  No.
19 BY MR. KOHN:
20 Q.  Do you remember having any discussions with Eric
21    Straus about who was the leaker?
22          MR. SMITH:  I believe this has been asked
23    and answered, objection.
24          MR. KOHN:  Was it asked and answered?
25          MR. SMITH:  I believe so but go ahead and


41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 258

1    answer it.
2    A.  Not specifically.
3    BY MR. KOHN:
4    Q.  Did you at some point take possession of
5       Mr. Convertino's computer?
6    A.  There was something involving computers.  There was
7       something involving computers.  I believe that that
8       was actually the agents assigned to the public
9       integrity section and that we offered our -- they
10      asked for and we gave our IT manager to assist them in
11      that.
12   Q.  And was Mr. Convertino's computer placed in your
13      office?
14   A.  The hard drives were placed in my safe.
15   Q.  And did you have access to all of his computer hard
16      drives and e-mails and materials?
17   A.  The hard drives were in my safe.  I would have no idea
18      how to do anything with any of that.  There were
19      receipts signed and initialed and dated.  I showed
20      them what I considered the best practice of how to log
21      evidence in and authenticate it, someone ultimately
22      came and took it and that was the end of it.
23   Q.  Do you know after the article on the OPR referral
24      appeared on January 17th, 2004, do you know if any
25      other judge in Plymouth or elsewhere asked to be shown

Page 259

1       a copy of the referral?
2    A.  Did the judges ask?
3    Q.  Did any other judge -- I think there's been testimony
4       about Judge Rosen.  Did any other judge ask to obtain
5       a copy of the OPR referral?
6    A.  I'm not aware of any.
7    Q.  In regards to Mr. Butch Jones do you have knowledge as
8       to whether he was able to use the fact that he
9       produced that letter and his testimony or actions in
10      the terrorism trial to escape the death penalty?
11   A.  There was -- there was an e-mail or two from
12      Mr. Corbet I think or -- yeah, I'm sure there was an
13      e-mail from Mr. Corbet involving Butch Jones on the
14      death penalty and whether something was used or not
15      used, I -- I don't think it was the letter.  I don't
16      know the answer to that.  I've seen something to that
17      effect.
18   Q.  Was that the department you worked in when you were up
19      in the attorney general's office?
20   A.  When I was --
21          MR. SMITH:  Objection to form.  The
22      department he worked in was the Department of Justice.
23   BY MR. KOHN:
24   Q.  Yeah, was that the piece of the pie that you had when
25      you were up in Washington about death penalty

Page 260

1    referrals?
2          MR. SMITH:  Objection to form.
3    A.  I made the recommendations for the deputy attorney
4       general and the attorney general.  By statute those
5       all have to be made personally by the attorney
6       general, but there's a big bureaucracy that makes
7       recommendations to him.  I was part of that.
8          I'm almost positive that the Butch Jones
9       matter had been resolved prior to me getting there and
10      even if it wasn't I had no involvement in it when I
11      was there.
12          MR. SMITH:  Okay.
13   BY MR. KOHN:
14   Q.  Have you ever been accused of misconduct?
15   A.  What do you mean?
16   Q.  Were you ever the subject of a misconduct complaint?
17          MR. SMITH:  You mean as an AUSA?
18   BY MR. KOHN:
19   Q.  Yeah, within the Department of Justice.
20   A.  Yes.
21   Q.  Were those matters kept confidential?
22   A.  Well, are you talking about a formal written
23      complaint?
24   Q.  Yeah.
25   A.  I mean, I recently -- there was a mistake that I made

Page 261

1       in a case that I was involved in.  I brought it to
2       everyone's attention, went to the court and got it
3       corrected.  I mean, there was no complaint filed
4       against me because I did that.  Is that what you're
5       talking about?
6    Q.  No, I'm talking about like an OPR type or any type of
7       proceeding which might be -- like looking at you,
8       whether you engaged in some type of misconduct?
9    A.  I've had one or two OPR complaints, I've had one or
10      two Bar complaints.  I believe those were all
11      confidential, but I don't really know.
12   Q.  But to the best of your knowledge they were kept
13      confidential?
14   A.  I think so.
15   Q.  Do you know if the copies of any of those complaints
16      were sent to the attorney general's office for their
17      review?
18   A.  You mean at the time?
19   Q.  Yeah.
20          MR. SMITH:  If you know.
21   A.  I would have no idea.
22          MR. KOHN:  Just off the record for a
23      moment?
24      (Discussion off the record at 4:23 p.m.)
25      (Back on the record at 4:28 p.m.)

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

## Page 262

1      MR. KOHN:  Just for the record, I've shown
2  the witness a document that's Bates stamped DOJ.  It's
3  his -- it's what was believed to be his notes and the
4  Bates stamp DOJ 5005961, 5961 A, 5961 B, 5961 C, 5962
5  D, 5961 E, 5962 -- or actually it looks like 5961 F
6  and then 596 -- 5962 through 5969.  I think when I
7  said 5962 D, actually it's a 1, it's 5961 D, but I'm
8  going to put these aside since they're under a
9  protective order and come back to them if we need to.
10 BY MR. KOHN:
11 Q.  I'm going to call your attention, do you remember at
12     one of the meetings and I'm going to call it the
13     October 10th meeting but one of those three meetings,
14     the issue of the Farhat sentencing coming up?
15 A.  It was at least one of the meetings.
16 Q.  Okay.  And I'm going to show you a document we're
17     going to mark as Exhibit 10 if you can just put that
18     aside for now.
19 A.  I was just trying to -- now that I see what you're
20     asking to refresh, to see if there was anything here.
21         MARKED BY THE REPORTER:
22         DEPOSITION EXHIBIT 10
23         4:30 p.m.
24     MR. KOHN:  And I'm showing the witness
25 Exhibit 10.  Exhibit 10 is a two-page document, the

## Page 263

1  cover page for the Marwan Farhat sentencing and one
2  page, page 20 from that transcript.
3         I believe the witness has already testified
4  that he had actually -- he had seen a copy of this.
5  He was not quite sure if he had a personal possession
6  of the copy.
7  BY MR. KOHN:
8  Q.  I think that was your testimony.
9  A.  I'm sorry, I missed that.
10 Q.  I think you've testified that you've seen --
11 A.  Yeah, right.
12 Q.  -- this document.
13 A.  Right.
14     MR. SMITH:  The full document.
15     MR. KOHN:  Right.
16     MR. SMITH:  Not this two-page version.
17 BY MR. KOHN:
18 Q.  Did you remember at one of the meetings either
19     providing Mr. Convertino with a copy of it or showing
20     him the sentencing transcript?
21 A.  No.
22 Q.  Did you ever ask Mr. Convertino to respond to anything
23     that was said at that sentencing hearing?
24 A.  Respond to me?
25 Q.  Yeah, like answer questions about what he did or said.

## Page 264

1  A.  Well, I see you've underlined the part about congress.
2      We asked him about that congress question and what
3      that was a reference to.
4  Q.  You did ask him that?
5  A.  Yes.
6  Q.  And what did he say?
7  A.  He said, it wasn't congress.  We said, what was it,
8      and he said, it wasn't congress.  What was it?  He
9      said, it's a private -- private organization.  We
10     said, really, what private organization.  Steve
11     Emerson's organization.
12 Q.  Did you find that response credible?
13 A.  I don't know.
14 Q.  Well, what was your reaction to that response?  If you
15     read this it says, they asked me to go testify in
16     front of congress -- reading page 20 lines 20 and
17     21 -- Rick Convertino asked me if I was willing to do
18     that.  Did you find what you just -- how you
19     articulated Mr. Convertino's response credible in
20     terms of your questions you had about this?
21 A.  I didn't really evaluate it that way.
22 Q.  How did you evaluate his response?
23 A.  I didn't.  I just sort of remembered it and later I
24     was interviewed by the Public Integrity investigators
25     and told -- excuse me -- them the exact same thing and

## Page 265

1  they already knew that.
2  Q.  What did they know?
3  A.  They knew that there was something with Steve Emerson.
4  Q.  Did you do any other discussion with Mr. Convertino
5      about this transcript page --
6  A.  No.
7  Q.  -- about the conflicts?
8  A.  No.
9  Q.  Why did you ask Mr. Convertino questions about the
10     information, about going to congress on page 20 of the
11     transcript?
12 A.  I don't remember if I asked that or if Alan asked
13     that, but I don't know.  Probably because there had
14     been talk about congress before.
15 Q.  And was that the prior congressional hearing -- the
16     hearing that Mr. Convertino testified to in front of
17     Judge -- in front of senator Grassley?
18 A.  Correct, and the whole question of whether that had
19     been approved and all that.
20 Q.  Did the information contained in this transcript raise
21     any concerns to either you or in your perception
22     Mr. Gershel?
23 A.  What do you mean?
24 Q.  In other words, was -- do you detect that Mr. Gershel
25     had any issues were raised concerning what was

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 266

1    presented in this transcript?
2    A.  I don't know.
3    Q.  Did it raise issues for you?
4    A.  It really didn't.  I don't think I even wrote it down
5        in my notes.  I just remember it because later, when I
6        was interviewed by the Public Integrity people I told
7        them this, and one of them was out of the room and the
8        other one came back and the first agent related to the
9        second agent what I had just told them and they said,
10       Steve Emerson, and they nodded at each other.  They
11       obviously had known something about Steve Emerson
12       before.
13   Q.  Did you know anything about who Mr. Steve Emerson was
14       when Mr. Convertino gave you the information he gave
15       you?
16   A.  After 9/11 I had heard of Steve Emerson.
17   Q.  Do you do any follow-up questions to Mr. Convertino
18       based on the answer he gave you?
19   A.  No, I don't think so.
20   Q.  Did you think that the answer he gave you was
21       responsive to your question?
22   A.  Yeah, I asked him what he meant and he explained to me
23       what it meant.
24   Q.  Who interviewed you from public integrity?
25   A.  That time when we were talking about Steve Emerson?

Page 267

1    Q.  Yes.
2    A.  Dan Cook was one.  I don't know who the other was.  It
3        may have been -- I don't remember his name, he was a
4        supervisor from St. Louis I think.  I'm not certain.
5    Q.  And do you --
6    A.  Dan Cook was definitely one.
7    Q.  Did you ever see a 302 produced concerning that
8        interview?
9    A.  Never seen any written recordings of interviews with
10       me from public integrity.
11   Q.  Was that interview with you recorded or just on paper?
12   A.  On paper.
13   Q.  How many interviews did you do with public integrity?
14   A.  I'm not sure.
15   Q.  More than one?
16   A.  Possibly.  I'm not certain.
17   Q.  Did you provide them information relevant to whether
18       they were going to indict Mr. Convertino?
19           MR. SMITH:  Objection to form.
20   A.  Did I provide public integrity information?
21   BY MR. KOHN:
22   Q.  Yeah.
23   A.  I don't think there was any such information at the
24       time.
25           Could you -- I'm not sure I understood the

Page 268

1    question.  Could you ask that again?
2           MR. KOHN:  Could you read back?
3           (The following portion of the record was
4           read by the reporter at 4:36 p.m.:
5           "Question.  Did you provide them
6           information relevant to whether they were
7           going to indict Mr. Convertino?
8           MR. SMITH:  Objection to form.
9           Then you said, did I provide public
10          integrity information?
11          You said yeah.
12          I don't think there was any such
13          information at the time.  Could you -- I'm
14          not sure I understood" --)
15   A.  Well, yeah, I'm not sure I understood the question.  I
16       provided them information.  What use they were going
17       to make of it, I don't know, that was up to them.  If
18       you're asking did I say you should use this to indict
19       him, no, I did not say that.
20   BY MR. KOHN:
21   Q.  Did anyone from there ever there ask you any opinion
22       whatsoever about a potential indictment?
23   A.  No.
24   Q.  Why were computer hard drives related to
25       Mr. Convertino's computer saved in your office safe

Page 269

1    and not say with the FBI or some other entity?
2           MR. SMITH:  Objection to form.  Also
3           objection because it calls for speculation.
4           You can answer if you know.
5    A.  I'm not sure.  As we sit here who took
6        those, if it was EOUSA who sent someone out to do that
7        or if it was the FBI, and I believe that for sometime
8        until those hard drives were taken out and put in my
9        safe, they had been sitting in our information
10       technology specialist's office with other computers,
11       and she had marked which ones they were, which one or
12       ones they were.
13   BY MR. KOHN:
14   Q.  When this came up at the -- one of the meetings, I'm
15       looking at the transcript of the Farhat -- do you
16       remember having put a yellow sticky on page 20 and
17       either handing Mr. Convertino a copy of the transcript
18       with a yellow sticky on it so he could turn it to page
19       20?
20   A.  No.
21   Q.  Now, you were interviewed by the Office of inspector
22       general regarding the leak?
23   A.  Yes.
24   Q.  Okay.  Tell me about your interviews and what happened
25       with the OIJ, okay?

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 270

1      MR. SMITH:  That's an awfully broad
2   question.
3   BY MR. KOHN:
4   Q.  Yeah, okay.  How many times were you interviewed?
5   A.  Three.
6   Q.  And what happened at the -- I mean, just tell me what
7       happened at the first interview.
8   A.  I can't separate them out in my mind that way.  I
9       think it started late and we didn't get finished.
10  Q.  And then you carried on to another day?
11  A.  I think so.
12  Q.  And then did it just carry on to a third day or did
13      they call you back?
14  A.  Well, one day they had asked for some things and I
15      found some additional documents so I took that to
16      them, and then we went to another interview and then
17      they asked for a third one.
18  Q.  And were you represented by counsel during these
19      interviews?
20      MR. SMITH:  You mean did he have a lawyer
21      there?
22  BY MR. KOHN:
23  Q.  Yeah.
24  A.  No.
25  Q.  Did you ever review the transcript -- you testified

Page 271

1       you reviewed the transcripts?  When you reviewed --
2       did you review the transcripts contemporaneously or
3       did you just review them now in preparation for this
4       testimony?
5   A.  Just now in preparation.
6   Q.  When you reviewed those transcripts did you find
7       anything that was inaccurate?
8   A.  Not that I recall.
9   Q.  Do you stand --
10      MR. SMITH:  You mean inaccurate
11      transcription?
12  BY MR. KOHN:
13  Q.  I'm not talking about --
14      MR. SMITH:  Or you mean if he made a
15      mistake --
16  BY MR. KOHN:
17  Q.  Yeah, if you made a mistake you'd like to correct.
18  A.  I don't think so.
19  Q.  So you would stand by the truthfulness of everything
20      you said to the inspector general?
21  A.  Yes.  Understanding that there are details that I
22      don't remember today as well as I did then.
23  Q.  Okay.  I'm going to ask -- I'm going to have some
24      names here, I'd like you to tell me if you ever talked
25      to them about Mr. Convertino.

Page 272

1       You've testified about contacts with
2       Jeffrey Taylor, correct?
3   A.  Yes.
4   Q.  Did you have any other contacts with him?
5       MR. SMITH:  About anything?
6   BY MR. KOHN:
7   Q.  About Mr. Convertino or the leak --
8       MR. SMITH:  Objection, form.
9   BY MR. KOHN:
10  Q.  -- or the OPR referral?
11  A.  No.
12  Q.  Stuart Levy, do you know who he is?
13  A.  Yes.
14  Q.  And --
15      MR. SMITH:  He was already testified about.
16  BY MR. KOHN:
17  Q.  Okay.  Any additional information concerning
18      communications you had with Mr. Levy on anything to do
19      with Mr. Convertino?
20  A.  Mr. Levy once told me when I worked in the Deputy
21      attorney general's office that he had had a case with
22      Mr. Convertino.
23  Q.  And other than that, was there any other discussions
24      about Mr. Levy and Mr. -- related to Mr. Convertino?
25  A.  Mr. Levy was very proud of the fact that he took over

Page 273

1       the case on appeal and secured a reversal.  He was
2       defense counsel.
3   Q.  And I'm just going to ask to strike as nonresponsive.
4       But my question is did you have any other
5       discussions with Mr. Levy concerning the matters we're
6       talking to here about Mr. Convertino, the OPR, the
7       Plymouth Free Press, those type of matters.
8   A.  No.
9       MR. SMITH:  Objection to form.
10  A.  I'm sorry.
11  BY MR. KOHN:
12  Q.  Did you -- did Mr. Levy -- did you share -- did you
13      share any criticisms of Mr. Convertino with Mr. Levy?
14  A.  No.
15  Q.  Did you say words like, yeah, I don't like that guy --
16  A.  No.
17  Q.  -- something like that?
18      You've testified about Mr. Margolis I
19      believe?
20  A.  Yes.
21  Q.  John Richter?
22      MR. SMITH:  Richter.
23  A.  Richter.  Don't really know him, I spoke to him on the
24      phone a couple of times.
25  BY MR. KOHN:

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 274

1  Q.  About Mr. Convertino?
2  A.  No.
3  Q.  Anything about Mr. Convertino?
4  A.  I don't think so.
5  Q.  Will Moschella?
6  A.  I don't think I've ever spoken to him at all.
7  Q.  And that's assistant attorney general for legislative
8      affairs?
9  A.  I think that's right.
10 Q.  Do you know that person?
11 A.  I know the name.
12 Q.  Do you know why he would have a need to know about
13     Mr. Convertino's OPR referral?
14 A.  I'm assuming it's because he was the director of the
15     Office of Legislative Affairs.  There were questions,
16     those letters we talked about from senator Grassley,
17     and it would be Mr. Moschella's job to do the final
18     signoff on any response to those.
19 Q.  Faith Burton?
20 A.  I know the name and I know she was someone high up in
21     justice, I don't know exactly what her position was.
22     I've never spoken to her.
23 Q.  Perhaps at the time special counsel for legislative
24     affairs?  Does that ring a bell?
25 A.  Those titles don't mean anything.

Page 275

1  Q.  Okay.  Other than reading the article, Exhibit Number
2      1 on the day it came out, have you seen -- ever
3      searched for that article on the Internet?
4  A.  I may have, I don't know.
5  Q.  Did you ever notice that that article was reprinted
6      anywhere, like, you know, like in a -- you know, like
7      people talk about it on the radio or on television,
8      things like that?
9         MR. SMITH:  Objection to form.
10 A.  You mean did I find it in multiple places on the
11     Internet?
12 BY MR. KOHN:
13 Q.  Yeah, like you're driving in -- like the day it came
14     out, do you know if it was also reported on the local
15     radio or television?
16 A.  I don't remember it being, but I don't know.
17 Q.  Did you discuss that article with any of your friends?
18 A.  Other than what we've talked about?
19 Q.  Yeah.
20 A.  No.
21 Q.  What about a -- was it ever discussed -- anything to
22     do with Mr. Convertino ever discussed at a Federalist
23     Society meeting?
24 A.  No.  Mr. Convertino once asked about coming to a
25     Federalist Society meeting with me but he never came.

Page 276

1         MR. KOHN:  Let's go off the record so I --
2      yeah.
3         MR. SMITH:  Are we on the record or off?
4         MR. KOHN:  Okay.  On the record.
5  BY MR. KOHN:
6  Q.  You testified that Mr. Ashenfelter called you on your
7      cell phone, correct?
8  A.  When?
9  Q.  On or about December 11, 2003.
10 A.  No, I don't think so.  I think he called me at my
11     office and I returned his call from my cell phone.
12 Q.  Okay.  And has Mr. Ashenfelter ever called you on your
13     cell phone?
14 A.  When he was doing that biographical piece about me, he
15     did.
16 Q.  And what about -- have you ever called him on your
17     cell phone?
18 A.  I did that day.  I may have returned a call or two
19     from him through that phone, I don't know.
20 Q.  And in 2000 -- between, and the months I'd be looking
21     at would be November 2003 through January 17, 2004.
22     Do you know what cell phone service you were using?
23        MR. SMITH:  You mean what company?
24        BY MR. KOHN:  Yeah.
25 A.  Sprint.

Page 277

1  BY MR. KOHN:
2  Q.  Would you be willing to request from Sprint all of
3      your and your wife's cell phone call receipts from
4      September -- from November 2003 through January
5      inclusive of 2004 to be produced?
6  A.  I would discuss it with -- with counsel.
7  Q.  Okay.  My question is right now today would you
8      agree -- your counsel may come back and say you don't
9      have to do it or don't do it, but I'm asking for you,
10     would you agree to go and do whatever you need to do
11     with Sprint and the telephone company to get every
12     cell phone record of all calls coming in and all calls
13     coming out of your personal cell phones that were
14     under your control and direction, I'm assuming
15     yourself and your wife, but like maybe you had two
16     cell phones or whatever, but every cell phone that was
17     under your personal control or your family's control
18     between -- I'll just put the dates, October 1, 2003
19     through January 31, 2004, would you be willing to do
20     that, get them all for us and produce them?
21        MR. SMITH:  Objection to form.
22 A.  Who's us?
23 BY MR. KOHN:
24 Q.  Counsel for Mr. Convertino, and we would accept those
25     under a protective order so we would not be able to

JONATHAN TUKEL
April 24, 2009

Page 278

1    disclose any of those numbers.
2          MR. SMITH: Of course this is all
3    hypothetical but go ahead and answer.
4    A.  Yeah, I'm not certain at this point.
5          MR. KOHN: Okay. Why don't we go off the
6    record for a moment?
7          (Discussion off the record at 4:48 p.m.)
8          (Back on the record at 4:52 p.m.)
9          MR. KOHN: Back on the record.
10   BY MR. KOHN:
11   Q.  When you met with the inspector general did you give
12       them any -- did they ask you what you thought about
13       Mr. Convertino on a personal level?
14   A.  I think they might have.
15   Q.  And what did you tell them?
16   A.  I think I said I don't particularly care for him.
17   Q.  And did you say anything else about Mr. Convertino to
18       them like about how you felt about him personally?
19   A.  I don't think so.
20   Q.  And did the inspector general's Office ask you to do
21       anything in terms of to determine whether you were
22       telling the truth or not about the leak?
23          MR. SMITH: I mean, I object just because
24       you have the transcripts so you're just -- it's just a
25       memory test for him. You're not actually searching

Page 279

1    for new information or --
2    BY MR. KOHN:
3    Q.  Okay. Let me just then -- have you ever asked a
4        criminal defendant to undergo a polygraph?
5    A.  I may have early in my career, not recently.
6    Q.  When's the last time you did?
7    A.  Well, I don't know that -- I mean, I have cases where
8        they've been done where the FBI did it without me
9        asking, I think without me asking, with poor results
10       and that was as a result of those types of things.
11   Q.  Okay. But going back to that, do you -- does your --
12       does the United States Attorney's Office, do people
13       there use polygraphs?
14   A.  Some do, some don't.
15   Q.  What position -- and you were the first assistant or
16       something? What was your position over there?
17   A.  I was first assistant.
18   Q.  And did you take any steps to have United States
19       Attorneys not use polygraphs?
20   A.  No.
21   Q.  Did you take any steps to have FBI agents not use
22       polygraphs?
23   A.  Well, what do you mean by steps?
24   Q.  Okay. Let me say this. Do you have a concern about
25       the reliability of polygraphs?

Page 280

1    A.  Yes.
2    Q.  Okay. Given that concern and given your -- and
3        what -- and did you have a management position in the
4        U.S. Attorney's Office?
5    A.  I didn't have a policymaking position in that sense.
6    Q.  Did you make any recommendations about the use of
7        polygraphs?
8    A.  That is a technique that is most commonly used by law
9        enforcement agencies. In cases in which I work, if
10       agents talk about doing it, we talk about the possible
11       benefits and the possible downsides.
12   Q.  But would you permit, if an agent says that he were
13       going to use a polygraph in a case you were involved
14       in, would you say okay or would you prevent them from
15       using it?
16   A.  I probably wouldn't prevent them from using it, it
17       depends on the circumstance though. It depends on
18       what they're trying to do.
19   Q.  And are you aware that polygraphs have a tremendous
20       beneficial impact far behind the little things that
21       just go up and down? I mean -- strike that.
22          Are you aware that polygraphs can be used
23       as a source for an interrogation and assist in an
24       interrogation of a person as opposed to just reading
25       results off a chart?

Page 281

1          MR. SMITH: Objection to form.
2          If you understand it you can answer it.
3    A.  I don't really understand it.
4    BY MR. KOHN:
5    Q.  Okay. When someone takes a polygraph do you
6        understand that there can be a printout of a reaction
7        to various questions?
8    A.  Yes.
9    Q.  Do you also understand there's a part of the polygraph
10       where the person who sat and was given the test is
11       asked questions about the results?
12   A.  I'm going to have to ask you to repeat that.
13   Q.  In other words, there's a part of a polygraph process
14       that includes an interrogation of the subject. Are
15       you aware of that?
16   A.  Yes.
17   Q.  And are you aware that the inter -- that the --
18       sometimes the results of the polygraph are useful to
19       assist in the interrogation of the subject?
20   A.  It depends who you ask.
21   Q.  But do you understand that in some cases the results
22       of the polygraph are useful and have produced
23       beneficial information as a result of the
24       interrogation of the subject --
25          MR. SMITH: Objection to form.



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 282

1  BY MR. KOHN:
2  Q.  -- yes or no?
3        MR. SMITH:  And also I think it's asked and
4     answered, but please answer it if you can.
5  A.  I'm not familiar with what you're talking about.
6  BY MR. KOHN:
7  Q.  Okay.  Then let me try to make it clear.
8  A.  I understood what you're talking about.
9  Q.  Okay.
10  A.  I'm not familiar with the concept you're talking
11     about.
12  Q.  Okay.  Well, I have a lot of experience in polygraphs
13     just to let you know and the polygraphers I've worked
14     with have told me that it's the post-examination --
15     post-examination interrogation that is the most useful
16     part of the process.  Do you think there's truth to
17     that?
18        MR. SMITH:  Objection to your testimony.
19        MR. KOHN:  Yeah.
20        MR. SMITH:  Do you think there's truth to
21     whether polygraphers have told him that?
22  BY MR. KOHN:
23  Q.  No, strike that.
24        My question is, do you understand that
25     after the physiological polygraph examination is

Page 283

1     administered the person who took the test is subject
2     to an interrogation?
3        MR. SMITH:  Is that your understanding?
4  A.  I don't know that that's uniformly true.
5  BY MR. KOHN:
6  Q.  Okay.  In the cases in which that happens, where
7     there's a post-physiological test interrogation, what
8     is your understanding of the usefulness of the
9     physiological component in the interrogation process?
10     Do you under --
11  A.  I don't think I have such --
12        MR. SMITH:  Objection to form.
13  A.  I don't think I have such an understanding.
14  BY MR. KOHN:
15  Q.  Okay.  What is your understanding about polygraphs?
16        MR. SMITH:  Objection to the vagueness of
17     that question.
18  BY MR. KOHN:
19  Q.  What do you know about them?
20        MR. SMITH:  Same objection.
21  A.  That they're inadmissible in evidence, that there's
22     scientific dispute as to their validity and from what
23     I would say I have learned interacting with law
24     enforcement agents, that they question the value of
25     them.

Page 284

1  BY MR. KOHN:
2  Q.  But now what about the post-polygraph examination
3     interrogation, is that admissible in evidence?
4  A.  I don't know.
5  Q.  You do not know -- how many years have you been in law
6     enforcement related activities?
7        MR. SMITH:  Objection, argumentative.
8        You can answer.
9  A.  18.
10  BY MR. KOHN:
11  Q.  So if you question a subject about the results of the
12     polygraph and the subject then gives you answers,
13     including say a confession, is that confession
14     admissible?
15  A.  I think it depends on the circumstances.
16        MR. SMITH:  Also objection to the extent it
17     calls for a legal conclusion.
18  BY MR. KOHN:
19  Q.  Okay.  So getting back to a polygraph, you have not
20     enforced any policy on law enforcement agents that
21     work for you as to whether they would use or not use
22     polygraphs in any given case, correct?
23  A.  I have no ability to make or enforce such a policy.
24  Q.  Have you informed any -- the law enforcement agents
25     that have worked under your -- on cases that you're

Page 285

1     involved in that if they do a polygraph you will not
2     use the results no matter what?
3        MR. SMITH:  You can answer.
4  A.  I don't think the results are usable, they're not
5     admissible.
6  BY MR. KOHN:
7  Q.  Well, any part --
8        MR. SMITH:  I guess it's vague in terms of
9     what you mean by use the results.
10  BY MR. KOHN:
11  Q.  Have you ever done research on polygraphs on your own?
12        MR. SMITH:  Objection, relevance.
13  A.  Talking with agents.
14  BY MR. KOHN:
15  Q.  Have you ever looked into like how to pass a
16     polygraph?
17  A.  No.
18  Q.  Could you please -- okay.  If it is not admissible,
19     why would an agent today administer a polygraph?
20        MR. SMITH:  Objection, calls for
21     speculation.
22        Answer if you have any knowledge of that.
23  A.  I don't know.  I think different agents probably would
24     have different reasons.
25  BY MR. KOHN:

BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

Page 286

1  Q.  Would you ever submit to polygraph on any matter
2     whatsoever, no matter what?
3           MR. SMITH:  Objection to form.
4  A.  Yeah, I can't answer that question.
5  BY MR. KOHN:
6  Q.  So might there be some theoretical situation for which
7     you would agree to be polygraphed?
8  A.  Well, I believe there are some regulations that might
9     require, for security clearance, that one do so.  I'm
10    not certain but I think that might be a possibility.
11 Q.  Okay.  Putting that aside, would it be your testimony
12    under oath today, would you -- that you would -- would
13    you ever voluntarily submit to a polygraph?
14          MR. SMITH:  Under any circumstances?
15 BY MR. KOHN:
16 Q.  Under any circumstances, yes or no?
17 A.  I can't imagine what all the circumstances would be.
18    I can't answer that, it's too speculative.
19 Q.  So there might be a circumstance where you would agree
20    to a voluntary polygraph, correct?
21 A.  You mean if someone was being held at gunpoint and
22    they said, unless you take this we're going to kill an
23    innocent person?
24 Q.  No, I'm saying a voluntary polygraph, might there be a
25    circumstance for which you would take a voluntary

Page 287

1     polygraph, yes or no?
2  A.  I don't know.
3  Q.  Would you agree to take a polygraph on whether or not
4     you were the person who leaked information to
5     Mr. Ashenfelter, yes or no?
6  A.  That's not a question I would answer without
7     consulting with counsel.
8  Q.  Would you agree -- assuming hypothetically that your
9     counsel said, yes, if it's up to us, you should do the
10    polygraph and just be done with the -- in other words,
11    it's not admissible in court, that's where we are,
12    we're in a civil court here and just do it to
13    resolve these matters, would you follow -- would you
14    then take that polygraph?
15          MR. SMITH:  I object to the hypothetical
16    where you're giving him legal advice.
17 BY MR. KOHN:
18 Q.  Okay.  Strike that.
19          Assuming your counsel said it was
20    completely up to you would you do it, yes or no?
21          MR. SMITH:  Same objection.
22 A.  I don't know what that means.
23 BY MR. KOHN:
24 Q.  In other words, if your counsel said, the decision to
25    take a polygraph in this case was your personal

Page 288

1     decision, would you agree to take it, yes or no?
2  A.  It would depend on a lot of factors.
3  Q.  What are those factors?
4  A.  I'm not going to get into that, that's potentially
5     attorney-client privileged things that you're asking
6     about.  I will not say anything that might waive
7     attorney-client privilege.
8           MR. KOHN:  Okay.  Okay.  We're done.
9           MR. SMITH:  Okay.  I just have a couple
10    quick questions.
11          EXAMINATION
12 BY MR. SMITH:
13 Q.  Okay.  You testified earlier about sources and
14    cooperating witnesses.  Who opens a source or a
15    cooperating witness, is it an attorney, AUSA or an
16    agent or can it be either?
17 A.  It has to be an agent.
18 Q.  Okay.  What agents can do it, what agencies?
19 A.  I probably couldn't tell you all of them.  Certainly
20    FBI can, DEA can, ICE can.  I don't know about some of
21    the smaller agencies.
22 Q.  But as an AUSA you can't?
23 A.  Correct.
24 Q.  Okay.  Were you aware in the time frame of December
25    2003, January 2004 that it would be improper to leak

Page 289

1     OPR related information to a reporter?
2  A.  Repeat that please.
3  Q.  Were you aware in the time frame of December 2003 to
4     January 2004 that it would be improper to leak OPR
5     information to a reporter?
6  A.  Yes.
7  Q.  Do you believe based on your experience that other
8     attorneys in your office would have had that awareness
9     as well?
10 A.  I would think they would assume that, yeah.
11 Q.  What about --
12          MR. KOHN:  And I'm just going to object to
13    the form of those questions.
14 BY MR. KOHN:
15 Q.  What about support staff?
16 A.  I would assume that also.
17          MR. SMITH:  Okay.  I have no other
18    questions.
19          MR. KOHN:  Okay.  Thank you.
20          THE WITNESS:  Thank you.
21          (The deposition was concluded at 5:08 p.m.
22    Signature of the witness was not requested by counsel
23    for the respective parties hereto.)
24
25



41d38563-24bd-4d8d-8a42-476a87384f98

JONATHAN TUKEL
April 24, 2009

```
                              Page 290
 1          CERTIFICATE OF NOTARY
 2    STATE OF MICHIGAN )
 3              ) SS
 4    COUNTY OF OAKLAND )
 5
 6        I, VIOLA NEWMAN, a Notary Public in
 7    and for the above county and state, do hereby
 8    certify that the above deposition was taken before
 9    me at the time and place hereinbefore set forth;
10    that the witness was by me first duly sworn to
11    testify to the truth, and nothing but the truth;
12    that the foregoing questions asked and answers made
13    by the witness were duly recorded by me
14    stenographically and reduced to computer
15    transcription; that this is a true, full and correct
16    transcript of my stenographic notes so taken; and
17    that I am not related to, nor of counsel to either
18    party nor interested in the event of this cause.
19
20
21        _____
22        VIOLA NEWMAN, CSR-4320, RPR
23        Notary Public,
24        Oakland County, Michigan
25    My Commission expires:  December 4, 2013
```



74 (Page 290)

41d38563-24bd-4d8d-8a42-476a87384f98