UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

———————————————————     )
                                         )
RICHARD G. CONVERTINO                    )
                                         )
                 Plaintiff,              )
                                         )
v.                                       )          Case No. 04-cv-0236-RCL
                                         )
UNITED STATES DEPARTMENT OF              )
JUSTICE, *et al.*,                       )
                                         )
                 Defendants.             )
———————————————————)


**Memorandum Opinion**


        This matter comes before the Court on defendant's Motion for Summary

Judgment. Mot. Summ. J., July 12, 2010, ECF No. 176. Also before the Court is

plaintiff's Motion for a Stay to Depose Key Witnesses Pursuant to Rule 56(f). Mot. Stay,

Oct. 18, 2010, ECF No. 187; Fed. R. Civ. P. 56(f). Having carefully considered the

Motions, the Oppositions, the Replies, the entire record in this case, and the applicable

law, the Court will grant defendant's Motion for Summary Judgment and deny plaintiff's

Motion for a Stay. A review of the background of the case, the governing law, the

parties' arguments, and the Court's reasoning in resolving those arguments follows.

## I.  Background

 *"In the aftermath of the Sept. 11, 2001, terrorist attacks, 2002 became the year of terrorist hunting."* [1]

Less than a week after 9/11, the Detroit Joint Terrorism Strike Force raided what it thought was the apartment of Nabil Al-Marabh, an individual on the FBI's watch list. Morford Report 6 (DA232)[2]; Morford Decl. ¶ 2, June 4, 2004, ECF No. 176-15. Al-Marabh's name was on the mailbox, but he was not living at the apartment at the time. Morford Report 6; Morford Decl. ¶ 2. Instead, agents found Kareem Koubriti and two others "living as apparent transients with little or no furniture." Morford Report 6; Morford Decl. ¶ 2. Agents arrested the three men and charged them with possession of false identity documents. Morford Report 6 (DA 232); Morford Decl. ¶ 2. Prosecution of the case was assigned to Assistant United States Attorney Richard G. Convertino, and what began as a simple document fraud prosecution soon escalated into a high-profile terrorism case—the first to proceed to trial after the 9/11 attacks. Morford Report 6.

To say the prosecution did not go as planned is an understatement. The Department of Justice alleges that Convertino, aided by a supporting cast of unsavory

---

[1] Dennis Wagner, *Aftermath of 9/11 Has U.S. on Edge* (Dec. 23, 2009), http://www.azcentral.com/review/2009/news/articles/2009/12/23/20091223adecade-CR.html.

[2] The Morford Report recounts the conclusions of a government investigation ordered by Judge Gerald Rosen. It was publicly filed with the Eastern District of Michigan on August 31, 2004, with the caption "Government's Consolidated Response Concurring in the Defendants' Motions for a New Trial and Government's Motion to Dismiss Count One Without Prejudice and Memorandum in Law in Support Thereof." References to "DA" are to the "Defendant's Appendix," which is on file with the Court. Many of the documents included in the Defendant's Appendix were not made available to the Court on ECF or anywhere else.

characters, broke an astonishing number of rules and DOJ policies during the prosecution. *E.g.*, Opp'n Mot. Summ. J. Ex. 5 (OPR Referral Letter), Nov. 3, 2003, ECF No. 188-9. Suspicions of Convertino's misconduct led to investigations, and the investigations led to his referral to DOJ's Office of Professional Responsibility. *Id.* Information about the particulars of Convertino's OPR referral found its way into the hands of David Ashenfelter—a reporter for the *Detroit Free Press*—who wasted no time in translating it into a shocking news story.  Opp'n Mot. Summ. J. Ex. 1 (*Terror Case Prosecutor is Probed on Conduct*), Jan. 17, 2004, ECF No. 188-5. Ashenfelter's article turned the tables on Convertino, shining a burning spotlight directly upon the terrorism prosecutor's alleged misdeeds. In the end, the suspected Detroit terrorists' convictions were overturned because of prosecutorial misconduct. *United States v. Koubriti*, 336 F. Supp. 2d 676 (E.D. Mich. 2004). Tales of this high-stakes terrorism case gone wrong filled headlines, leaving a broken reputation and this Privacy Act case in their wake.

Convertino contends that an unknown person or persons at DOJ disclosed details from his OPR referral to Ashenfelter. Compl. 28–29, Feb. 13, 2004, ECF No. 1. This anonymous DOJ employee (or employees), according to Convertino, knew the leak would destroy his reputation and was fueled by a desire to get back at him for criticizing the Department and for testifying before a congressional committee. *E.g.*, *id.* at 10–16, 22–23, 24–25, 29.  Based on these allegations, Convertino sued DOJ and others alleging violations of the Administrative Procedure Act, the First Amendment, the Lloyd-LaFollette Act, and the Privacy Act. *Id.* at 7, 25. This Court granted the defendants' Partial Motion to Dismiss, leaving DOJ as the sole remaining defendant and the Privacy

Act allegation as the sole remaining count. *Convertino v. U.S. Dep't of Justice*, 393 F. Supp. 2d 42 (D.D.C. 2005).

As the above introduction shows, the facts of this case could occupy the imagination of a good fiction writer for some time, but very few of the more salacious details are actually relevant to the issues before the Court or to its analysis. Pared down to essentials, this case is the simple story of Richard G. Convertino's unsuccessful quest to unmask the leaker of his private information. Seven years of litigation have sapped the resources of more than one United States District Court, yet Convertino is no closer to answering the most basic question of all: Who done it? Lacking that vital information, Convertino is defenseless against DOJ's Motion for Summary Judgment. Accordingly, this Court must grant it. Before doing so, however, it reviews the relevant factual background.

### a.   The Ashenfelter Article

On January 17, 2004, the front page of the *Detroit Free Press* featured an article by David Ashenfelter entitled *Terror Case Prosecutor is Probed on Conduct*. Opp'n Mot. Summ. J. Ex. 1, Jan. 17, 2004, ECF No. 188-5. Ashenfelter's article reported confidential information regarding Convertino's OPR referral and the allegations of misconduct that led to it. *Id.* It sourced this information to "[Justice] Department officials" who spoke on condition of anonymity because they "fear[ed] repercussions." *Id.* Ashenfelter also signed a sworn affidavit confirming that his source(s) were DOJ employees. Ashenfelter Decl. ¶ 4, Mar. 26, 2008, ECF No. 188-6.

### b. The Office of the Inspector General Investigation into the Source(s) of the Leak

DOJ's Office of the Inspector General conducted an investigation to determine who leaked information to the *Detroit Free Press*. Opp'n Mot. Summ J. Ex. 4 at 1 (OIG Report), Aug. 9, 2004, ECF No. 188-8. OIG is a DOJ office tasked with "conduct[ing] independent investigations . . . of United States Department of Justice personnel and programs to detect and deter waste, fraud, abuse, and misconduct, and to promote integrity, economy, efficiency, and effectiveness in Department of Justice operations." USDOJ—The Office of the Inspector General, http://www.justice.gov/oig/. Thus, OIG "focused its investigation" on "approximately 30 DOJ employees" who had access to the materials related to Convertino's OPR referral. Opp'n Mot Summ. J. Ex. 4 at 5 (OIG Report). It "interviewed 10 employees in the Detroit USAO, some of them several times." *Id.* It "also interviewed 20 Department of Justice officials in Washington, D.C." *Id.* After a thorough investigation, "The OIG was unable to determine by a preponderance of the evidence the source of the information about Convertino . . . that was published in the *Detroit Free Press* on January 17, 2004." *Id.* at 16.

### c. Convertino's Unsuccessful Quest to Identify the Source(s) of the Leak

Realizing that "the identity of Mr. Ashenfelter's source(s) rest at the heart of [his] case," Convertino has dedicated much time and energy into his own quest to identify them. Pl's Reply to Non-Party Media Respondents' Response to Pl's Motion to Compel Production at 10–11, *Convertino v. U.S. Dep't of Justice*, 2:07-cv-13842-RHC-RSW (E.D. Mich. Apr. 18, 2008), ECF No. 25 (DA 322–23) (internal quotation marks

omitted). Despite seven years of dedicated effort, Convertino is no closer to identifying

the source(s) of the leak today than he was when this litigation commenced. To illustrate

the extent of Convertino's efforts in this regard, the Court describes Convertino's

unsuccessful search.

Convertino issued a subpoena from this Court to Gannett Co., the corporate parent

of the *Detroit Free Press*. Subpoena, *Ashenfelter v. Convertino*, 2:06-cv-14016, ECF No.

1 Ex. G. The subpoena sought to have Gannett designate "'one or more officers,

directors, or managing agents, or other persons'" to "'testify on behalf' of its newspapers

concerning the source of the article by David Ashenfelter entitled 'Terror Case

Prosecutor is Probed on Conduct.'" *Id.* (quoting Fed. R. Civ. P. 30(b)(6)). On September

12, 2006, Ashenfelter filed suit against Convertino, contending that Convertino's attempt

to obtain his confidential source information from Gannett without giving him an

opportunity to protect his asserted reporters' privilege "violate[d] Ashenfelter's rights

under the First and Fifth Amendments of the United States Constitution." Complaint ¶

49, *Ashenfelter v. Convertino*, 2:06-cv-14016 (E.D. Mich.), ECF No. 1. Convertino

moved to dismiss Ashenfelter's complaint. *Id.* at ECF No. 4. After the parties exchanged

briefing on the motion, Convertino withdrew the subpoena, and Ashenfelter dismissed

the case on May 17, 2007. *Id.* at ECF No. 14.

In the meantime, Convertino served subpoenas issued from the Eastern District of

Michigan on Ashenfelter and the *Detroit Free Press*, seeking both depositions and

documents. *Convertino v. U.S. Dep't of Justice*, No. 07-CV-13842, 2007 WL 2782039, at

*1 (E.D. Mich. Sept. 24, 2007). On July 6, 2007, after Ashenfelter and the *Detroit Free

Press* refused to comply with the subpoenas, Convertino opened a miscellaneous action

in the Eastern District of Michigan and filed a motion to compel production from

Ashenfelter and the *Detroit Free Press*. *Convertino v. U.S. Dep't of Justice*, 2:07-cv-

13842 (E.D. Mich.), ECF No. 1.

On August 28, 2008, the court granted Convertino's motion to compel

Ashenfelter's compliance with the subpoena finding that identification of Ashenfelter's

source or sources was necessary for Convertino to have any chance of prevailing in his

Privacy Act suit against DOJ. *Convertino v. U.S. Dep't of Justice*, No. 07-CV-13842,

2008 WL 4104347, at *7 (E.D. Mich. Aug. 28, 2008) ("To establish that the DOJ

committed a willful or intentional violation, [Convertino] must present evidence of the

disclosing person's state of mind, which requires him to identify and question those who

perpetrated the allegedly improper disclosure.") (citing *Hatfill v. Gonzales*, 505 F. Supp.

2d 33, 42–43 (D.D.C. 2007)). The court denied Convertino's motion to compel

compliance by the *Detroit Free Press*, finding that it was "'unreasonably cumulative

[and] duplicative.'" *Id.* at *9 (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)) (alteration in

original); *see also Convertino v. U.S. Dep't of Justice*, No. 07-CV-13842, 2008 WL

4998369 (E.D. Mich. Nov. 21, 2008) (denying Ashenfelter's motion for reconsideration).

Ashenfelter made further requests for protection from the Eastern District of Michigan

and from this Court, both of which were denied. *Convertino v. U.S. Dep't of Justice*, 260

F.R.D. 678 (E.D. Mich. 2008); Order, Dec. 4, 2008, ECF No. 107 (this Court's Order

denying Ashenfelter's motions for protective order and stay).

On December 8, 2008, Convertino deposed Ashenfelter for the first time in this

case. Mot Summ. J. Ex. 4 (First Ashenfelter Dep.), ECF No. 176-4. Ashenfelter invoked

his Fifth Amendment privilege and refused to substantively answer any questions. *Id.* at

7–8.  On December 23, 2008, Convertino filed motions seeking contempt and sanctions against Ashenfelter. *Convertino v. U.S. Dep't of Justice*, 2:07-cv-13842 (E.D. Mich.), ECF Nos. 39–40. On February 26, 2009, the court denied Convertino's motion seeking contempt, but ordered Ashenfelter to appear at a second deposition to be held at the federal courthouse in Detroit. *Convertino v. U.S. Dep't of Justice*, No. 07-CV-13842, 2009 WL 497400 (E.D. Mich.); *see also Convertino v. U.S. Dep't of Justice*, No. 07-CV-13842, 2009 WL 891701 (E.D. Mich. Mar. 31, 2009) (denying Ashenfelter's motion to certify for interlocutory appeal); *In re: David Ashenfelter*, No. 09-1443 (6th Cir. Apr. 16, 2009) (denying Ashenfelter's petition for a writ of mandamus).

On April 21, 2009, counsel for the parties congregated in Judge Cleland's jury room for Ashenfelter's second deposition. Mot. Summ. J. Ex. 5 (Second Ashenfelter Dep.), Apr. 21, 2009, ECF No. 176-5. This time, Ashenfelter substantively answered some questions but refused to answer any about how he had obtained information for the article. *Id.* at 80–81, 84. Judge Cleland eventually sustained Ashenfelter's assertion of the Fifth Amendment privilege with regard to questions about how he had obtained the relevant information. *Id.* at 105.

In sum, Convertino has made a monumental effort to identify Ashenfelter's source(s) and has had absolutely no success. Moreover, OIG conducted its own extensive investigation into the identity of the source(s) and was equally unsuccessful. After seven years of litigation, then, Convertino cannot answer the question that lies at the heart of [his] case."  Plaintiff's Reply to Non-Party Media Respondents' Response to Pl's Motion to Compel Production at 10–11, *Convertino v. U.S. Dep't of Justice*, 2:07-

cv-13842-RHC-RSW (E.D. Mich. Apr. 18, 2008), ECF No. 25 (internal quotation marks omitted).

## II.  Legal Standard

### A.  Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  This standard requires more than the mere existence of *some* factual dispute between the parties to defeat an otherwise properly supported motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (emphasis in original). A material fact is one that, under the substantive law applicable to the case, is capable of affecting the outcome of the litigation. *Id.* An issue is genuine where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," as opposed to evidence that is "so one-sided that one party must prevail as a matter of law." *Id.* at 248, 252. The nonmoving party's evidence is to be believed, and all reasonable inferences from the record are to be drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986).

## III. Analysis

Convertino brings several claims under the Privacy Act, which governs federal agencies' acquisition, maintenance, and control of records containing information about individuals. 5 U.S.C. § 552a. The Act applies only to "records" maintained in a "system

of records" by a federal "agency," as each of those terms is defined by the statute and elaborated upon in case law, that are retrieved by the name or other identifying information of the individual. 5 U.S.C. § 552a(a). It limits what information agencies may maintain about individuals, requires that agencies establish appropriate safeguards to ensure the confidentiality of records, and limits agencies' authority to disclose records. *Id.* §§ 552a(b), (e)(1), & (e)10.  Convertino raises separate claims under the Privacy Act's disclosure, accuracy, rules of conduct, and accounting provisions, but because a common fault hampers them all, the Court need not consider them each individually.[3] Instead, the Court first explains why Convertino's failure to produce any evidence that DOJ acted intentionally or willfully is fatal to all of his claims. Next, it goes on to provide additional analysis of certain problems that apply particularly to his rules of conduct and accounting claims. Finally, the Court explains its reasons for denying Convertino's 56(f) Motion.

1. **Each of Convertino's Privacy Act claims fails because he produces no evidence upon which a reasonable fact-finder could conclude that DOJ acted willfully or intentionally.**

   a. **The Privacy Act's unique and exacting willfulness or intentionality standard**

   Section 552(g)(4) of the Privacy Act provides:

   (4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of-

---

[3] Convertino originally brought Privacy Act claims under 5 U.S.C. §§ 552a(e)(7) and (e)(10), but announces in his Opposition to DOJ's Motion for Summary Judgment that he "does not oppose summary judgment on the issues of whether DOJ violated [those provisions]." Opp'n Mot Summ. J. 2 n.2. Accordingly, the Court will grant summary judgment with regard to Convertino's (e)(7) and (e)(10) claims without further consideration.

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552(g)(4). Subsections (g)(1)(C) and (D), in turn, provide:

(g)(1) Civil remedies.—Whenever an agency

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with *any other provision of this section*, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

*Id.* §§ 552(g)(1)(D) (emphasis added). Thus, each of Convertino's claims requires him to prove that DOJ acted willfully or intentionally.

Standards of intentionality and willfulness are anything but rare in the law. Importantly, though, the Privacy Act's intent or willfulness requirement is peculiar to the Act and must not be confused with less exacting standards parading under the same name from other common law or statutory sources. *White v. Office of Pers. Mgmt.*, 840 F.2d 85, 87 (D.C. Cir. 1988) (per curiam) ("[T]he words 'intentional' and 'willful' in § 552a(g)(4) do not have their vernacular meanings . . . . [I]nstead, they are terms of art, . . . [which] set a standard that is somewhat greater than gross negligence."). To show intent or willfulness under the Privacy Act, Convertino must show that DOJ engaged in behavior so patently egregious that anyone undertaking the conduct should have known it was

unlawful. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations

omitted). Put another way, Convertino must show that "'the offending agency acted

'without grounds for believing [its actions] lawful' or that i[t] 'flagrantly disregarded' the

rights guaranteed under the Privacy Act.'" *Id.* (quoting *Albright v. United States*, 732

F.2d 181, 189 (D.C. Cir. 1984)). In determining intent or willfulness, the Court must

examine (1) the "purpose" for which the disclosure was made; (2) "the source of the idea

to" make the disclosure; and (3) other "circumstances surrounding the disclosure."

*Albright*, 732 F.2d at 189.

### b.  Without knowledge of the leaker's identity, Convertino cannot establish that DOJ acted willfully or intentionally

To meet the Privacy Act's high standard for a showing of willfulness or

intentionality, Convertino must know the leaker's identity. *McCready v. Principi*, 297 F.

Supp. 2d 178, 197 (D.D.C. 2003), *rev'd on other grounds*, *McCready v. Nicholson*, 465

F.3d 1 (D.C. Cir. 2006). The D.C. Circuit illustrated this principle in *Lee v. Department

of Justice*, 413 F.3d 53 (D.C. Cir. 2005), a case that—like this one—involved alleged

"leaks" of investigative information. The *Lee* Court granted the plaintiff the right to

depose reporters regarding the names of government sources, recognizing that "without

obtaining truthful testimony from journalists concerning the identities of the Government

sources who allegedly leaked information to the press, [plaintiff] cannot proceed with this

lawsuit." *Lee v. Dep't of Justice*, 401 F. Supp. 2d 123 (D.D.C. 2005). The D.C. Circuit

upheld that order, agreeing with the district court that without sources' names, the

plaintiff's "ability to show the other elements of [his lawsuit], such as willfulness and

intent, will be compromised." 413 F.3d at 60; *see also Zerilli v. Smith*, 656 F.2d 705, 714

12

(D.C. Cir. 1981) ("The success of [appellants'] Privacy Act and Fourth Amendment

claims may depend on the identities of the individuals who leaked the wiretap logs.");

*McCready*, 297 F. Supp. 2d 197 ("Without more evidence of the perpetrator of the

alleged 'leak' and that the 'leak' was intentional and willful, no violation of the Privacy

Act can be determined."). Indeed, another judge on this Court has observed that "a wealth

of case law suggests that in order to prove that a violation of the Privacy Act has

occurred, the actual source of the information must be identified." *Hatfill v. Gonzales*,

C.A. 03-1793, Order 2 (D.D.C. March 30, 2007). Therefore, lacking any evidence of the

leaker's identity, no reasonable fact-finder could find that DOJ acted willfully or

intentionally with regard to any leak in this case.[4]

    **c.  Without knowledge of the leaker's identity, Convertino cannot establish that the leaker was acting within the scope of his DOJ employment.**

Part of the reason Convertino has to know the leaker's identity in order to defeat

DOJ's Motion for Summary Judgment is that without it, he cannot show that the DOJ

employee who allegedly leaked information to the *Detroit Free Press* was acting within

---

[4] Convertino counters by citing *Pilon v. United States Dep't of Justice*, 796 F. Supp. 7 (D.D.C. 1992), for the proposition that where the plaintiff produces evidence that leaked information was closely held within the DOJ and available only to a limited number of department officials, that should suffice to create an issue of material fact under the Privacy Act. Opp'n Mot. Summ. J. 11. But *Pilon* does not apply to this case. In *Pilon*, the defendant brought a motion to dismiss or for summary judgment before any discovery had taken place, 796 F. Supp. at 11 ("Plaintiff has not yet had the opportunity for discovery . . . ."), and Judge Greene was weighing the sufficiency of the allegations in the complaint only. *Id.* at 12 ("The issue before the Court is whether the complaint can withstand a motion for summary judgment; . . . ."). Here, by contrast, Convertino has had years of discovery and has consistently failed to produce admissible, probative evidence that could meet his burden of proof. Therefore, summary judgment is appropriate with regard to his disclosure and accuracy claims.

the scope of his or her DOJ employment at the time of the leak. In order for an agency to be liable for a Privacy Act violation allegedly committed by one of its employees, the responsible agency employee must have been acting within the scope of his or her employment. *Alexander v. F.B.I.*, 971 F. Supp. 603, 610 (D.D.C. 1997); *see also McCready v. Nicholson*, 465 F.3d 1, 13 (D.C. Cir. 2006) ("The Privacy Act constrains *agencies* regarding their records and imposes obligations on *agencies* when they use such records.") (emphases in original). Therefore, even if Convertino could prove that the leak must have come from a DOJ employee—which he cannot—his claim would fail because no reasonable fact-finder could conclude that any such DOJ employee was acting within the scope of his or her employment at the time of the leak.

> **d. Convertino's argument that a reasonable fact-finder could find that Tukel was the leaker fails.**

Perhaps recognizing what is—to put it mildly—the vulnerability of his argument, Convertino argues that he does, in fact, have evidence of the individual leaker's identity. He unleashes a barrage of arguments—in grapeshot fashion—that a reasonable fact-finder could conclude that Tukel was the leaker, pointing to several pieces of "evidence" to support his claim. Opp'n Mot. Summ. J. 24–26. First, the preliminary draft of the OIG Report shows that OIG investigators focused primary attention on Tukel. Opp'n Mot. Summ. J. Ex. 4 at 1. They also found that Tukel had (1) the most knowledge of the allegations in the OPR Referral letter, (2) the "greatest opportunity to leak the information about Convertino," and (3) a motive to leak the information. *Id.* at 11–12. Finally, the investigators indicated that Tukel did not give straightforward answers to their questions and appeared nervous and uncomfortable during his OIG interviews. *Id.* at

13. Convertino says his strongest evidence is that when the OIG investigators challenged Tukel with their belief that he was the source of the leak, "[H]e barely defended himself . . . [and] made little attempt either during the interview or afterward to convince the investigators that he did not leak the information." *Id.* at 13–14.

Convertino also argues that Tukel's retention of private counsel during the OIG investigation could be used as evidence that he is the leaker. Opp'n Mot. Summ. J. 25. Finally, he points to the testimony of Ana Bruni—his secretary—who said, "One, [Tukel] had the animosity to do it, he had access to all these documents and . . . I saw the article mentions Farhat going to talk to congress or something and for whatever reason when I saw that, I thought, oh, there's Tukel right there." *Id.* at 26.

These arguments fall far short of satisfying the Privacy Act's intentionality or willfulness requirement. The Court will begin with some of the broad problems, which apply to all of Convertino's arguments, and then explore other problems that apply to each of them individually. The main flaw in Convertino's attempt to show that a reasonable fact-finder could conclude that Tukel was the source of the leak[5] is that his "evidence" amounts to nothing more than bold speculation and is therefore insufficient to defeat DOJ's Motion for Summary Judgment. *Maydak v. United States*, 630 F.3d 166, 183 (D.C. Cir. 2010) ("As our case law makes clear, the Privacy Act's 'intentional or willful" element cannot be established with mere speculation . . . .") (citations omitted); *Mulhern v. Gates*, 525 F.Supp.2d 174, 186 (D.D.C. 2007) (quoting *Harding v. Gray*, 9

---

[5] The Court makes clear that it has not confused the intentionality or willfulness requirement with the disclosure requirement. Convertino seeks to show that Tukel was the leaker in order to overcome the objection that he cannot prove that DOJ acted willfully or intentionally without knowledge of the leaker's identity.

F.3d 150, 154 (D.C. Cir. 1993) ("[A] mere unsubstantiated allegation . . . creates no genuine issue of fact and will not withstand summary judgment.")); *see also Fujitsu Ltd. V. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (holding that a plaintiff may not rely "on conclusory allegations or unsubstantiated speculation"). None of Convertino's arguments tend to show that Tukel actually leaked this information. Convertino's burden is not to show that Tukel *could* have leaked the information or that he had a *motive* to leak the information. Instead, he must show that Tukel *actually did* leak the information. Otherwise, Privacy Act plaintiffs could prevail simply by proving a blackened heart and an opportunity to violate the Act, thereby circumventing the Act's text, which requires proof of an intentional or willful agency disclosure before a plaintiff may recover damages. 5 U.S.C. § 552(g)(4).

Moving to particular problems with each of Convertino's arguments, he seeks to use cherry-picked phrases lifted out of context from a *preliminary draft* of the OIG Report to reach a conclusion that *OIG itself rejected*. Convertino relies on the draft version because it is more useful to him than the final version, which replaces much of Convertino's "evidence" with the conclusion that:

> [T]he OIG could not conclude that Tukel did in fact leak this information to the reporter. The evidence regarding his knowledge, opportunity, and motive was offset by other factors, including evidence of his prompt reporting and subsequent referral of the leak to DOJ OPR and his willingness to authorize Ashenfelter to disclose to the OIG the substance of their conversations prior to the publication of the article.

Opp'n Mot. Summ. J. Ex. 3 at 14 (OIG Report). Yet even the *draft* version makes clear that investigators did "not have sufficient direct or circumstantial evidence" to implicate Tukel. *Id.* Ex. 4 at 14 (Draft OIG Report); *see also id.* at 16 ("[W]e did not find sufficient

evidence to prove, by a preponderance of the evidence, that [Tukel] was the source of the leak."). Thus, neither the draft nor the final version of the OIG Report supports Convertino's conclusion that a reasonable fact-finder could conclude that Tukel was the leaker.

Convertino's argument that a reasonable jury could conclude that Tukel was the source of the leak because he retained private counsel is particularly weak. The first problem is that Tukel was *not* the only person to retain counsel—Convertino did as well. Second, and more importantly, whether Tukel retained counsel is irrelevant because it has absolutely no bearing on whether he leaked information to Ashenfelter. Third, this Court declines to create a rule that would discourage people from seeking legal counsel for fear that doing so would be used against them in later litigation. Retaining counsel is often prudent—even for the blameless—and it is certainly not a justification for suspicion.

Finally, Convertino's argument that his former secretary's testimony that she believed that Tukel was the leaker would allow a reasonable fact-finder to draw the same conclusion is totally unpersuasive. Her statement is pure speculation and is not based on personal knowledge. Accordingly, it is inadmissible. Fed. R. Evid. 602.

Convertino can show that Tukel had access to the information at issue in this case. He can even show that Tukel did not like him. But that is simply not enough. He has produced no evidence upon which a reasonable fact-finder could conclude that Tukel acted on his distaste for him by leaking his information to Ashenfelter. Moreover, Tukel denied being the leaker and testified that he was upset to learn that someone had leaked information to Ashenfelter because it compromised his investigation into Convertino's

17

misconduct. Opp'n Mot. Summ. J. Ex. 15 at 183, 256 (Tukel Dep.), Apr. 24, 2009, ECF No. 188-19. Aside from his conclusory speculations, Convertino has produced no evidence upon which a reasonable fact-finder could believe that Tukel is lying and was in fact the leaker.

> ### e. Convertino's argument that a reasonable fact-finder could conclude that DOJ acted willfully or intentionally because the OIG Report narrows the universe of potential leakers to thirty DOJ employees fails.

Lacking evidence of the leaker's identity, Convertino grounds his argument regarding willfulness and intentionality on flimsy legal reasoning that is itself based on a flatly incorrect reading of the OIG report. He argues that the OIG Report identified thirty potential leakers, that they were all DOJ employees, and that therefore, the leaker must have been a DOJ employee. Opp'n Mot. Summ. J. 19. Thus, the argument goes, a reasonable fact-finder could conclude that DOJ intentionally or willfully leaked his private information to Ashenfelter in violation of the Privacy Act. This argument is riddled with unfounded assumptions and misapplications of law, and the Court therefore rejects it.

As a threshold matter, the Court notes that if it blessed Convertino's argument, then any plaintiff who proved a harmful agency disclosure would automatically have proven—on that basis alone—intentionality or willfulness. The Court declines to adopt this res ipsa loquitor-like standard because it runs roughshod over this Circuit's case law and the language of the Act itself, which explicitly requires—among other things—a showing of intentionality or willfulness. *See Maydak v. U.S.*, 630 F.3d 166, 181 (D.C. Cir. 2010) (rejecting appellants' argument that "wrongful intent [under the Privacy Act]

could be *inferred* from the agency's continued retention of duplicate photos") (emphasis added). Although this basic problem alone renders Convertino's argument unpersuasive, other serious problems abound.

### i. Convertino misreads the OIG Report.

First, the OIG Report never concludes that the leaker must have been a DOJ employee. Instead, it says, "Based on the evidence in our investigation, we *focused primary attention* on the Detroit USAO." Opp'n Mot. Summ. J. Ex. 3 at 1 (OIG Report), Dec. 15, 2004, ECF No. 188-7 (emphasis added). The Report goes on to say that "we determined that approximately 30 DOJ employees had access to the November 3 referral letter or the December 1 OPR response. We obtained affidavits from all of these individuals in which all denied providing the information to the *Detroit Free Press*." *Id.* at 5. Convertino equates the scope of OIG's investigation with the universe of potential leakers, but OIG's focus on certain individuals does not mean that it concluded that the universe of potentially responsible parties was limited to those individuals.

Convertino's argument is even less persuasive in light of OIG's stated purpose, which is to "conduct[] independent investigations . . . of United States Department of Justice personnel and programs to detect and deter waste, fraud, abuse, and misconduct, and to promote integrity, economy, efficiency, and effectiveness *in Department of Justice operations*." USDOJ—The Office of the Inspector General, http://www.justice.gov/oig/ (emphasis added). It is unsurprising that an office tasked with investigating DOJ misbehavior would focus its investigations on DOJ employees exclusively. Indeed, it would be more surprising if DOJ focused its investigation on non-DOJ entities. One could argue that it is *less likely* that DOJ is responsible for the leak in light of the fact that

19

OIG—an entity tasked with investigating DOJ misbehavior—was unable to conclude that DOJ was responsible even after a thorough investigation. In short, although OIG's purpose limited the scope of its investigation to DOJ employees exclusively, that does not mean that the universe of potential leakers is limited to DOJ employees.

### ii. Neither Ashenfelter's article nor his affidavit helps Convertino to prove that DOJ willfully or intentionally violated his Privacy Act rights.

Convertino also argues that statements in Ashenfelter's article and his affidavit constitute evidence that DOJ willfully or intentionally leaked his private information. As discussed above, Ashenfelter's article sourced this information to "[Justice] Department officials" who spoke on condition of anonymity because they "fear[ed] repercussions." Opp'n Mot. Summ. J. Ex. 1 (the Ashenfelter article). Ashenfelter also signed a sworn affidavit confirming that his source(s) were DOJ employees. *Id.* Ex. 2. Of course, Convertino does not argue that Ashenfelter's affidavit or article reveals the leaker's identity. Instead, he argues that—like the OIG Report—they show that the leaker must have been a DOJ employee. As the Court has already explained, even if Convertino could prove that an anonymous DOJ employee leaked his information, he still could not survive summary judgment because (1) he cannot prove intent or willfulness without knowing the leaker's identity, and (2) he cannot show that an unknown DOJ employee was acting within the scope of his employment at the time of the leak. Putting those issues to the side, however, the statements to which Convertino refers from Ashenfelter's article and his affidavit do not constitute evidence that DOJ intentionally or willfully violated Convertino's Privacy Act rights.

Evidence cannot be used to defeat a summary judgment motion unless it is "capable of being converted into admissible evidence" at trial. *Gleken v. Democratic Congressional Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Ashenfelter's article is inadmissible because statements from newspaper articles offered for their truth are hearsay: "'[N]ewspaper articles clearly fall within the definition of hearsay, and, thus, are inadmissible.'" *Huitra v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) (Lamberth, J.) (quoting *Eisenstadt v. Allen*, 113 F.3d 1240, 1997 WL 211313 (9th Cir. 1997)) (alteration omitted); *see also Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents."). Convertino's argument that he is not using the article's statements for the truth of the matters they assert but "as evidence that a DOJ employee made the statements" is unavailing. Opp'n Mot. Summ. J. 11. Despite his protestations to the contrary, Convertino does seek to use the statements for the truth of the matters they assert—he wants to show that a DOJ official did in fact leak information to Ashenfelter. If the article's statements to that effect were untrue, they would be useless to Convertino. They are also not party admissions, as he contends, because Convertino seeks to use the article's assertions—not the DOJ officials' alleged assertions—as evidence.

Ashenfelter's affidavit is also inadmissible. Affidavits are normally admissible at the summary judgment stage because they are capable of being converted into admissible evidence at trial. *Gleken*, 199 F.3d at 1369. But because Ashenfelter has consistently refused to be deposed in this case and has successfully invoked his Fifth Amendment privilege, he is unavailable to testify to the contents of his affidavit, rendering it incapable

of being converted into evidence at trial. Fed. R. Evid. 804(b) ("'Unavailability as a witness' includes situations in which the declarant . . . is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; . . . ."). Convertino argues that Ashenfelter's affidavit should be admissible under Federal Rule of Evidence 804(a) because Ashenfelter is unavailable, but Rule 804 does not make all statements by unavailable declarants admissible. Ashenfelter's affidavit does not meet any of the requirements for admissibility related to unavailability under Rule 804(b). Rule 804(b) says that former testimony, statements under belief of impending death, statements against interest, statements of personal or family history, forfeiture by wrongdoing "are not excluded by the hearsay rule if the declarant is unavailable as a witness." Fed. R. Evid. 804(b). Convertino makes no argument that Ashenfelter's affidavit meets any of Rule 804(b)'s requirements, and this Court finds that it does not. The Court also finds that the statements in Ashenfelter's affidavit do not fall within any other hearsay exception within the Federal Rules of Evidence. Thus, neither Ashenfelter's affidavit nor the article is helpful to Convertino's case.

### f. Convertino is judicially estopped from arguing that he can survive summary judgment without knowing the leaker's identity.

Even if Convertino could overcome all of the hurdles discussed above, he is judicially estopped from arguing that he can prevail over DOJ's Motion for Summary Judgment without knowing the leaker's identity. Judicial estoppel "prevents a party from taking one position in one legal proceeding, succeeding in that position, and then later taking a contrary position." *Convertino v. U.S. Dep't of Justice*, 674 F. Supp. 2d 97, 106–07 (D.D.C. 2009). Courts should also consider whether the party seeking to assert an

inconsistent position would derive an unfair advantage or impose an unfair detriment on

the opposing party if not estopped. *Prince Constr. Co. v. District of Columbia Contract*

*Appeals Bd.*, 892 A.2d 380, 386–87 n.7 (D.C. 2006) (quoting *New Hampshire v. Maine*,

532 U.S. 742, 750–51 (2001) (citations omitted).

Convertino has long recognized that his inability to identify the leaker dooms his

case. In his memorandum for Judge Cleland in the litigation in the Eastern District of

Michigan that has paralleled this one, he argued:

> Respondents [Ashenfelter and the Free Press] asserted that "Convertino
> need not prove the specific person(s) within the DOJ who leaked the
> information in order to prevail in his Privacy Act claim—only that the
> source was a DOJ employee and disclosed the information willfully." *This
> assertion is wrong*. In fact, in its [memorandum, DOJ] itself argued that
> Respondents' argument was mistaken and "misreads the relevant case
> law."
>
> The DOJ explained that "[c]ontrary to [Respondents'] assertion, without
> the name of the source of the alleged disclosure, plaintiff Convertino
> cannot sustain his burden of proof on any of the threshold elements
> necessary for him to prove a Privacy Act violation. For example, without
> the name of the source, Convertino cannot show that the purported
> 'disclosure' was made with the necessary willfulness and intent to satisfy
> the requirements of the Act. Nor can he show that the information
> complained of was, in fact, actually retrieved from a system of records
> Governed by the Privacy Act, or that the unidentified source(s) in fact
> conveyed the precise information attributed to them by Ashenfelter." DOJ
> Response at 1–2. The DOJ then discussed these points in considerable
> detail, making many of the same arguments that Mr. Convertino made in
> his original Motion to Compel, clearly demonstrating that the identity of
> Mr. Ashenfelter's confidential source(s) "goes to the heart" of Mr.
> Convertino's claim.
>
> As explained in Mr. Convertino's initial motion, and further explained by
> the U.S. Department of Justice, the identity of Mr. Ashenfelter's source(s)
> rest at the "heart of Mr. Convertino's case." Consistent with *numerous*
> *Privacy Act cases concerning a plaintiff's need to confirm the identity of*

> *the leaker in a Privacy Act disclosure case*, this proposition cannot be
> reasonably contested.

Plaintiff's Reply to Non-Party Media Respondents' Response to Pl's Motion to Compel

Production Convertino v. U.S. Dep't of Justice at 10–11, 2:07-cv-13842-RHC-RSW

(E.D. Mich. Apr. 18, 2008), ECF No. 25 (emphases added). Judge Cleland agreed with

Convertino on this issue and relied on this finding in granting Convertino the relief he

sought:

> As the DOJ points out in its brief, Convertino cannot sustain his burden of
> proof on the Privacy Act claim without identifying Ashenfelter's source.
> To prove his Privacy Act case, Convertino must demonstrate that the
> agency acted "in violation of the Act in a willful or intentional manner,
> either by committing the act without grounds for believing it to be lawful,
> or by flagrantly disregarding others' rights under the Act." *Albright v.
> United States*, 732 F.2d 181, 189 (D.C. Cir. 1984). To establish that the
> DOJ committed a willful or intentional violation, he must present evidence
> of the disclosing person's state of mind, which requires him to identify
> and question those who perpetrated the allegedly improper disclosure.
> *Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 42–43 (D.D.C. 2007).

*Convertino v. U.S. Dep't of Justice*, 2:07-cv-13842, 2008 WL 4104347, at *7 (E.D. Mich.

Aug. 28, 2008).

Even more recently, and in this Court, Convertino has insisted that knowledge of

the leaker's identity is essential to his success in this lawsuit. In his Opposition to DOJ's

Motion for Summary Judgment, he concedes that "the most *essential* fact of his case" is

"the identity of the DOJ employee who [allegedly] leaked the OPR Letters to Mr.

Ashenfelter." Opp'n Mot. Summ. J. 4 (emphasis added). He further concedes that he

"still lacks *essential* evidence as to the identity of the leaker." *Id.* at 5 (emphasis added);

*see also id.* at 6 ("The central question in this case is how Mr. Ashenfelter learned of the

existence of the OPR investigation and the details of the allegations about Mr. Convertino

that Mr. Collins referred to in the OPR."). And, in his Rule 56(f) Motion, he states plainly that, because he lacks information regarding Ashenfelter's source, "Convertino *cannot present facts essential for the justification of his opposition* to summary judgment." Rule 56(f) Mot. 1, Oct. 18, 2010, ECF No. 187 (emphasis added).

Convertino has insisted throughout this litigation that knowing the leaker's identity is essential to his case. At various times, that insistence has inured to his benefit. Thus, he is now judicially stopped from taking the contrary position. *Convertino*, 674 F. Supp. 2d at 106–07.

Although the willfulness and intentionality problems discussed above are fatal to each of Convertino's claims, the Court goes on to discuss certain additional problems regarding his rules of conduct and accounting claims.

### 2. Convertino's rules of conduct claim fails.

The burden of establishing a rules of conduct violation under Section (e)(9) of the Privacy Act is particularly high. Section (e)(9) provides that each agency that maintains a system of records shall:

> establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties of noncompliance.

5 U.S.C. § 552a(e)(9).

"The Privacy Act does not make administrative agencies guarantors of the integrity and security of the materials which they generate," or "authorize the federal

courts to act as micro-managers of the records practices of the administrative agencies."
*Kostyu v. United States*, 742 F. Supp. 413, 417 (E.D. Mich. 1990). Instead, "the agencies
are to decide for themselves how to manage their record security problems, within the
broad parameters set out by the Act." *Id.* In doing so, "[T]he agencies have broad
discretion to [choose] among alternative methods of securing their records commensurate
with their needs, objectives, procedures, and resources." *Id.* Civil liability is reserved for
those lapses that constitute an extraordinary departure from standards of reasonable
conduct. *Id.*

      Convertino argues that "the evidence shows that the DOJ completely failed to
carry out this obligation, as official after official testified that they had received little to
no instruction in the Privacy Act." Opp'n Mot. Summ. J. 28. He goes on to emphasize the
testimony of several DOJ officials who reported that they were unfamiliar with the
Privacy Act. *Id.* The problem with Convertino's argument is that the Privacy Act does not
require DOJ officials to understand the Privacy Act. It only requires that each covered
employee understand the proper handling of systems of records over which he or she has
responsibility as well as records that he or she is responsible for maintaining. Just
because certain DOJ employees did not associate their knowledge and training regarding
records systems management with the words "Privacy Act" does not mean that they were
not, in fact, properly instructed in records systems management. Courts cannot create a
magic-words test requiring government employees to associate otherwise-satisfactory
training with the words "Privacy Act" without "act[ing] as micro-managers of the records
practices of the administrative agencies." *Kostyu v. United States*, 742 F. Supp. 413, 417
(E.D. Mich. 1990).

In this case, whether they knew the statute was called the Privacy Act or not, Convertino himself recognizes that "every DOJ employee deposed by Mr. Convertino testified that they understood the sensitivity of an OPR referral and knew that OPR officials were supposed to be kept confidential." Opp'n Mot. Summ. J. 18; *see also id.* ("Eric Straus also testified that it was general knowledge within the DOJ that OPR matters were confidential."). This shows two things. First, DOJ officials in this case received enough instruction to preclude a determination of an extraordinary departure from standards of reasonable conduct because they uniformly understood the confidential nature of the information at issue. *Cf. Dong v. Smithsonian Institute*, 943 F. Supp. 69, 73 (D.D.C. 1996) (finding a violation of the Privacy Act where there were "clear indication that the agency intentionally chose to ignore the law merely because of its disagreement with the District Court's ruling" constituting "reckless disregard for the Privacy Act rights of the approximately two-thirds of the Smithsonian staff who are federal service employees"). Second, whatever injuries Convertino may have suffered could not have been caused by a lack of records management training because—as he concedes—DOJ employees were aware that OPR materials were required to be kept confidential.

Convertino relies on *Dong v. Smithsonian Inst.*, 943 F. Supp. 69 (D.D.C. 1996), but that case does not help his Section (e)(9) claim. *Dong* involved a claim under Section (e)(2) regarding the agency's collection of employee information. *Id.* at 70. This Court found a "reckless disregard for the Privacy Act" by an agency that believed it was not subject to the Act. *Id.* at 73. Here, in contrast, DOJ has "promulgated extensive regulations, codified at 28 C.F.R. § 16.1, *et seq.*, that safeguard its Privacy Act-protected records." *Krieger v. U.S. Dep't of Justice*, 529 F. Supp. 2d 24, 54–55 (D.D.C. 2008); 28

27

C.F.R. §§ 16.40–16.55. Those regulations show that DOJ embraces its obligations under the Privacy Act—a far cry from the "reckless disregard" the agency exhibited in *Dong*.

### 3.  Convertino's accounting claim fails

Convertino's accounting claim—like each of his other claims—fails because he cannot show that DOJ acted intentionally or willfully. The Court, however, proceeds to discuss other problems with his accounting claim. First, looking to the statute's text, its accounting provision requires an agency to "keep an accurate accounting of [certain information regarding] each disclosure of a record to any person or to another agency *made under subsection (b) of this section*." 5 U.S.C. § 552(c)(1)(A) (emphasis added). The referenced subsection (b), in turn, states twelve categories of permissible disclosure. 5 U.S.C. § 552a(b). The Act's accounting requirement, therefore, applies only where there has been an antecedent disclosure of a record that was made pursuant to Section 552a(b), and has no application where an alleged disclosure was made unlawfully, meaning that it was not made in accordance with subsection (b). *See Beaven v. U.S. Dep't of Justice*, Civil Action No. 03-84-JBC, 2007 WL 1032301, at *23 (E.D. Ky. Mar. 30, 2007) ("The plaintiff's complaint is that the defendants failed to make an accounting of the alleged *unauthorized* disclosure, and the accounting requirement of the Privacy Act, § 552a(c), is therefore inapplicable.") (emphasis in original). Here, because Convertino contends that the disclosure was unlawful, he cannot bring a claim under § 552(c).

Second, the Court seriously questions whether Convertino could prove a disclosure in the first place for reasons similar to those discussed above in connection with the Court's willfulness or intentionality analysis. Convertino cites three sources of

evidence of a DOJ disclosure: (1) the Ashenfelter article, (2) the Ashenfelter affidavit, and (3) the OIG Report. As discussed above, neither Ashenfelter's article nor his affidavit is acceptable evidence, even at the summary judgment stage. Further, the OIG Report not only fails to show that any DOJ employee made a disclosure but is arguably evidence that DOJ did *not* disclose information to Ashenfelter.

### 4. The Court denies Convertino's Motion for a Stay Pursuant to Rule 56(f).

Convertino argues that summary judgment is premature despite the passage of seven years since this litigation's inception and moves for a stay to enable him to continue to pursue Ashenfelter and the *Detroit Free Press* in the Eastern District of Michigan. Mot. Stay, Oct. 18, 2010, ECF No. 187.   Because the Court is not persuaded that the requested stay and potential subsequent discovery are likely to result in the revelation of triable fact issues, it denies Convertino's Motion. *Citizens for Responsibility & Ethics in Wash. v. Leavitt*, 577 F.Supp.2d 427, 434 (D.D.C. 2008) (citing *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999)).

Rule 56(f) allows courts to "order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken" when "a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(f). In order to demonstrate that a party has not had the "full opportunity to conduct discovery," a party seeking a Rule 56(f) continuance should state why it is "unable to present the necessary opposing material." *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*, 669 F.2d 1274, 1278 n.6 (D.C. Cir. 1983).

A stay to complete discovery under Rule 56(f) should be granted when the requested discovery is likely to reveal triable issues of fact. *Leavitt*, 557 F.Supp.2d at 434 (citing *Carpenter*, 174 F.3d at 237).  Here, though, a stay would likely be futile. Convertino's wholly unsuccessful attempts to procure the identity of Ashenfelter's source in the Eastern District of Michigan have now spanned several years. The Michigan Court required him to seek his answers from Ashenfelter first. *Convertino v. U.S. Dep't of Justice*, No. 07-CV-13842, 2008 WL 4104347 (E.D. Mich. Aug. 28, 2008).  Ashenfelter successfully invoked his Fifth Amendment privilege and was not required to disclose the source of the leaked information to Convertino. Mot. Summ. J. Ex. 5 at 105 (Second Ashenfelter Dep.). Convertino then sought to compel the *Detroit Free Press* to subject itself to discovery regarding the leaker's identity. That motion is still pending in the Eastern District of Michigan.

Convertino points out that this Court issued an Order—over three years ago—that said:

> Should *Convertino v. United States Department of Justice*, C.A. No. 07-13842 (E.D. Mich.) result in an order compelling Mr. David Ashenfelter and/or the Detroit Free Press to reveal confidential source information issued after the close of the discovery period set forth above, the parties to the instant action shall have 30 days from the time Mr. Ashenfelter, or the Detroit Free Press, complies with such an order, should one issue, in which to conduct limited discovery related solely to matters arising from Mr. Ashenfelter's or the Detroit Free Press's compliance with such order.

Order 2, Dec. 20, 2007, ECF No. 80. On the basis of that wording alone, Convertino argues that "discovery in this case is still open, and will remain so until Mr. Convertino has exhausted his pursuit of the source(s) of the leak." Mot. Stay 2. But that is not so. Indeed, the very point of the Order was to make clear that further limited discovery

would be available if the Eastern District of Michigan compelled Ashenfelter or the *Detroit Free Press* to reveal the source of the leak "*after* the close of the discovery period." Order 2 (emphasis added). The Court certainly did not bind its own hands by restricting its ability to move forward in this case until the Eastern District of Michigan responds to all of Convertino's motions. It merely made clear that *if* such an order issued from the Eastern District of Michigan, it would allow the parties limited discovery related to any developments that resulted from the order. Such an escape valve is still available to Convertino even after this Opinion and the Order memorializing its reasoning. After all, if the Eastern District of Michigan compels discovery and Convertino is in fact able to obtain the information he seeks, he is free to move for reconsideration in light of newly discovered evidence. Fed. R. Civ. P. 60(b).

At this time, however, this Court is unwilling to prolong this litigation further. Convertino has spent nearly a decade in his unsuccessful attempts to identify Ashenfelter's sources, and there is simply no reason to believe that yet another delay in this case will result in discovery of that information. There is every reason to believe, however, that granting such a stay will likely result in delays beyond those necessary to allow the Michigan Court to decide the motion to compel that is now pending. If the Michigan Court rules against Convertino, he will almost certainly appeal its decisions related to Ashenfelter's Fifth Amendment rights and the *Detroit Free Press*. Presumably, he would want to delay this case to await the result of those appeals. As the Supreme Court has said, "There must be an end to litigation, someday." *Polities v. United States*, 364 U.S. 426, 433 (1960). This Court will not commit itself to delaying this litigation for

what could easily become several more years based merely on Convertino's speculative hope that things will suddenly go his way in Michigan.

## IV. Conclusion

For the reasons discussed above, the Court grants DOJ's Motion for Summary Judgment and denies Convertino's Motion for a Stay. A separate Order memorializing this Opinion will issue today.


Date: March 24, 2011                              /s/ Royce C. Lamberth

Chief United States District Judge